**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich, Esq. (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333 | Fax: (818) 347-4118

**LAW OFFICES OF GRECH & PACKER**
Trenton C. Packer (SBN 241057)
tpacker@grechpackerlaw.com
7095 Indiana Ave Ste 200
Riverside, CA 92506
Phone: (951) 682-9311

*Attorneys for Plaintiff* XAVIER LOPEZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| XAVIER LOPEZ,<br><br>                    Plaintiff,<br><br>        v.<br><br>CITY OF RIVERSIDE; EVAN WRIGHT; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | CASE No.: 5:21-cv-02140-PSG (JEMx)<br><br>[*Honorable Philip S. Gutierrez*]<br>Magistrate Judge John E. McDermott<br><br>**DECLARATION OF MARCEL F. SINCICH IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE* Nos. 1-5**<br><br>[(Proposed) Orders; Notice of Motions and Motions *in Limine* 1-5; and attached exhibits *filed concurrently herewith*]<br><br>**Pretrial Conference**:<br>January 19, 2024, at 02:00 p.m.<br>**Jury Trial**<br>February 1, 2024, at 09:00 a.m.<br><br>350 West 1st Street, 6A, 6th Floor<br>Los Angeles. California 90012 |

## DECLARATION OF MARCEL F. SINCICH

I, Marcel F. Sincich, hereby declare as follows:

**1.** I am an attorney duly licensed to practice law in the State of California and the United States District Court for the Central District of California. I am one of the attorneys of record for Plaintiff Xavier Lopez. I make this declaration in support of Plaintiff's Motion *in Limine* No. 1 to Exclude Information Unknown; Plaintiff's Motion *in Limine* No. 2 to Limit Admission of Information Defendant Wright Claims To Have Known At The Time Of The Incident; Plaintiff's Motion *in Limine* No. 3 to Exclude Defendants' Animation Exhibits; Plaintiff's Motion *in Limine* No. 4 to Exclude and Limit Defendants Police Practices Experts; and Plaintiff's Motion *in Limine* No. 5 to Exclude Defendants' Toxicology Expert. I have personal knowledge of the facts contained herein and could testify competently thereto if called.

**2.** These motions are made following a conference of counsel pursuant to Local Rule 7-3 during which no resolution could be reached. The subjects of Plaintiff's Motion *in Limine* Nos. 1-5 have been discussed with opposing counsel. Opposing counsel has indicated their intent to submit evidence to the jury related to such matters contained within each motion.

**What Defendant Wright Claims to Have Known at the Time of the Incident:**

**3.** Attached hereto is as "**Exhibit A**" a true and correct copy of the relevant portions of a transcript of the January 28, 2021, County of Riverside District Attorney Investigator Interview with Defendant Evan Wright. Contained within regarding the information known at the time of the incident includes: (**A**) was contacted by Patrol Officer Prado who told Wright that he was in a vehicle pursuit with Plaintiff, that Plaintiff has a warrant and is a parolee at large (Exh. A at 4); (**B**) read Officer Prado's Report (Exh. A at 4); (**C**) did a records check on Plaintiff (Exh. A at 4); (**D**) looked at Plaintiff's picture (Exh. A at 4); (**E**) ran Plaintiff's criminal history to discovery an arrest for narcotics, assault with a firearm, and confirmed the

parole warrant (Exh. A at 4); (**F**) Parole Officer William Iriart gave Wright Carina Avila's contact information and stated that the relationship between Ms. Avila and Plaintiff is "rocky as far as he knew" (Exh. A at 4); (**G**) was called by Ms. Avila who told Wright some possible addresses Plaintiff could be, relatives names, informed Wright they had a child together, gave Wright Plaintiff's cell phone number, and stated that Plaintiff had come to her house a few days prior with a handgun, tweaked out, on drugs, and she basically had to kick him out (Exh. A at 4-5); and (**H**) during the weekend Wright was texting with Ms. Avila and she told Wright that on January 26th Plaintiff would be at her house to pick up his daughter (Exh. A at 5).

4. However, regarding the incident at Ms. Avila's house where Ms. Avila mentioned Plaintiff having a gun and being tweaked out, (**A**) Defendant Wright did not see any reports on the event. (Exh. A at 9-10.) (**B**) Ms. Avila never described how it made her feel that Plaintiff came to her house with a gun, and she did not give any details about the gun; "she just said it was a handgun." (Exh. A at 19-20.) (**C**) Defendant Wright did not get any details from Ms. Avila about the incident that occurred at her house a few days prior. Ms. Avila just said that she kicked him out and that was it. (Exh. A at 20.) (**D**) Ms. Avila did not describe having any other problems with Plaintiff and Defendant Wright did not know anything else about the history between Plaintiff and Ms. Avila. (Exh. A at 20.) (**E**) Defendant Wright did not have any previous contacts with Plaintiff that he could remember. (Exh. A at 22.) (**F**) Outside of Officer Prado and Ms. Avila, Defendant Wright did not have any other information regarding Plaintiff. (Exh. A at 22.)

5. Attached hereto as "**Exhibit B**" is a true and correct copy of the relevant portions of the October 20, 2023 deposition transcript of Defendant Evan Wright. Contained within includes: Defendant Wright ran Plaintiff's criminal history but Defendant Wright did not have the reports related to the assault with a deadly weapon case prior to the incident. (Exh. B at 18:10-13.)

6.      Attached hereto as "**Exhibit C**" is a true and correct copy of Defendant Wright's <u>January 26, 2021</u> Operations Plan for this incident, produced by Defendants as CITY 664-665. Contained within regarding Plaintiff's history relevant to this incident includes: (**A**) "Lopez was involved in a vehicle pursuit with RPD Officers on 01-19-20 (21001775). Lopez was the solo occupant of the vehicle and he was able to avoid apprehension. A records check of Lopez revealed he was a parolee at large. Officer Prado contacted the METRO Team for assistance in locating Lopez for 2800.2 CVC and 3056 PC (Exh. C at 1); and (**B**) "Lopez has a criminal history with arrests/contacts for 11377(a) H&S, 148 PC, 459 PC, 496 PC, 10851 CVC, 2800.2 CVC, 3455 PC, and 245(a)(2) PC. We learned Lopez may be in the area of his ex-girlfriend's residence, 4610 Tomlinson. The operation will take place at that location (Exh. C at 1). Known intelligence regarding "Weapons" was not checked. (Exh. C at 1.)

7.      Attached hereto as "**Exhibit D**" is a true and correct copy of Defendant Evan Wright's <u>May 2, 2022</u> Declaration filed in support of Defendants' Motion for Summary Judgment as Docket Number 19-3. Contained within regarding information known about Plaintiff includes: (**A**) "On January 19, 2021, at approximately 8:14 a.m., I was contacted by RPD Officer Moses Prado ("Officer Prado") who told me that he was involved in a vehicle pursuit involving Xavier Lopez ("Plaintiff"). Officer Prado was able to identify the driver and learned there was an outstanding parolee-at-large (PAL) warrant to apprehend him (Exh. D at 2:13-17); (**B**) "I obtained basic information from Officer Prado including a summary of the pursuit details and Plaintiff's identifying information so I could conduct my own investigation into Plaintiff's status for purposes of completing the assignment. Officer Prado indicated that it was a short pursuit because it had to be terminated when Plaintiff entered the 91 freeway from the wrong direction. Officer Prado cancelled the pursuit because it was too dangerous to follow Plaintiff in oncoming highway traffic" (Exh. D at 2:21-27); (**C**) "I reviewed Officer Prado's report

concerning his pursuit of Plaintiff on January 19, 2021 as well as the COBAN video from Officer Prado's patrol car (Exh. D at 3:3-4); (**D**) "I conducted a records check on Plaintiff, including his criminal history that included the convictions, and the related incarcerations, paroles, and warrants that issued:" (i) 2/22/14 Vehicle Theft PC 666.5(a), (ii) 7/14/14 Recklessly Evading Arrest VC 2800.2, (iii) 2/26/15 Receiving Stolen Vehicle PC 496d(a) and PC 666.5(a), (iv) Receiving Stolen Property PC 666.5(a), and (v) 9/19/19 Assault with a Firearm PC 245(a)(2)(01) (Exh. D at 3:7-17); (**E**) "I contacted his parole officer, William Iriart, to obtain additional information on Plaintiff, but he had limited information and had not spoken to Plaintiff since December 29, 2020. He was able to provide the name and telephone number of Plaintiff's prior girlfriend, Carina Avila ("Avila"), who is also the mother of his child" (Exh. D at 3:20-24); (**F**) obtained Plaintiff's photograph and confirmed that he had an outstanding PAL warrant (Exh. D at 3:18-19); (**G**) merely that "Plaintiff came to Avila's residence armed with a gun" (Exh. D at 3:28-4:1); (**H**) "After the initial surveillance effort failed, I contacted Avila to obtain additional information to locate Plaintiff. Avila was very cooperative and provided additional addresses, information on family relatives, Plaintiff's cell phone number, and information concerning recent contact she had with Plaintiff concerning their daughter. Avila reported that Plaintiff had recently been to her home, armed with a gun and 'tweaked out.' She asked Plaintiff to leave." (Exh. D at 4:4-9).

      **8.**    Attached hereto as "**Exhibit E**" is a true and correct copy of the relevant portions of Defendant Wright's <u>September 7, 2023</u> Responses to Plaintiff's Interrogatories.  Plaintiff's first Interrogatory requests: "Identify all the information YOU personally had prior to YOUR use of deadly force that YOU considered in making YOUR decision to use deadly force during the INCIDENT." Defendant Wright's response includes:

      On January 17, 2021, Officer Ransom DeCastro was involved in a 911 Dispatch concerning Plaintiff. Responding Party had knowledge of all information

contained in Officer DeCastro's report. In addition, Carina Avila ("Avila") spoke with Officer DeCastro concerning Plaintiff's intrusion into her home and her demands that Plaintiff leave. Officers DeCastro and Espinosa responded to the 911 call by Avila. Officer Wright learned that Plaintiff refused to leave Avila's residence and threatened her with a gun. Plaintiff left after Avila dialed 911.

On January 19, 2021, Plaintiff was the subject of a vehicle pursuit by a Riverside police officer, Officer Moses Prado (Hereafter "Prado"). Responding Party had knowledge of all information contained in Prado's encounter with Plaintiff. Prado was driving northbound on Adams Street when he saw a Hispanic male adult, later identified as Plaintiff, leaning into the passenger side of a Nissan Sentra that was occupied by two unknown occupants parked at a gas station. Prado drove into the gas station, causing Plaintiff to stand up from the Nissan and enter into his vehicle, a silver Chrysler Sebring ("Subject Vehicle"). The Subject Vehicle had a dark film on the front side of the windows, in violation of VEHICLE CODE section 26708.

Prado positioned his vehicle behind Plaintiff's vehicle to initiate a traffic enforcement stop. Prado activated his lights and sirens which were checked prior to his shift and were in working order. Plaintiff failed to yield and continued driving southbound on Adams Street at the speed limit. As Plaintiff approached Briarwood Drive, he accelerated to about 60 miles per hour, a violation of VEHICLE CODE section 22350, and transversed to the wrong side of the roadway on Adams Street, in violation of California VEHICLE CODE section 21651(b). Prado continued in the southbound lanes of traffic.

Plaintiff entered the westbound 91 freeway off-ramp and continued against traffic on the wrong side of the road, in violation of VEHICLE CODE section 21651(b) with total disregard for public safety, in violation of VEHICLE CODE section 2800.2. Prado did not continue the vehicle pursuit but maintained a visual of Plaintiff. Plaintiff continued onto the 91 freeway in the westbound lanes

and ultimately made an illegal u-turn between Adams Street and Madison Street in violation of VEHICLE CODE section 21801. Due to the heavy traffic on the freeway, Prado lost visual of Plaintiff and the pursuit was terminated.

Responding Party had knowledge of all information contained in Prado's follow-up investigation. Prado performed a records check on the vehicle and found the registered owner to be "Xavier Lopez". Using law enforcement databases, Prado identified the subject that he saw entering the Subject Vehicle as Xavier Lopez, date of birth June 30, 1991. Prado also discovered Plaintiff was also arrested in the same Subject Vehicle on September 21, 2020, by Riverside Police Officer Solano. The records check further revealed that Plaintiff had an active felony warrant for his arrest for a parole violation as it relates to Case Number BPR2001853. Plaintiff was not located or arrested at Plaintiff's known addresses in Riverside and Moreno Valley.

Prado contacted the Multi-Enforcement Tactical Response Operations (METRO) team, and in particular, Responding Party, for assistance in locating Plaintiff for violating VEHICLE CODE section 2800.2 and Penal Code Section 3056. Responding Party learned that Plaintiff had a criminal history, which included arrests for 11377(a) H&S, 148PC, 459 PC, 496 PC, 10851 CVC, 2800.2 CVC, 3455 PC, and 245(a)(2) PC. The METRO team was responsible for locating and apprehending wanted fugitives and parolees at large.

Responding Party was assigned to the METRO team at the time Prado reported the vehicle pursuit involving Plaintiff. Responding Party learned of this incident from Prado and discovered a criminal past for Plaintiff which included narcotics violations and an assault with a deadly weapon. Responding Party spoke to Plaintiff's parole officer, William Iriart, who provided Plaintiff's last known address, potential persons who would have Plaintiff's contact information, and Plaintiff's relationship with Avila. Plaintiff's parole officer relayed he had not spoken with Plaintiff since December 2020.

Responding Party had knowledge of all activities conducted by the METRO team to locate and apprehend Plaintiff. On January 21, 2021, METRO officers conducted a surveillance operation in Moreno Valley in an attempt to locate and arrest Plaintiff. During the operation Responding Party had communications with Avila, mother of Plaintiff's daughter, where he learned that Plaintiff and Avila were no longer in a dating relationship and had a child together. Avila reported she last saw Plaintiff on or around January 17 at her residence where Plaintiff showed up to see his daughter and was upset with Avila. Avila described Plaintiff as acting incoherent and was waving his gun. Avila reported to Responding Party that Plaintiff has been using methamphetamine and feared for her daughter safety during visitation. Avila confirmed that Plaintiff was still driving the subject vehicle and provided Plaintiff's phone number to Responding Party. In the days prior to the incident Avila communicates with Responding Party to coordinate a time when Plaintiff would be at her residence at 4610 Tomlinson Ave, ("Subject Location").

9. Attached hereto as "**Exhibit F**" is a true and correct copy of the relevant portions of Defendant Wright's <u>September 7, 2023</u> Responses to Plaintiff's Requests for Admission. Plaintiff's Request for Admission No. 77 states: "Admit that prior to YOUR use of deadly force during the INCIDENT, YOU had no specific information that LOPEZ was intoxicated with alcohol on the day of the INCIDENT." Defendant's responses includes: "Responding Party admits that he did not have specific information that Lopez was intoxicated with alcohol on the day of the law enforcement encounter that is the subject of this lawsuit."

10. Attached hereto as "**Exhibit G**" is a true and correct copy of Officer Henry Park's January 27, 2021 post incident Case Report, produced by Defendants at CITY 54-60. Contained within includes the statements from Park "learned S/Lopez and Avila are no longer in a dating relationship and have a child together. Avila told Officer Wright that she last saw S/Lopez during the weekend of January 16-17 at her residence. Avila said S/Lopez showed up to see his daughter and was

upset with her. Avila also said S/Lopez was waving around a gun and acting incoherent. I heard her tell Officer Wright that S/Lopez has been using methamphetamine heavily recently and that she was scared to let their daughter leave with him during his time for visitation. Avila also said that she believed S/Lopez was driving the silver Chrysler Sebring and she provided S/Lopez 's cellular phone number to Officer Wright."

11.     Attached hereto as "**Exhibit H**" is a true and correct copy of Officer Moses Prado's Case Report, claimed to have been read by Defendant Wright, and filed by Defendants in support of Defendants' Motion for Summary Judgment as evidence of Defendant Wright's knowledge as Docket Number 19-14. Contained within includes the following information: **(A)** Subject: CVC 2800.2 – Felony Evading, Reporting Officer: 1820 – Prado, Moses J, "On Tuesday, January 19th, 2021, I was working uniformed patrol for the Riverside Police Department (RPD), driving a marked police unit (Unit #3848), in the City of Riverside. At approximately 0530 hours, I attempted to conduct a traffic enforcement stop. The vehicle fled and pursuit ensued. The suspect eluded arrest." (Exh. H at 1); **(B)** Suspect Name: Xavier Lopez, Age: 29, Race: Hispanic, Height: 6'3", Weight: 210; Hair: Brown; Eyes: Brown; Parole: Yes; Probation: No (Exh. H at 3); **(C)** Pursuit Distance: 1.6 miles (Exh. H at 4); **(D)** "S/Lopez was leaning into the passenger side of a Nissan Sentra [] that was occupied by two unknown occupants parked at the 76 gas station located at 6020 Arlington Avenue. I drove into the parking lot at which point S/Lopez stood up, looked at me, then entered a silver Chrysler Sebring two door…. The vehicle had a dark film on the front side of the windows (CVC 26708)." (Exh. H at 5); **(E)** "I positioned my vehicle behind S/Lopez's vehicle to initiate a traffic enforcement stop. I activated my lights and sirens with a forward facing red light at Adams Street and California Avenue. … The vehicle failed to yield and continued driving southbound on Adams Street at the speed limit. As S/Lopez approached Briarwood Drive, he accelerated to about 60 miles per hour

(CVC22350) and traversed to the wrong side of the roadway on Adams Street in violation of CVC 21651(b). I continued in the southbound lanes of traffic." (Exh. H at 5); **(F)** "S/Lopez entered the westbound 91 freeway off-ramp and continued against traffic on the wrong side of the road (CVC 21651(b)) with total disregard for the public's safety (CVC 2800.2). I did not continue the vehicle pursuit at this point and maintained visual of S/Lopez. S/Lopez continued onto the 91 freeway westbound lanes and ultimately made an illegal U-turn (CVC 21801) between Adams Street and Madison Street. Due to the heavy traffic on the freeway, I lost visual of S/Lopez at which time the pursuit was terminated." (Exh. H at 5); **(G)** "A records check on the vehicle returned with the registered owner of 'Xavier Lopez.' Using law enforcement databases, I identified the subject I saw enter the suspect's vehicle at the gas station as S/Xavier Lopez with a date of birth of 06/30/1991." (Exh. H at 5); **(H)** "S/Lopez was also arrested in the same vehicle on 09-21-20 by Riverside PD Officer Solano." (Exh. H at 5); and **(I)** "A records check on S/Lopez revealed he had an active felony warrant for his arrest for a parole violation (BPR2001853)." (Exh. H at 5).

**12.** Plaintiff's counsel requested, in several different forms, documents related to Plaintiff's history in order to ascertain what criminal history information Defendant Wright reviewed prior to the incident. Plaintiff's counsel reviewed Defendants' produced materials, CITY 1-4451, and have seen a criminal history report that reflects the criminal history Defendant Wright refers to in his Operations Plan or Declaration. Nevertheless, Defendants attached as Exhibit 6 to Plaintiff's deposition, the following post-incident criminal file which indicates Plaintiff's criminal history, which does not match Defendant Wright's Operations Plan and Declaration. Attached hereto as "**Exhibit I**" is a true and correct copy of the relevant portion of the Peoples's Opposition to Motion to Dismiss Prior Strike filed June 9, 2022, whereby the Deputy District Attorney lists "Defendant's Known Criminal History." The pertinent prior criminal history included: **(A)** 2/25/2013 – PC 249 2nd

x3, HS 11377; **(B)** 6/10/2014 – VC 2800.2; **(C)** 2/26/2015 – PC 496(d); **(D)** 9/12/2016 – PC 666.5/VX 10851; **(E)** 1/23/2018 – PC 666.5 x's 2; **(F)** 3/1/2018 – PC 245(a)(2); and **(G)** 9/19/2019 – PC 21810, HS 11377.

### Regarding Third Party Witness Carina Avila:

**13.**     Attached hereto as "**Exhibit J**" is a true and correct copy of the October 30, 2023 deposition transcript of Carina Avila. Contained therein includes: **(A)** whether Plaintiff ever entered Ms. Avila's house without her permission (Exh. J at 15:11-15); **(B)** whether Plaintiff has taken his daughter without her permission (Exh. J at 16:3-12); **(C)** whether in September of 2020 Plaintiff entered the Avila home while Ms. Avila was not there to take his daughter (Exh. J at 16:21-17:11); **(D)** whether in September of 2020 Ms. Avila threatened to call the police if Plaintiff did not leave (Exh. J at 19:25-20:2); **(E)** whether Ms. Avila or his daughter ever visited Plaintiff in prison (Exh. J at 29:22-25); **(F)** whether Plaintiff did property damage to Ms. Avila's home or neighborhood, including pushing her door open and breaking the frame (Exh. J at 33:9-19); **(G)** Ms. Avila has never seen Plaintiff taking drugs (Exh. J at 34:18-23); **(H)** Plaintiff "has always been the same with" Ms. Avila, she has not seen "him to drugs" so she does not "know if he's on them or not" (Exh. J at 36:3-9); **(I)** whether Plaintiff had ever harassed Ms. Avila (Exh. J at 53:3-6); **(J)** whether Plaintiff had been watching Ms. Avila (Exh. J at 54:11-15); and **(K)** that a week before the shooting Ms. Avila was afraid for her life and thought she was going to die (Exh. J at 55:4-13).

**14.**     Ms. Avila did not know where Lopez was staying; Lopez was moving from house to house; they were no longer dating; they had a child together; Lopez threatened her with a gun on January 16 or 17; perhaps that he was afraid of Lopez (Exh. J at 45:23-46:24); Lopez would be at the house to pick up his daughter (Exh. J at 48:10-12).

/ / /

**Regarding Third Party Witness Marisol Garcia:**

**15.**     Attached hereto as "**Exhibit K**" is a true and correct copy of the RPD Report by Officer Vasquez regarding his canvass interview of Marisol Garcia, produced by Defendants as CITY 106-109. Therein: Ms. Garcia stated that Lopez commonly tells her thar he is armed and is "messing up," and that she would not be surprised if her son was armed because Lopez was involved with gangs since he was sixteen years old.

**16.**     Attached hereto as "**Exhibit L**" is a true and correct copy of the Riverside County District Attorney Report by Sr. DA Investigator James Campos regarding his station interview of Marisol Garcia, produced by Defendants as CITY 116-171. After learning her son was shot, Ms. Garcia was taken to the station where she was interviewed by Investigator Campos at approximately 10:00 p.m. The following is the type of irrelevant, information unknown to Defendant Wright, and impermissible character evidence that Defendants will seek to illicit at trial: **(A)** that Lopez wanted Ms. Garcia to meet him because he did not want to fight with Ms. Avila. (Exh. L at 3:30-31.) **(B)** When the van pulled up right next to her, she assumed it was gang members because Lopez had issues with gangs in the past and she thought he was going to get jumped. (Exh. L at 4:3-7.) **(C)** Lopez having problems with Ms. Avila regarding who Lopez could visit with. (Exh. L at 5:14-16.) **(D)** That Child Protective Services removed a child from Ms. Avila's care. (Exh. L at 5:16-17.) **(E)** Visitation issues between Lopez and Ms. Avila regarding their daughter. (Exh. L at 5:19-21.) **(F)** Houses being raided by law enforcement apparently looking for Lopez. (Exh. L at 7:26-27.) **(G)** That Lopez "started really acting up" as a child and having attitude problems in elementary school. (Exh. L at 10:14-15.) **(H)** Ms. Garcia being in an abusive relationship when Lopez was a child, so Lopez had to be raised at his grandmother's house, then started having problems because he was hanging out with his uncle and aunt, who were described as "real bad" people. (Exh. L at 10:16-19.) **(I)** That Lopez did not finish school and got into

selling drugs and got into gangs. (Exh. L at 10:20-21.) **(J)** That Lopez has "had a lot of problems with the law." (Exh. L at 10:26.) **(K)** That he had a substance abuse problem with methamphetamine but did not know if he was still using. (Exh. L at 11:12-23.) **(L)** That Lopez does not like to take direction or advice from Ms. Garcia. (Exh. L at 12:12.) **(M)** At some point having interaction with the Sur Riva Locotes gang when he was approximately 16 years old. (Exh. L at 12:27-33, 13:27-34.) **(N)** That Lopez was in the foster care system and "they" wanted to put Lopez in a foster home and also tried to put him in a group home, but Lopez did not want to, so he ran away. (Exh. L at 14:20-22.) **(O)** That Ms. Garcia remembers ever since then, the law constantly coming after him. (Exh. L at 14:2-30.) **(P)** That Ms. Garcia never saw him with weapons, "But he's mentioned it plenty of time," because there have been a lot of fights in the family, including Ms. Garcia. (Exh. L at 16:6-24.) **(Q)** That he has kept a gun in his car. (Exh. L at 17:9-17.) **(R)** That he carried a gun because he is worried because he had been put in the hospital for being jumped a number of times. (Exh. L at 19:19-30.) **(S)** That Lopez has to sneak over to see his daughter because Ms. Avila's parents do not want him over there. (Exh. L at 20:9.) **(T)** Discussion as how Ms. Avila set Lopez up to pick up his daughter for the police. (Exh. L at 22:26-24:14.) **(U)** Regarding why Lopez got shot, "Now, I don't wanna saw I expected something like this, but for him to be defiant, I kind of like, maybe that's possible, very possible." (Exh. L at 34:8-10.) **(V)** That Lopez has "been very hurtful since he hasn't been able to see" his daughter; that he had been angry and yelled and cussed for no reason. (Exh. L at 34:14-15.) **(W)** That Ms. Garcia was worried because she thought Lopez may have shot somebody. (Exh. L at 36:30-34.) **(X)** That if Ms. Garcia had an opportunity to speak with Defendant Wright, she would apologize for the way Lopez was "defiant or whatever had happened," that she understands his actions and does not hold a grudge. (Exh. L at 37:22-26.)

17.    Attached hereto as "**Exhibit M**" is a true and correct copy of the October 30, 2023 deposition transcript of Marisol Garcia. Contained within

includes: **(A)** Plaintiff mentioning that he was interested in guns (Exh. M at 37:22-23); **(B)** that methamphetamine was Plaintiff's drug of choice and that he would drink (Exh. M at 43:9-13); **(C)** that Plaintiff was affiliated with a gang, the Sur Riva Locotes since he was 16 years old (Exh. M at 44.23-44:19); **(D)** that Plaintiff's nickname was Sniper (Exh. M at 45:2-4); **(E)** whether Plaintiff had "run-ins with the police" as a child (Exh. M at 46:11-21); **(F)** whether Plaintiff ever sold drugs (Exh. M at 47:2-8); **(G)** whether Plaintiff has ever grabbed something and thrown it to the floor (Exh. M at 48:25-49:1); **(H)** whether Plaintiff ever damaged the Avila's property or a neighbor's property (Exh. M at 49:4-8); **(I)** text messages sent from Ms. Garcia to Ms. Avila after the incident (Exh. M at 51:15-20).

**Regarding Third Party Witness Antonio Avila:**

      **18.**    Attached hereto as "**Exhibit N**" is a true and correct copy of the relevant portions of the RD Officer Report of Serio Mercado regarding his canvass interview of Antonion Avila, produced by Defendants as CITY 94-100. Contained within includes the following: **(A)** that Plaintiff broke a door at the Avila residence; **(B)** that Plaintiff was no longer allowed to be at the residence; **(C)** that Plaintiff was in a verbal altercation with Mr. Avila; **(D)** that Plaintiff threw a water bottle at Ms. Avila's car; **(E)** that Plaintiff threatened a physical alteration with Mr. Avila; and **(F)** that Mr. Avila believed Plaintiff may have carried a firearm at that time.

**Regarding Third Party Witness Alice Garcia:**

      **19.**    Attached hereto as "**Exhibit O**" is a true and correct copy of the October 18, 2023 deposition transcript of Alice Victoria Garcia Hernandez. Contained within includes: **(A)** "Q: And how would you describe your relationship with Mr. Lopez? A: I hate him. He's a very awful person. Q: Okay. Have you always hated him? A: Since the moment I met him, yes." (Exh. O at 16:15-19.) **(B)** "Q: What about him, when you met him, made you hate him? A: His criminal lifestyle. He's a very heinous person, hurts others, and has no regard - - no, no - - how do you say it - - disregard or regard for anybody's safety while being - - hurts

people, just for his own convenience. Q: And you knew this from the first time you met him? A: You can tell a person from a mile away who (sic) their colors are, who (sic) their true colors are." (Exh. O at 16:20-17:4.) **(C)** "Q: And has - - did you have any cause in those 11 years to witness him do any criminal activity? A: Yes, actually. He's, you know, done a lot of things. Q: Could you kind of overview for us what those were? A: He's done a lot towards my parents' property, breaking windows, slashing tires. He's harassed and threatened many - - a couple of my neighbors and tenants that we have, and he's - - I'm pretty sure that's not all. There's more to that, more things he's done." (Exh. O at 17:5-15.) **(D)** "Q: Have you ever seen him threaten any of these people? A: I've seen him break windows." (Exh. O at 17:16-18.) **(E)** Unsolicited comment: "I just wish people would understand how - - what a disgusting and horrible person he is. He's - - he gets mad - - or he would get mad at my sister for stupid reasons, come to the house, break windows, try to come in, and it's - - slash tires, and I just - - the list goes on, steal things, break into the house, you know, take things here and there, not just from - - from different people, you know, damaged my neighbor' properties. There's a lot of things that he's done." (Exh. O at 17:23-18:6.) **(F)** "Q: I guess I'm wondering, has he ever solen anything from you? A: It's been 11 years since we've dealt with him. I can't remember. I mean, he stole my peace, my peace of mind. I can't sleep knowing that he's out there on the streets." (Exh. O at 18:7-12.) **(G)** "I was always living on the edge knowing - - what he is going to do now? Is he going to break a window? God forbid he ever comes and even kills one of us. That's how crazy he is." (Exh. O at 18:22-19:1.) **(H)** That two years prior to the incident, at approximately 5 a.m., Ms. Garcia's dog was barking so he grabbed a machete, and Plaintiff "pops up out of the corner" and "he told me, 'Well, you're not going to do anything with that machete. Either way, I'm going to come back.'" (Exh. O 19:1-21:1.) **(I)** "I don't know if he was armed. He always - - he's always armed." (Exh. O at 20:6-7.) **(J)** "Q: Okay. So you live in fear of Mr. Lopez? A: I always, to this day.

As soon as - - he's always in and out of jail. He's a criminal. He should be kept there, and the moment he steps out of jail, I can't sleep at night knowing that if my dog goes barking, he's at the window trying to break in. It's always him trying to do something, and I can - - I live in fear that - - knowing that something can happen to my little sister. Something can happen to my parents, you know, to my family, to my family's property. It's a constant fear." (Exh. O at 21:2-11.) **(K)** "Q: So in the last two years since the shooting, have you seen Mr. Lopez? A: No, because I believe he was in jail. Q: Okay. A: I think those were the peaceful times in my life." (Exh. O at 21:12-16.) **(L)** "Q: Are you still afraid of him today? A" Yes, because he is a very horrible person. He has a very horrible criminal background, and I've heard the things that he's done to people, the pain he's caused to people, and I'm – I'm scared of him, but at the same time, I'm not scared of him. I'm not scared to defend myself. I will do whatever I have to do to defend me and my family, but I'm scared of the fact of him doing something to the people I love and me not being there to protect them. So that's what scares me. (Exh. O at 21:17-22:1.) **(M)** "Q: You said that he's always armed. How is it that you know that? A: He's -- you know, if you look at his criminal record, he's always getting locked up for, you know, firearms or whatnot. He's always -- he always – he's armed either with knives, guns or something. He's always – Q: Have you ever seen him armed, show you any kind of a weapon? A: You know, I have not, because he hides them." (Exh. O at 22:2-11.) **(N)** "Creepily, he was watching the house." (Exh. O at 22:20-21.) **(O)** "What the - - what heinous person would do that to their own child? What monster would threaten the mother of their child while their child is there? That is disgusting. What a disgusting human being." (Exh. O at 23:24-24:2.) **(P)** "Officer Wright did what he had to do to protect our community and my family and, you know, I'm glad that he was there, because what could have happened? He did not come with good intentions." (Exh. O at 25:10-13.) **(Q)** "Xavier's crackhead mom walking by." (Exh. O at 29:21.) **(R)** "Q: Did at some point you look to see what was going on to see if it

was the officer that was shot or Mr. Lopez? A: No, because I felt safe that the officers were there. So I knew that they were there to protect us in case -- when the police is present, I feel safe. I don't have to feel scared, you know, no matter what the situation is, and they're there to protect and serve us, and you know, I had no idea that -- what was going on, but I knew they were protecting and serving our community." (Exh. O at 33:7-16.) **(S)** "Q: Okay. And do you know if Mr. Lopez has a drug problem? A: Is that even a question? He's -- he obviously has a drug problem. He has – he's always on something Q How do you know that? A: You know -- Q: By looking at him? A: By looking at him, you can always tell he's on drugs…. This man is always on something. If it's not marijuana, it's - - its something else.: (Exh. O at 38:22-39:19.) **(T)** "People that are always on drugs do things that they shouldn't, hurt people, and you know, who knows, they probably might even hurt kids." (Exh. O at 40:18-20.) **(U)** "For him to leave his own child in a car like that, he's a heinous person." (Exh. O at 41:11-12.) **(V)** That "the neighbor one time, we were talking, and the neighbor tells me that Mr. Xavier called him and threatened him and told him that if he didn't stop saying hi to Carina, talking to Carina, that he would make his disappear basically." (Exh. O at 42:9-13.) **(W)** That Plaintiff is jealous. (Exh. O at 44:23-24.) **(X)** "Q: And has anybody conveyed to you that they expect these lawyers are going to be very successful for Xavier Lopez? A: Yeah. I hope not. He does not deserve anything good in the world." (Exh. O at 47:5-9.) **(Y)** Ms. Garcia never spoke to the police prior to the incident. (Exh. O at 51:9-12.) **(Z)** Ms. Garcia has never seen Lopez physically harm any person. (Exh. O at 53:4-24.) **(AA)** Ms. Garcia hoped the officers "would take him out" (i.e., kill Lopez) "because he's a very heinous person." (Exh. O at 54:20-24.) **(BB)** Ms. Garcia is glad that Lopez was shot. (Exh. O at 56:10-13.) **(CC)** "Q So from your view and your knowledge of him in all of the 11 years, would you -- is it fair to say that from your view he was tormenting your family and neighborhood? A Yes, yes, he was. All of my neighbors hate him. My front door neighbor, you should see the way -- my front

door -- one of my front door neighbors put barbed wire, barbed wire on the top of his fence because Xavier would jump over his fence and try to terrorize his property. No person should have to go through that. No person should have to live through that." (Exh. O at 57:2-12.)

**Regarding Third Party Witness Suzana Fuentes:**

**20.** Attached hereto as "**Exhibit P**" is a true and correct copy of the October 26, 2023 deposition transcript of Suzana Fuentes: **(A)** Mrs. Fuentes did not know Plaintiff's name but recognizes his face (Exh. P at 11:10-19); **(B)** Mrs. Fuentes lives across the street from where the incident occurred at a diagonal and could not see what happened because there were trees blocking her view (Exh. P at 13:3-15); **(C)** that Mrs. Fuentes told the police that the boyfriend of the girl that lives next to her, referring to Plaintiff, always makes trouble (Exh. P at 16:8-16); **(D)** the trouble she is referring to is that Mrs. Fuentes heard from an elderly neighbor had some issues with the boyfriend and was upset because the elderly neighbor told Mrs. Fuentes that the boyfriend threw a screwdriver or something like that over the fence and it hit his truck (Exh. P at 16:17-17:2); **(E)** or that sometimes she would hear the girlfriend and the boyfriend yelling and he would take off in a car (Exh. P at 17:5-8); **(F)** that Plaintiff would have parties at his grandmother's house and that Mrs. Fuentes' now deceased little brother would have attended those parties (Exh. P at 18:13-18); **(G)** that Plaintiff would come to the neighborhood in the middle of the night (Exh. P at 19:18-20); **(H)** that Mrs. Fuentes would be sleeping and would wake up to hearing screams, yelling, or crying in the middle of the night and see Plaintiff walking in the street arguing (Exh. P at 20:3-9); **(I)** that it was Mrs. Fuentes' belief that Plaintiff would go to the house high or drunk (Exh. P at 20:16-19); **(J)** "There was times when he would drive erratically towards the girlfriend's house, and you could tell he was on something because he would hit the curve, and then he would go on top of … [the] dirt on the sides" (Exh. P at 21:1-5); **(K)** "And you can tell he was drunk or something was going on because he nearly

would hit other cars, and then he would jump the curb and jump it off (Exh. P at 21:12-15); **(L)** what Mrs. Fuentes described was from years before the incident (Exh. P at 22:9-15); **(M)** "When he would get angry and take off, he would burn rubber on the front of the house of the girlfriend" (Exh. P at 22:21-23).

### Regarding Defense Experts Craig Allen and Jeffrey Martin

21.     Attached hereto as "**Exhibit Q**" is a true and correct copy of the Rule 26 Report of Defense Police Practices Expert Craig Allen.

22.     Defendants intend to illicit evidence from Mr. Allen specifically used for the purpose of "**propensity**" including: **(A)** Mr. Lopez's propensity to flee with increasingly reckless behavior (Exh. Q, Report at 9); **(B)** an entire section in his Rule 26 Report entitled "**CRIMINAL BEHAVIOR PERTINENT TO MR LOPEZ'S PROPENSITY FOR VIOLENCE**" (Report at 12); **(C)** On September 14, 2020, at 1:00 a.m., the Riverside Police Department received a report that Mr. Lopez entered the residence of his ex-girlfriend, Ms. Carina Avila, through an unlocked front residence entrance. Mr. Lopez went into his minor daughter's bedroom, where she was sleeping, and removed her from the house. Mr. Lopez took the child for a period of time and abandoned her at a neighbor's house in the dark of night; **(D)** On September 15, 2020, Mr. Lopez returned to Ms. Avila's residence and attempted to remove the minor child from the residence again. Mr. Lopez faced resistance in the form of a locked bedroom door to include Ms. Avila's intense, vocal objections to Mr. Lopez's unauthorized presence in her home; **(E)** On September 16, 2020, a warrant was issued for Mr. Lopez's arrest; **(F)** On September 21, 2020, Riverside Police Officer Arthur Ramirez contacted Mr. Lopez during a routine pedestrian check when he discovered the active parolee-at-large warrant. Officer Ramirez arrested Mr. Lopez and he was placed in the Robert Presley detention center for burglary and child endangerment; **(G)** On September 30, 2020, Mr. Lopez was sanctioned 120 days in custody with an expected release date of November 19, 2020; **(H)** Mr. Lopez was actually released on or about October 15,

2020; **(I)** On December 29, 2020, a parole-at-large warrant was issued for Mr. Lopez's arrest when it was reported his parole officer could not locate Mr. Lopez after his parole release; **(J)** On January 17, 2021, Riverside Police Department Officer Ransom De Castro responded to an emergency call at Ms. Avila's residence. … Ms. Avila told Officer Castro that she was in fear for her life; and **(K)** On January 19, 2021, Riverside Police Department Officer Moses Prado spotted Mr. Lopez at a local gas station and attempted to stop him for a vehicle code violation.

23.     Defendants intend to illicit evidence from Mr. Allen specifically based on his **credibility determinations** including: **(A)** Mr. Lopez's assertion that his intent was to retrieve the weapon and place it on the ground certainly appears self-serving at best now that Mr. Lopez further explained that his handgun somehow got hung up in his coat pocket (Exh. Q, Report at 11); and **(B)** that Defendant Wright's perceptions were correct (Report at 21, 32).

24.     Defendants intend to illicit evidence from Mr. Allen which calls for **speculation and lack foundation** including: **(A)** "according to Officer Wright, 99.9 percent of these individuals do not reach for weapons when they are approached by law enforcement" (Exh. Q, Report at 11); **(B)** "Mr. Lopez attempted to reach for his handgun a second time" (Report at 33); and **(C)** "Mr. Lopez, blocking, maneuvering or otherwise physically attempting to thwart Officer Wright reaching to control the area where his handgun was at. Clearly, the precipitous actions by Mr. Lopez would lead a reasonable police officer to conclude they were under deadly assault" (Report at 33).

25.     Defendants intend to illicit evidence from Mr. Allen which was **information unknown to Defendant Wright** including: **(A)** August 2, 2020, Mr. Lopez was released on parole (Exh. Q, Report at 9); **(B)** On September 14, 2020, at 1:00 a.m., the Riverside Police Department received a report that Mr. Lopez entered the residence of his ex-girlfriend, Ms. Carina Avila, through an unlocked front residence entrance. Mr. Lopez went into his minor daughter's bedroom, where she

was sleeping, and removed her from the house. Mr. Lopez took the child for a period of time and abandoned her at a neighbor's house in the dark of night (Report at 12); **(C)** On September 15, 2020, Mr. Lopez returned to Ms. Avila's residence and attempted to remove the minor child from the residence again. Mr. Lopez faced resistance in the form of a locked bedroom door to include Ms. Avila's intense, vocal objections to Mr. Lopez's unauthorized presence in her home (Report at 12); **(D)** September 21, 2020, Mr. Lopez was arrested on his outstanding warrant and was subsequently released on October 15, 2020 (Report at 9); **(E)** On September 21, 2020, Riverside Police Officer Arthur Ramirez contacted Mr. Lopez during a routine pedestrian check when he discovered the active parolee-at-large warrant. Officer Ramirez arrested Mr. Lopez and he was placed in the Robert Presley detention center for burglary and child endangerment (Report at 12); **(F)** On September 30, 2020, Mr. Lopez was sanctioned 120 days in custody with an expected release date of November 19, 2020 (Report at 12); and **(G)** Mr. Lopez was actually released on or about October 15, 2020 (Report at 12).

26.     Attached hereto as "**Exhibit R**" is a true and correct copy of the Rule 26 Report of Defense Police Practices Expert Jeffrey Martin.

27.     Defendants intend to illicit evidence from Mr. Martin which calls for **speculation and lack foundation** including: **(A)** taking cover would have resulted in Lopez running into the house and taking a hostage (Exh. R, Report at 22); and **(B)** had Wright issued a warning Lopez would have shot Wright (Report at 25).

28.     Attached hereto as "**Exhibit S**" is a true and correct copy of Mr. Martin's CV attached to Mr. Martin's Rule 26 Report.

/ / /

/ / /

**29.    Mr. Allen and Mr. Martin have a significant overlap in their background experience, education and training**:

| | Background In: | Craig Allen | Jeffrey Martin |
|---|---|---|---|
| A. | Police officer | Report at 3 | CV at 2 |
| B. | Field Training Officer | Report at 3 | CV at 2 |
| C. | Narcotics Investigator | Report at 3 | CV at 2 |
| D. | Patrol Sergeant | Report at 3 | Report at 1 CV at 2 |
| E. | Training Sergeant | Report at 3 | Report at 1 CV at 2 |
| F. | Internal Affairs | Report at 3 | CV at 6 |
| G. | Firearms Instructor | Report at 3 | Report at 2 CV at 2, 9 |
| H. | Defensive Tactics Instructor | Report at 3 | Report at 2 CV at 2, 9 |
| I. | Scenario Based Instructor | Report at 3 | CV at 5 |
| J. | Confrontational Simulations Instructor | Report at 3 | CV at 10 |
| K. | Taser Instructor | Report at 3 | CV at 2, 8 |
| L. | Less-Lethal/Non-Lethal | Report at 3 | CV at 24 |
| M. | Diversionary Device | Report at 3 | CV at 15 |
| N. | Patrol Tactics | Report at 3 | CV at 2, 5 |
| O. | Oversaw Patrol Division | Report at 3 | CV at 2 |
| P. | Use of Force Instructor | Report at 3 | CV at 10 |
| Q. | OC/Pepper Spray | Report at 3 | CV at 9 |
| R. | Baton | Report at 3 | CV at 9 |
| S. | Force Science Institutes | Report at 3 | CV at 1, 10 |
| T. | Crisis Intervention | Report at 3 | CV at 10 |
| U. | Internal Affairs Investigations | Report at 3 | CV at 10 |
| V. | De-escalation Tactics and Techniques | Report at 3 | CV at 10 |

| | Background In: | Craig Allen | Jeffrey Martin |
|---|---|---|---|
| W. | Search warrants | Report at 4 | CV at 10 |
| X. | Academy Instructor | Report at 4 | CV at 2, 3 |
| Y. | Legal Justification for Force and Tactics | Report at 4 | CV at 1 |
| Z. | Psychology | Report at 4 | CV at 1 |
| AA. | Human Factors | Report at 4, 7 | CV at 1 |

**30.    Mr. Allen and Mr. Martin have a significant overlap in their expected testimonies**:

| | | Craig Allen | Jeffrey Martin |
|---|---|---|---|
| | STATEMENTS OF FACTS OF THE CASE | | |
| A. | Plaintiff criminal history. | Report at 9 | Report at 22 |
| B. | January 19, 2021, incident with Officer Prado, on patrol, initiated a traffic stop, Plaintiff failed to pull over, fled, vehicle pursuit ensued, Plaintiff entered freeway in oncoming traffic, Officer Prado terminated the pursuit. | Report at 9 | Report at 15 |
| C. | Officer Prado subsequently identified the driver of as Plaintiff who had an outstanding felony warrant for being a parolee at large. | Report at 9 | Report at 15 |
| D. | Officer Prado later contacted Officer Evan Wright. | Report at 9 | Report at 15 |
| E. | January 26, 2021, officers conducted surveillance to investigate Plaintiff's location. | Report at 9 | Report at 15-16 |
| F. | Officer Monreal identified Plaintiff exiting his vehicle near Ms. Avila's residence. | Report at 10 | Report at 16 |
| G. | Prior to Officer Wright's arrival, Mr. Lopez was walking toward Ms. Avila's residence. | Report at 10 | Report at 16 |
| H. | Officer Wright stopped van near Plaintiff | Report at 10 | Report at 16 |

| | | Craig Allen | Jeffrey Martin |
|---|---|---|---|
| | in an effort to apprehend Mr. Lopez before he could enter Ms. Avila's residence. | | |
| I. | Officer Wright exited van, drew weapon, and gave commands. | Report at 10 | Report at 17 |
| J. | Plaintiff reached into coat. | Report at 10 | Report at 17 |
| K. | As a result of Mr. Lopez's refusal to obey the clear warnings provided by the Riverside police officers on scene, while simultaneously retrieving a handgun from his coat pocket, led Officer Wright to conclude a deadly assault was imminent. | Report at 10 | Report at 17 |
| L. | Officer Write fired two shots in close succession hitting Mr. Lopez in the chest and abdomen. | Report at 10 | Report at 18 |
| M. | Plaintiff taken into custody. | Report at 10 | Report at 18 |
| N. | Officers on scene provided immediate first aid to Mr. Lopez and summoned emergency medical services to assist. | Report at 10 | Report at 18 |
| O. | Stated pre-incident knowledge. | Report at 13-14 | Report at 15, 19 |
| P. | Conclusions of fact. | Opinions 1-7. Report at 15-18 | Report 16-19 |
| Q. | Video Analysis, shortfalls/criticism of BWC videos, comparing BWC videos to human eye/officer perspective. | Opinions 1-7, 11. Report at 15-18, 21-22 | Report at 6-9 |
| OPINIONS | | | |
| R. | That Officer Wright acted reasonably. | Report at 10, 32 | Opinion 1. Report at 19 |
| S. | That Plaintiff created an imminent danger of death or serious bodily injury. | Report at 10 | Report at 19 |
| T. | Re. Officer Wright's perception. | Report at 11 | Opinion 2. Report at 20-22 |
| U. | Re. warnings and commands. | Report at 11. Opinion 9. | Opinion 5. Report at 24-25 |

| | | | Craig Allen | Jeffrey Martin |
|---|---|---|---|---|
| | | | Report at 19 | |
| V. | Re. Plaintiff mannerisms. | | Report at 11 | Opinion 6. Report at 25-26 |
| W. | Re. imminent danger of a felon who acted with disregard. | | Report at 11 | Opinion 1. Report at 19 |
| X. | Re. tense, uncertain and rapidly evolving | | Report at 11 | Opinion 1. Report at 20 |
| Y. | Re. RPD use of force policy 300.4. | | Opinions 8 and 9. Report at 18, 19 | Opinion 8. Report at 27 |
| Z. | Operations/Tactical Plan. | | Opinion 10. Report at 23 | Opinion 3. Report at 22-23 |
| AA. | Re. officer tactics. | | Opinion 14. Report at 25 | Opinion 4. Report at 23-24 |
| BB. | Re. officer clothing. | | Opinion 17. Report at 27 | Opinion 3. Report at 23 |
| CC. | Referencing California Penal Code §835a | | Report at 18 | Report at 10 |
| DD. | Referencing POST | | Report at 31 | Report at 10-14 |
| EE. | Referencing *Graham v. Connor*. | | Report at 33 | Report at 10 |
| FF. | Perception Reaction Opinions | -Importance of time. Report at 11 -Opinions 1-7: precisely about an analysis of reaction time. -Opinion 8: re Plaintiff's ability to perceive and react. Report at 19 -Opinion 10: specifically references importance of human factors, human perception, contextualization, and decision-making processes to evaluate reasonableness of officer's use of force. Report at 20 -Re. experiments, mental chronometry, scientific mathematical laws. Report at 20-21 -Citing psychology studies titled: | Opinion 2. Report at 20-22 Opinion 7. Report at 26 | |

| | | | **Craig Allen** | **Jeffrey Martin** |
|---|---|---|---|---|
| | | | "On the speed of mental processes," "On the rate of gain of information," "Officer reaction-response times in firing a handgun," and "An examination of police officer mental chronometry." Report at 21 -Explaining perception reaction time, split-second decisions. Report at 21 -Plaintiff's PRT. Report at 23 -Reasonableness of deadly force based on perception. Report at 32 | |
| | GG. | *Monell* Opinions | -Report at 11-12 -Opinion 13 re. agency policies. Report at 23-24 -Opinion 16 re post-shooting investigation. Report at 25-27 -Opinion 18 re training. Report at 27 -Opinion 19 re report writing policies and procedures. Report at 28 -Opinion 22 re Community Police Review Commission. Report at 29 -Opinion 24 re Wright history of use of force found within policy. Report at 29 -Opinion 25: this incident found within policy and no evidence of criminal liability. Report at 29 -Opinions 26-28. Report at 29-32 | Opinion 9. Report at 26 |

31.     Attached hereto as "**Exhibit T**" is a true and correct copy of the animations produced by Defendant, created by Brady Held.

Exh. T (1), Mr. Held's "Camera Match" animation.

Exh. T (2), Mr. Held's "OTS Real Time" animation.

Exh. T (3), Mr. Held's "OTS Slow" animation.

1      Exh. T (4), Mr. Held's "Plain View Real Time" animation.

2      Exh. T (5), Mr. Held's "Plain View Slow" animation.

3      Exh. T (6), Mr. Held's "Plain View Real Time Close" animation.

4      Exh. T (7), Mr. Held's "Plain Slow Close" animation.

5      Exh. T (8), Mr. Held's "Backwards from Shot #1" animation.

6      **32.**   Attached hereto as "**Exhibit U**" is a true and correct copy of the

7  attachments created by Defendants video expert Parris Ward.

8      Exh. U (1), Mr. Ward's "Park BWC Stabilized" video.

9      Exh. U (2), Mr. Ward's "Park BWC Stabilized-SlowMo" video.

10     Exh. U (3), Mr. Ward's "Stabilized BWCs Synchonized" video.

11     Exh. U (4), Mr. Ward's "Stabilized BWCs Synchonized-SlowMo" video.

12     Exh. U (5), Mr. Ward's "Stabilized BWCs 4k" video.

13     Exh. U (6), Mr. Ward's "Stabilized BWCs 1080P" video.

14     Exh. U (7), Mr. Ward's "Wright BWC Stabilized" video.

15     Exh. U (8), Mr. Ward's "Wright BWC Stabilized-SlowMo" video.

16     Exh. U (9), Mr. Ward's "Park Stabilized BWC Frames" document.

17     Exh. U (10), Mr. Ward's "Stabilized BWCs Sync'd" document.

18     Exh. U (11), Mr. Ward's "Synchronized BWCs" document.

19     Exh. U (12), Mr. Ward's "Wright Stabilized BWC Frames" document.

20     **33.**   The following are relevant portions of the Rought Transcript of the

21  December 1, 2023, Deposition of Defendants animation expert Brady Held.

22  Contained therein includes:

23     **A.**   Mr. Held is able to show the entire video with the overlay so that

24         the viewer can see whether or not the animation matches the body-worn

25         camera video the entire time instead of just on the particular times that

26         the is shown in the "Camera Match" animation. (RT Held Depo at 49-

27         50.)

28

1   **B.**     Mr. Held's task was to review body-worn camera footage,

2   analyze that footage, and animate the positions of the officers and

3   Lopez throughout the shooting event. (RT Held Depo at 5.)

4   **C.**     It is essential in Mr. Held's work to ensure that the placement of

5   the individuals is as accurate as possible. (RT Held Depo at 7.)

6   **D.**     Mr. Held was supposed to make the animations as close as

7   possible to exactly what occurred in the videos. (RT Held Depo at 9.)

8   **E.**     Mr. Held admitted to depicting in his animations something that

9   is not in the body-worn camera videos, including the yellow gun. (RT

10  Held Depo at 10-11.)

11  **F.**     Of particular importance here is the position of the individuals

12  involved and any objects in and around their hands. (RT Held Depo at

13  15.)

14  **G.**     Mr. Held relied on Mr. Ward's 3D laser scan and Mr. Ward's

15  written report, and a synchronized video from Mr. Ward's disclosures.

16  (RT Held Depo at 13-14.)

17  **H.**     If an individual's position is even slightly off initially, then it

18  would have an effect on other depictions later in the animation. (RT

19  Held Depo at 16.)

20  **I.**      There are several examples of inaccuracies in Mr. Held's

21  animations due to budgetary constraints, time constraints, and where

22  Mr. Held chooses to focus his attention. (RT Held Depo at 27-29.)

23  **J.**     Mr. Held has no basis for the position of the yellow gun that he

24  depicted in his animations from anything he reviewed in this case. (RT

25  Held Depo at 32.)

26  **K.**     Mr. Held admitted that he is not sure if the yellow firearm

27  position is accurate. (RT Held Depo at 32-33.)

28

**L.**     Mr. Held admitted to inaccurately placing Lopez closer to Defendant Wright in the animation than what is depicted in the video along with other inaccuracies in the animation. (RT Held Depo at 35-36.)

**M.**     It was possible to create the animation so that it reflected Defendant Wright's eye level. (RT Held Depo at 47, 49.)

**N.**     Mr. Held admits that an animation is almost impossible to have great representation of what Wright saw. (RT Held Depo at 48.)

**O.**     In response to the question, "Okay. So that's where I'm just trying to figure out is from which camera did you see Mr. Lopez's hand going towards Sergeant Wright in that two-pump motion in order to put it in your animation?", Mr. Held responded, "It's total all three it's a combination of all three you know it's all three cameras gives you gives me the best opportunity to be able to track that hand motion …. (RT Held Depo at 59-60.)

**P.**     Mr. Held admits that from 1.0 to 0.87 seconds prior to the first shot, there is distance being created between Defendant Wright and Lopez's left hand, and that Lopez's left hand is being rotated up so that his palm is forward. (RT Held Depo at 65-67.)

**Q.**     Mr. Held has been excluded from testifying at trial before. (RT Held Depo at 67.)

**R.**     Mr. Held has had animations excluded from being published to the jury before, including the most recent trial Mr. Held participated in. (RT Held Depo at 68.)

**S.**     Mr. Held has been ordered to alter his animations prior to them being presented to the jury before, including the court ordering an element of the animation being removed. (RT Held Depo at 68-69.)

**34.**     Attached hereto as "**Exhibit V**" is a true and correct copy of the Rule 26 Report of Defendants toxicology expert Martin Breen.

**35.**     The following are relevant portions of the Rought Transcript of the December 1, 2023, Deposition of Defendants toxicology expert Martin Breen. Contained therein includes:

**A.**     Plaintiff's blood alcohol concentration was estimated to be 0.4%. (RT Breen Depo at 6.)

**B.**     Plaintiff's blood alcohol concentration was half the California legal limit to drive. (RT Breen Depo at 6.)

**C.**     Mr. Breen found no evidence of drugs in Plaintiff's medical records, including no evidence of methamphetamine. (RT Breen Depo at 6-7.)

**D.**     The finding of a 0.04% blood alcohol concentration was 1 hour and 10 minutes after the shooting. (RT Breen Depo at 5-6.)

**E.**     Mr. Breen concluded that Plaintiff's blood alcohol concentration at the time of the shooting was between 0.05 and 0.06%. (RT Breen Depo at 7.)

**F.**     Plaintiff's BAC at the time of the shooting would have been 0.02-0.03% points below the legal limit in California. (RT Breen Depo at 7.)

**G.**     Mr. Breen could not opine on the amount Plaintiff had to drink. (RT Breen Depo at 7-8.)

**H.**     Mr. Breen further testified that given the level of impairment, Plaintiff would still be able to understand a command to put his hands up and actually put his hands up. (RT Breen Depo at 11-12.)

**I.**     Mr. Breen never reviewed the body worn camera footage, though he admitted such a review would be helpful to understand whether

Plaintiff's conduct was actually consistent with any signs of impairment. (RT Breen Depo at 14-15.)

**J.**  Mr. Breen could not testify regarding any actual effects on Plaintiff such as memory issues, reaction time, divided attention, and risk taking, among others, only that they were possible. (RT Breen Depo at 21.)

**K.**  Mr. Breen admitted he did not review critical video evidence at the heart of this case even though he admitted he knew a video existed and reviewing the video would be important. (RT Breen Depo at 14-15.)

**L.**  It was Mr. Breen's understanding that Plaintiff's hands were in his pockets, and that Mr. Breen did not "see anywhere where they asked him to put his hands up." Such information, Mr. Breen testified, would be "contrary to what is indicated in the officers' reports and depositions." (RT Breen Depo at 16-17.)

**M.**  Mr. Breen admitted he did not know Plaintiff's drinking pattern before the incident. (RT Breen Depo at 7-8.)

**N.**  Mr. Breen reviewing multiple sources from police incident reports and the deposition of Defendant Wright that indicated officers told Lopez to put his hands up. (RT Breen Depo at 12, 16.)

**O.**  Based on the materials Mr. Breen reviewed in this case, Mr. Breen did not know whether Lopez's hands were up at the time he was shot. (RT Breen Depo at 15-16.)

**P.**  It would be important to Mr. Breen's analysis if he had information that Lopez put his hands up after he was asked to do so by the police because it would contradict what the officers said that Lopez's hands were in his pocket, and they could see the butt of a gun in his possession, so his hands were never up. (RT Breen Depo at 16.)

1      **Q.**    It would be important to Mr. Breen's analysis if Lopez was told

2      to put his hands up and he did put his hands up because it would be

3      contrary to the officers' reports and depositions. (RT Breen Depo at

4      16.)

5      **R.**    Mr. Breen knew body-worn camera video existed in this case.

6      (RT Breen Depo at 13.)

7      **S.**    Mr. Breen did not review any body-worn camera footage of the

8      incident. (RT Breen Depo at 12.)

9    **36.**    Attached hereto as "**Exhibit W**" is a true and correct copy of the

10  parties' correspondence regarding motions *in limine*.

11

12      I declare under penalty of perjury under the laws of the United States that the

13  foregoing is true and correct.  Executed this 18th day of December 2023.

14  _____ _____

15                      Marcel F. Sincich

16

17

18

19

20

21

22

23

24

25

26

27

28