# "EXHIBIT Q"

November 16, 2023


Debra K. Cook
Senior Deputy City Attorney
City Attorney's Office
Litigation Division
3750 University Avenue, Suite 250
Riverside, CA 92501

RE:  Xavier Lopez v. City of Riverside; Evan Wright / Case Number 5:21-cv-02140-ODW / United
States District Court Central District of California.

Interim Report by Craig Allen
Pursuant to Rule 26(a)(2)(B)


Dear Ms. Cook,

Thank you for the kind invitation to work on this case.  I have reviewed and considered the
following materials.  My report begins on page 9.

Items received on March 8, 2023, through submittal of report:


14.  DKT 06 - Defendants-Appellants' Statement of Jurisdiction
15.  DKT 19-1 Excerpts of Record Vol. 1
16.  DKT 19-2 Excerpts of Record Vol. 2
17.  DKT 19-3 Excerpts of Record Vol. 3
18.  DKT 39 - Notice of Appeal by defendants
19.  DKT 56 - Order denying motion to dismiss appeal
20.  LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report
21.  LOPEZ 1 (CITY) 0443 - LOPEZ 1 (CITY) 0656 Case Reports
22.  LOPEZ 1 (CITY) 0657 - LOPEZ 1 (CITY) 0663 Search Warrant 9.21.21
23.  LOPEZ 1 (CITY) 0664 - LOPEZ 1 (CITY) 0665 RPD Operations Plan
24.  LOPEZ 1 (CITY) 0666 - LOPEZ 1 (CITY) 0707 Incident Detail Report
25.  LOPEZ 1 (CITY) 0708 - LOPEZ 1 (CITY) 0774 Safety National Commercial Policy
26.  LOPEZ 1 (CITY) 0775 - LOPEZ 1 (CITY) 1545 RPD Policy Manual
27.  LOPEZ 1 (CITY) 2040-2061 Incident L1Q70027- L1Q70048 (VIDEOS)
28.  LOPEZ 1 (CITY) 2062 Interview with Evan Wright 01-28-21 #1
29.  LOPEZ 1 (CITY) 2063 Interview with Evan Wright 01-28-21 #2
30.  LOPEZ 1 (CITY) 2064 Interview with Marisol Garcia 01-26-21 #1
31.  LOPEZ 1 (CITY) 2065 Interview with Marisol Garcia 01-26-21 #2
32.  LOPEZ 1 (CITY) 2066 Interview with Monica Gonzalez 01-26-21 #1
33.  LOPEZ 1 (CITY) 2067 Interview with Monica Gonzalez 01-26-21 #2
34.  LOPEZ 1 (CITY) 2068 Interview with Xavier Lopez 02-02-21 #1
35.  LOPEZ 1 (CITY) 2069 Interview with Xavier Lopez 02-02-21 #2
36.  LOPEZ 1 (CITY) 2070 Riverside Police Critical Incident Video January 26, 2021 (Video)

37. LOPEZ 1 (CITY) 2071 1374BS 01_26_2021 08_07 PM (Audio)
38. LOPEZ 1 (CITY) 2072 1374BS 01_26_2021 08_12 PM (Audio)
39. LOPEZ 1 (CITY) 2073 1374BS 01_26_2021 08_15 PM (Audio)
40. LOPEZ 1 (CITY) 2074 1374BS 01_26_2021 08_19 PM (Audio)
41. LOPEZ 1 (CITY) 2075 1374BS 01_26_2021 08_20 PM (Audio)
42. LOPEZ 1 (CITY) 2076 1374BS 01_26_2021 08_51 PM (Audio)
43. LOPEZ 1 (CITY) 2077 1374BS 01_26_2021 09_33 PM (Audio)
44. LOPEZ 1 (CITY) 2078 1374BS 01_26_2021 09_36 PM (Audio)
45. LOPEZ 1 (CITY) 2079 1374BS 01_28_2021 11_01 AM (Audio)
46. LOPEZ 1 (CITY) 2080 1374BS 01_28_2021 11_17 AM (Audio)
47. LOPEZ 1 (CITY) 2082 - LOPEZ 1 (CITY) 3175 Use of Force Training
48. LOPEZ 1 (CITY) 3176 00_0002017376 BWC (right-side)
49. LOPEZ 1 (CITY) 3177 00_0002279505 BWC (primary)
50. LOPEZ 1 (CITY) 3178 00_0000327682 BWC (front)
51. Lopez Stills 1-26-21 shooting001-251
52. DKT 19 - Defs' Rule 56 MSJ
53. DKT 19-1 Defs.' SSUMF
54. DKT 19-2 Evidentiary Appendix
55. DKT 19-3 Dec of Evan Wright and Deposition of Evan Wright
56. DKT 19-4 Dec of Robert Monreal and Deposition of Robert Monreal
57. DKT 19-5 Dec of Henry Park and Deposition of Henry Park
58. DKT 19-6 Dec of Ryan Railsback
59. DKT 19-7 Dec of DKC
60. DKT 19-8 Notice of Lodgment combined w-RFJN
61. DKT 19-9 Exhibit A Case Info & Docket – Criminal
62. DKT 19-10 Exhibit B Docket – Criminal
63. DKT 19-11 Exhibit C Warrant Request and Order
64. DKT 19-12 Exhibit D Petition to Revoke Parole
65. DKT 19-13 Exhibit E Complete Case Docket-Warrant Request – Criminal
66. DKT 19-14 Exhibit 1 Officer Prado's 1-19-21 Police Report
67. DKT 19-15 Exhibit 2 Certified Court Transcript Prelim Hrg. March 17, 2021
68. DKT 19-16 Exhibit 3 Officer De Castro's 1-17-21 Police Report
69. DKT 19-17 Exhibit 4 Officer Wright's 1-26-21 Body Worn Camera Video
70. DKT 19-18 Exhibit 5 Officer Monreal's 1-26-21 Body Worn Camera Video
71. DKT 19-19 Exhibit 6 Officer Park's 1-26-21 Body Worn Camera Video
72. DKT 19-20 Exhibit 7 City's Critical Incident Video 1-26-21 OIS
73. DKT 20 Notice of Manual Filing or Lodging (certified original lodged)
74. DKT 26 - pltf oppos. to MSJ
75. DKT 26-1 pltf objections to evidence presented in defs sep
76. DKT 26-2 pltf stmt. of genuine disputes; add'l material facts
77. DKT 27 Dec of Xavier Lopez ISO oppos. to MSJ
78. DKT 28 Dec of Marcel F. Sincich ISO oppos. to MSJ
79. DKT 28-1-9 Exhibit A-L
80. DKT 29 pltf oppos. to notice of lodgment combined w-RFJN
81. DKT 31 - Defs' Response to Pltf Objections to Defs' Evidence September
82. DKT 32 - Defs' Objections to Pltf Evidence Presented in Pltf Sep. Stmt. of Additional Facts
83. DKT 33 - Defs' Response to Pltf. Sep. Stmt. of Additional Material Facts
84. DKT 34 - Defs' Reply to Pltf Oppos. to MSJ
85. DKT 34-1 - Exhibit A (Pltf. challenges to Defs' Undisputed Facts)
86. DKT 38 - Order Denying Defs' MSJ
87. Videos by Defense Expert Mr. Paris Ward
88. Compilation video of scene animation by Mr. Brady Held / Courtroom Animations

**INTRODUCTION AND QUALIFICATIONS**

My name is Craig Allen and I have been a Police Officer for 30 years, 29 of which have been with the Hillsboro, Oregon Police Department.  I retired from Hillsboro Police in May 2023.  My last attained rank was Police Commander overseeing the Patrol and Training Divisions.  I have held positions within the police department ranging from Patrol Officer, Field Training Officer, SWAT, Narcotics Investigator, Detective, Patrol Sergeant, Training Sergeant, Lieutenant of Internal Affairs, Training Lieutenant, and Patrol Lieutenant.

Currently, I am employed full-time as the Director of Training and Senior Instructor with the Force Science Institute, Bloomington Minnesota (duties outlined below).

I hold formal certifications in:

- Firearms Instructor, (handgun, patrol rifle, shotgun and specialty weapons)
- SWAT Officer/Instructor
- Field Training Officer
- Defensive Tactics Instructor
- Scenario Based (SBT) Instructor
- Confrontational Simulations Instructor
- Integrated Public Safety Response to Mass Casualty Events
- Taser / ECD Instructor
- Less-Lethal Munitions Instructor
- High Risk Traffic Stops
- Weapons Armorer
- Diversionary Device Instructor
- Patrol Tactics Instructor
- Use of Force Instructor
- Advanced Force Control Instructor
- Pepper Spray (OC) Instructor
- Impact Weapons Instructor
- Force Science Institutes, Force Analyst Certification
- Force Science Institutes, Advanced Force Specialist Certification
- National Level Instructor / Force Science Institute
- Crime Scene Management
- Crisis Intervention Certification
- Internal Affairs Investigations
- De-escalation Tactics and Techniques
- Interview and Interrogation
- Basic, Intermediate, Advanced, Supervisory, and Mid-Management certification through Oregon Department of Public Safety Standards and Training

 I was assigned to our agency's Tactical Services Unit, (SWAT) for 11 years and served as assistant team leader in conjunction while serving on the Washington County Oregon, Interagency Tactical Negotiations Team, (SWAT) for eight years.  During my tenure in SWAT, I instructed in the areas

of high risk warrant service, building search, hostage rescue, active shooter, and search warrant planning and preparation.  I have instructed at the Oregon Basic SWAT School and received my SWAT certification through the U.S. Department of Defense (SWAT operator's course) and the Oregon Tactical Officers Association.

I am a former certified instructor at the Oregon Police Academy, (Department of Public Safety Standards and Training) instructing in the areas of building search, survival skills, and high-risk vehicle stops.  Throughout my tenure as a Police Officer, I have accumulated over 6,500 hours of certified police training.

I developed our agency's Force and Tactics Instructor (FTI), program.  While overseeing our Training Division (2007-2014), I concurrently lead the FTI team while acting in the capacity as lead Force and Tactics Instructor for our agency.  The responsibility of the Force and Tactics Team is comprehensive in scope.  The team is responsible for all curriculum development and agency instruction encompassing police force response.  Instructional topics include all aspects of firearms training and specialty weapons, Taser/ECD, less lethal munitions, pepper spray, collapsible baton, diversionary devises, defensive tactics, custody control techniques, patrol intervention tactics, and the legal justification and agency certification surrounding these applications.  The team is also responsible for instruction on individual and team tactics, including active shooter response, high risk vehicle stops, barricade subjects, crisis exigent entry, crisis intervention techniques to include other critical responses common to police emergency services.

The Force and Tactics Team also develops and oversees a wide spectrum of scenario-based training.  A significant portion of this training includes the implementation and analysis of the human performance factors associated with deadly and non-deadly force encounters.  Primarily these associative factors pertain to the psychological, physiological and environmental causes influencing officer performance, threat recognition, and situational awareness under normal and simulated duress situations.  I am advisor for the FTI team and continue to provide agency instruction in these areas to include research and development related to high liability areas such as police use of force and crisis decision making.

I have offered testimony in state and federal courts, in civil, criminal, and administrative proceedings as an expert witness and I am routinely consulted regarding these matters.  Below is a list of cases I have offered testimony and/or sworn affidavits as an expert witness in the area of police use of force, tactics, and training:

- **State of Oregon v. Paul Padilla, October 2005**
  - State court / testified UOF expert on behalf of officer / focus blows
- **Michael Burke v. Josephine County Sheriffs Association (OR), April 2008**
  - Arbitration hearing / report in favor of city on termination hearing / unlawful arrest
- **State of Oregon v. James Orr, June 2008**
  - State court / testified UOF expert on behalf of officer; tactics surrounding OIS
- **State of Oregon v. Flores-Haro, March 2012**
  - State court / Grand Jury / testified UOF expert on behalf of officer on tactics focus blows

- **Makarowsky v. Lobdell, (Washington Fed) August 2012**
  - ○ Rule 26 and Deposition / testified on behalf of officer OIS / perception, weapon manipulation, timing of shots, and external ballistics
- **Lookabill v. City of Vancouver (Washington Fed)  November 2013**
  - ○ Rule 26 and Deposition / testified on behalf of officer OIS / UOF
- **Theoharis v. Washington State Department of Corrections, April 2014**
  - ○ Rule 26 / written report on behalf of officer OIS / UOF
- **Andison v. Clark County Washington, July 2015**
  - ○ Rule 26 and Deposition / testified on behalf of officer OIS / UOF and tactics
- **Rhoads v. City of Hillsboro (OR), October 2016**
  - ○ State court / testified UOF expert on behalf of officer; handcuffing and control holds
- **Johnson v. Officer Benjamin Kelly (WA), January 2017**
  - ○ Rule 26 / written report on behalf of officer OIS / UOF / struggle over weapon, close contact shots
- **Jacques v. City of Bend (OR), February 2017**
  - ○ Consult on OIS / no report
- **Altabef v. Stayton Oregon Police Department, June 2018**
  - ○ Arbitration hearing / testified as UOF expert / excessive force by officer / termination hearing
- **Agency Use of Force Review / Eugene Oregon Police / OIS / January 2020**
  - ○ Review of agency OIS & written report / requested by agency for independent UOF council / timing of shots, shot cadence, perception and reaction
- **McKenna v. Wolk / Eastern District of Pennsylvania / Pursuit / January 2020**
  - ○ Rule 26 / written report on behalf of plaintiff / excessive force by officer in pursuit
- **Agency Use of Force Review (Sheriff's Association ) / Lyon County, Nevada / March 2020**
  - ○ Review of agency OIS & written report / requested by agency for independent UOF council / timing of shots, shot cadence, perception and reaction
- **Arbiters Report:  University of Oregon Police Department / May 2020**
  - ○  Retained on behalf of the agency, termination case / excessive use of force (June 2020)
- **Yearick v. Maricopa County (Arizona Fed Dist) / OIS / April 2020**
  - ○ Retained on behalf of Maricopa County; police practices and tactics, pending Rule 26
- **State of Louisiana v. Crystal Alexander / criminal defense / July 2020**
  - ○ Report issued for defense; shot cadence and crime scene investigation
- **Alexander v. City of Seattle / Washington Fed / August 2020**
  - ○ State created danger / case ongoing
- **Benbo v. Clark County / Clackamas, Oregon Cir Court / Sept 2000**
  - ○ General Use of Force / Requested on behalf of the State / case settled
- **Retained by City of Santa Fe, NM (Feb 2022) OIS / Currently no suit filed.**
  - ○ Action, perception reaction dynamics and shooting cadence of fire related to OIS.
- **Estate of William Abbe v. City of Vancouver / Western District of Washington / Mar 2022**
  - ○ Retained by City of Vancouver / OIS / Action, perception dynamics and general UOF / No report filled, case settled.
- **State of Oregon v. Matthew McAdoo / Washington Co. Cir. Court, Hillsboro / June 2022**
  - ○ Retained by prosecution, testified at trial / Murder case / Time to draw and fire and action, perception dynamics.
- **Estate of Douglas Diamond v. City of Sandy / US District Court, Oregon / OIS / Oct 2022**

- o Retained by Clackamas County for Defendant / Case in prelim stages, no report. Police procedures and tactics dealing with suicidal subjects.
- **Estate of Ryan Miller v. Police Officer Joseph Wolk / Eastern Dis. Of Pennsylvania / July 2022**
  - o Rule 26 / Retained by plaintiff / excessive force / pursuit
- **Dezsanne Jones v. City of Riverside / Central District of California / Feb 2023**
  - o Retained by City of Riverside / Case pending / no report issued.
- **Eric H. Saldivar v. Evan Wright and Abel Soria / Central District of California / Feb 2003**
  - o Retained by City of Riverside / Case pending / no report issued.
- **Jason White v. City of Riverside, Devin Hill / Central District of California / Feb 2003**
  - o Retained by City of Riverside / Case pending / no report issued.

I have provided instruction on the justification and application of police use of force to our agency to include 40 additional law enforcement agencies in Oregon, Washington and California.  I have also instructed K-9 application of use of force at the Oregon Police Canine Association yearly conference.

I have assisted with curriculum development with respect to our agency's Tactical Communication and Crisis Intervention training modules.  I have been consulted by and provided course material to Retired Chief Ron Louie, Hillsboro Oregon, regarding his curriculum and for his accredited Crisis Intervention class taught at Portland State University, Portland Oregon, and Portland Community College.

In 2009, I was selected by Attorney Randy Means (one of the managing attorneys for the landmark United States Supreme Court case Graham v, Connor and co-founder of ABLE  (Allied to Benefit Law Enforcement)), to participate on a National  Advisory Board on Police Officer Safety Training and currently remain a board trainer/consultant with ABLE.  I have submitted papers to the publisher of ABLE on officer safety and survival.  My contributive article was selected to be a part of a national training module on police officer safety training and survival.

I have co-authored additional articles, both in print and web-based media, pursuant to police active shooter response in Law in Order Magazine, Oct 2013, and American Cop, August 2013.

In 2010 and 2012, I was the recipient of the Police Chief's Award for my continual work towards officer safety training and scenario development.  In 2006 and 2012, I received the Hillsboro Police Officer of the Year Award for my dedication to the profession and continual growth in police training.  I have received two Distinguished Service Awards for involvement in hazardous situations, two Medals of Valor for circumstances involving extreme hazard, one Life Saving Award, (Oregon Police Officer Association) one Police Services Award for project/community involvement and two Meritorious Service Awards for complex projects and coordination.  In 2011, I received the Hillsboro Optimist Clubs award for innovative methods in police training.  In 2012, I received a Meritorious Service Award from the Oregon Police Officers Association for integrating public safety agencies (police and fire) in response to active shooter incidents.  In 2014, I received the Hillsboro, Oregon Chamber of Leadership Public Safety Award for instituting innovative methods in police training and practices.

In 2015, I received the National Police Trainer of the Year Award from the International Law Enforcement and Educators Trainers Association, (ILEETA).

From 2009 through 2015, I was the primary instructor at the Portland Oregon Metropolitan Sergeants Academy instructing Tactical Supervision to supervisors in Oregon.  My curriculum has been taught to over 190 sergeants from 19 jurisdictions and encompasses the tactical and strategic aspects of police deployment in critical incidents.   In addition, I also instructed Supervisor Responsibility in Use of Force Incidents.

I am a member of the International Association of Law Enforcement Educators and Trainers Association, the International Association of Law Enforcement Firearms Instructors, the National Tactical Officers Association, the Oregon Tactical Officers Association, the California Tactical Officers Association, the Police Policy Studies Council, Force Science Research Center, and the Human Factors and Ergonomics Society.  I was a member of the International Wound Ballistics Association for six years while it existed and have studied and observed the causative factors in the injuring and killing of humans associated with this.  Each of these organizations is devoted to promoting the latest methods of producing positive results in officers under stressful and dynamic conditions.

I have drawn upon my experience as a police officer, coupled with additional training, education, and experience I have received in my professional career, including experiences in my personal life, to better understand, educate and train police officers on the aspects associated with human violence, crisis decision making and corresponding force responses.

I have been tasked numerous times by the Washington County, Oregon, District Attorney's Office, the City of Vancouver, Washington, Prosecuting Attorney's Office, and the Seattle, Washington, District Attorney's Office to conduct research and test fire on weapons pending litigation.  Prior to my law enforcement career, I was in the United States Marine Corps, trained in part as a machine gunner and weapons armorer.  Through these experiences, I have gained extensive knowledge in the functionality, capability, ballistics, and field application of a wide variety of weapons.

I have studied the effects of numerous calibers of bullets, with respects to spalling, fragmentation and deformation when shot through various mediums to include human tissue, bone, ballistic gelatin, wood, wall board, sheet metal, clothing, glass, sand, and masonry.  My knowledge and expertise in this area comes from my physical inspection of bullets, discussions with technicians from Federal, Remington, and Winchester Manufacturing Corporation, the Oregon State Crime Lab, Federal Bureau of Investigation Firearms Training Unit, to include on-site demonstrations of bullet ballistic and penetration characteristic, shooting recreations and through academic research.

A considerable portion of my professional career has involved the study and analysis of the conduct of peace officers with respects to their use of force and tactics, including the legal and liability issues that surround these encounters.  I have studied, been trained in, researched, and

have conducted training to officers and the instructors of officers in physical skills, learning theory (including reaction times), physiological and psychological reactions to physical, emotional, and life-threatening stress. This training also includes the evaluation of physical actions in combative environments, including what is required to create effective human combative responses and decision-making under stress.

I currently hold certifications from the Force Science Institute as a Force Analyst and an Advanced Force Specialist.  The advanced training and subsequent certification I received centers around the psychological, physiological, and biomechanical aspects of lethal force encounters.  Specific human performance areas in which I have received additional training are within the fields of human motor skills/action and reaction times; human cognition, memory and recall capabilities and the subsequent psychological and physiological factors that have influence on these processes; human performance and decision making while under emotional or environmental stress; visual, perceptual and cogitative distortions with respects to selective attention; inattentional and change blindness; neuroanatomy and physiological aspects of fear and arousal; and the focal and ambient visuomotor systems of human vision.

In 2018, I was selected as an instructor with the Force Science Institute.  My instructorship encompasses teaching a section of the curriculum for the Force Science Certification Course nationally.  This curriculum covers an overview of the Institutes cutting-edge research into the dynamics of human behavior during life-threatening encounters.  The course explores the aspects and applications of unbiased scientific principles and processes in repetitive physical experiments designed to determine the true nature of suspect provocation and officer response (action-perception-reaction dynamics), human perception limitations, and motor learning and performance.  The goal of the program is to encourage law enforcement professionals to apply the important concepts revealed in this research when investigating, reconstructing, recalling, or otherwise analyzing a use of force incident.

In May 2023, I became the Director of Training for Force Science and currently work full-time in that capacity.

I have a Bachelor of Science degree from Portland State University in Criminal Justice.  I currently possess a Police Officer Basic, Intermediate, Advanced, and Mid-Management Certificates from the Oregon Department of Public Safety Standards and Training and have approximately 7000 hours of formal police training and instruction.

# REPORT

**PURPOSE**

I was asked by attorney Ms. Debra Cook to utilize my expertise in police use of force, tactics, training, and generally accepted police practices to offer an opinion as to the reasonableness of the conduct of City of Riverside, California, Police Officer Evan Wright during a shooting Officer Wright was involved in on January 26, 2021.  My opinions and conclusions in this matter are reliably supported by my 27 years of professional police experience in teaching, instructing, and analyzing police use of force applications, tactics, and training.

**SUMMARY OF INCIDENT**

Mr. Xavier Lopez has a criminal record and has been incarcerated for prior criminal convictions.[1] On August 2, 2020, Mr. Lopez was released on parole.  On September 15, 2020, Mr. Lopez failed to report to his parole officer resulting in a parolee-at-large warrant being issued.  On September 21, 2020, Mr. Lopez was arrested on his outstanding warrant and was subsequently released on October 15, 2020.  On December 29, 2020, another warrant was issued for Mr. Lopez as Mr. Lopez's parole officer was unable to locate him.

On January 19, 2021, Riverside Police Officer Moses Prado spotted Mr. Lopez at a local gas station and attempted to stop Mr. Lopez for a vehicle code violation.  When Officer Prado initiated the traffic stop, Mr. Lopez refused to pull over and a vehicle pursuit ensued.  The pursuit ended when Mr. Lopez recklessly entered a nearby California freeway in oncoming traffic.  Officer Prado terminated the pursuit because of the extreme danger to the public and himself.  Officer Prado was able to identify Mr. Lopez from a visual obtained while Mr. Lopez was at the gas station and subsequently confirmed a check on the vehicle registration for the car Mr. Lopez was driving.[2]

Officer Prado later contacted Officer Evan Wright, with the City of Riverside Police Department, concerning the information he learned about Mr. Lopez and requested the Riverside Police Department's Multi-Enforcement Tactical Response Operations Team (METRO) to assign resources to apprehend Mr. Lopez due, in part, for Mr. Lopez's outstanding felony warrant, his criminal history (one charge being assault with a Firearm), and Mr. Lopez's propensity to flee with increasingly reckless behavior.

on January 26, 2021, at 4:00 p.m., Officer Wright along with additional officers with the City of Riverside police METRO team set up surveillance at an associate's residence with the objective of arresting Mr. Lopez.[3][4]  Officer Wright and the METRO team's objective was to contain and

---

[1] Vehicle theft 2/22/14, Recklessly Evading Arrest 7/14/14, Receiving Stolen Property 2/26/15 and again on 1/23/18, Assault with a Firearm.

[2] Chrysler Sebring, California license number 8TIV315.

[3] The residence belonged to Ms. Carina Avila, the ex-girlfriend of Mr. Lopez, at 4610 Tomlinson Ave, Riverside, California.  The shooting occurred outside Ms. Avila's residence.

[4] City of Riverside police officers Henry Park and Kyle Wilder accompanied Officer Wright in his undercover

converge on Mr. Lopez and take him into custody, preferably without the need to use force. After approximately twenty minutes of surveillance at the target location, Officer Robert Monreal identified Mr. Lopez exiting his vehicle near Ms. Avila's residence.  Upon hearing over the radio the arrival of Mr. Lopez, Officer Wright drove his vehicle toward Mr. Lopez's location.  Prior to Officer Wright's arrival, Mr. Lopez was walking toward Ms. Avila's residence.  Officer Wright stopped his vehicle in close proximity to Mr. Lopez in an effort to apprehend Mr. Lopez before he could enter Ms. Avila's residence.  The convergence of the City of Riverside Police Officers Evan Wright, Henry Park, Kyle Wilder, and Robert Monreal is captured on the various officer's body-worn cameras.[5]

Officer Wright parked and exited his vehicle with his duty weapon drawn, and immediately verbally warned Mr. Lopez by stating, **"Hey, Xavier, it's the cops, take your hands out of your pockets, bro, hands up, hands up, don't move, don't move."**[6]  Officers Monreal and Wilder also simultaneously gave verbal warnings to Mr. Lopez as they converged with Officer Wright.

Mr. Lopez failed to comply with these orders and quickly thrust his right hand into his left upper interior coat pocket and partially retrieved a handgun which Officer Wright clearly observed.  As a result of Mr. Lopez's refusal to obey the clear warnings provided by the Riverside police officers on scene, while simultaneously retrieving a handgun from his coat pocket, led Officer Wright to conclude a deadly assault was imminent.  Officer Write fired two shots in close succession hitting Mr. Lopez in the chest and abdomen.  Mr. Lopez was eventually taken into custody.  Officers on scene provided immediate first aid to Mr. Lopez and summoned emergency medical services to assist.

**GENERAL CONCLUSION**

It is my opinion that Defendant City of Riverside, California, Police Officer Evan Wright acted as a reasonable well-trained California peace officer when he intentionally responded with deadly force in shooting Mr. Xavier Lopez on January 26, 2021.  The actions of Officer Wright, as well as the other Riverside police officers on scene, based on the totality of the facts known to them at the time of the shooting, as well as the immediate actions taken to obtain medical aid for Mr. Lopez, are those expected of reasonable and experienced police officers.

The circumstances initiated by Mr. Lopez, namely failing to comply with commands to surrender while thrusting his hand into his coat pocket and retrieving a loaded 9mm handgun in my opinion would lead a reasonable well-trained police officer to conclude their life was in imminent danger of death or serious physical injury sufficiently threatening as to justify Officer Wright's actions.

---

minivan.  Officer Robert Monreal was assigned on surveillance overserving Ms. Avila's residence and notified Officer Wright of Mr. Lopez's arrival at the residence.
[5] BWC footage of the shooting; synchronized videos by defense expert Mr. Parris Ward.
[6] BWC footage of the shooting; synchronized videos by defense expert Mr. Parris Ward.

Officer Wright reasonably responded per his training and a sudden perception of imminent threat by firing his respective duty weapon thus wounding Mr. Lopez.  Mr. Lopez initiated a series of events that would lead a reasonable well-trained officer to conclude his intent and behavior was to use a lethal firearm to cause imminent harm to either Officer Wright and/or other officers on the scene.  Although the underlying intent of Mr. Lopez is irrelevant, what is clear is Mr. Lopez disobeyed numerous warnings from police officers on scene, whom he knew were police officers, while deliberately reaching into his coat pocket and retrieving a handgun within close proximity to the officers.  Mr. Lopez's assertion that his intent was to retrieve the weapon and place it on the ground certainly appears self-serving at best now that Mr. Lopez further explained that his handgun somehow got hung up in his coat pocket.[7]  At the very least Mr. Lopez's stated desire runs contrary to the extensive previous experiences that Officer Wright has had with hundreds of past violent criminals and according to Officer Wright, 99.9 percent of these individuals do not reach for weapons when they are approached by law enforcement.[8]

The behaviors and mannerisms of Mr. Lopez would clearly provide a substantial reasonable belief, if not beyond certainty, to a reasonable police officer that Mr. Lopez was going to use his handgun and fire at the officers.  It is my opinion having reviewed the record in this matter, to include Officer Wright's statements, Officer Wright deduced the same resulting in Officer Wright's reasonable force response to protect his life and the lives of fellow officers present.

It is my opinion the officers involved, including Officer Wright who was the primary investigating officer, applied great care both in their pre-planning and coordination of the warrant service to include the actual methods undertaken to arrest Mr. Lopez on the outstanding warrant.  It was Mr. Lopez who abruptly and without provocation chose to disobey the lawful commands of the police officers while reaching into his coat pocket and retrieving a handgun.  Most importantly it is in this moment in time, basically fractions of a second, Officer Wright was thrust into the unenviable position of having to interpret Mr. Lopez's behaviors and body mannerisms and conclude and respond in a meaningful way to potentially save his life and/or the lives of fellow police officers on scene.  It is my opinion Officer Wright justifiably felt he was confronting an imminent and impending deadly assault with Mr. Lopez, a wanted felon, accessing and partially retrieving a concealed handgun in complete disregard and contrast to the clear and direct commands Officer Wright and fellow officers on the scene provided.  Officer Evan Wright reasonably responded with deadly force to Mr. Lopez's precipitous acts within the totality of the facts and circumstances known to him at the time in this rapidly evolving, and uncertain event.

It is my opinion, in reviewing the materials provided, the Riverside Police Department did not endorse or have any custom, policy, or practice that led to a violation of Mr. Lopez's constitutional rights.  The Riverside Police Department has a robust internal after-action review process for police use of force codified in agency policy.  The Riverside Police Department has embraced the necessity to have outside agency oversight of its use of force and agencies polices

---

[7] Mr. Lopez Interview with Det. Campos / LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report / Bates 0257
[8] Officer Wright deposition Pg. 19

and practices.  It is to the credit of the Riverside Police Department that they have adopted and
continue their relationship with the Riverside Community Police Review Commission.

I believe the fact pattern to be the following after my review of the materials provided to date.

**CRIMINAL BEHAVIOR PERTINENT TO MR LOPEZ'S PROPENSITY FOR VIOLENCE**

1.  On September 14, 2020, at 1:00 a.m., the Riverside Police Department received a report
    that Mr. Lopez entered the residence of his ex-girlfriend, Ms. Carina Avila, through an
    unlocked front residence entrance.   Mr. Lopez went into his minor daughter's bedroom,
    where she was sleeping, and removed her from the house.  Mr. Lopez took the child for a
    period of time and abandoned her at a neighbor's house in the dark of night.  On
    September 15, 2020, Mr. Lopez returned to Ms. Avila's residence and attempted to
    remove the minor child from the residence again.  Mr. Lopez faced resistance in the form
    of a locked bedroom door to include Ms. Avila's intense, vocal objections to Mr. Lopez's
    unauthorized presence in her home.  On September 16, 2020, a warrant was issued for
    Mr. Lopez's arrest.

2.  On September 21, 2020, Riverside Police Officer Arthur Ramirez contacted Mr. Lopez
    during a routine pedestrian check when he discovered the active parolee-at-large
    warrant.  Officer Ramirez arrested Mr. Lopez and he was placed in the Robert Presley
    detention center for burglary and child endangerment.  On September 30, 2020, Mr.
    Lopez was sanctioned 120 days in custody with an expected release date of November
    19, 2020.  Mr. Lopez was actually released on or about October 15, 2020.  On December
    29, 2020, a parole-at-large warrant was issued for Mr. Lopez's arrest when it was reported
    his parole officer could not locate Mr. Lopez after his parole release.

3.  On January 17, 2021, Riverside Police Department Officer Ransom De Castro responded
    to an emergency call at Ms. Avila's residence.  Ms. Avila reported to Officer De Castro
    that on January 17, 2021, Mr. Lopez unlawfully entered her bedroom.  When Ms. Avila
    told Mr. Lopez to leave, he lifted his shirt and exposed a black semiautomatic handgun
    and told her to "shut the fuck up."  Ms. Avila told Officer Castro that she was in fear for
    her life.

4.  On January 19, 2021, Riverside Police Department Officer Moses Prado spotted Mr.
    Lopez at a local gas station and attempted to stop him for a vehicle code violation.  When
    Officer Prado signaled Mr. Lopez with his lights and siren to pull over, Mr. Lopez refused
    and a vehicular pursuit ensued.  The pursuit ended when Plaintiff entered the 91
    Freeway in oncoming traffic.  Officer Prado terminated the pursuit because of the
    extreme danger to the public and himself.  Officer Prado was able to identify Mr. Lopez
    from a visual obtained while Mr. Lopez was at the gas station which was confirmed by a
    check on the vehicle registration for the car he was driving, a Chrysler Sebring, California
    license number 8TIV315.  Officer Prado contacted Officer Wright concerning the
    information he learned about Mr. Lopez and asked the Riverside METRO team to assist in
    the apprehension of Mr. Lopez.

**OFFICER WRIGHT PRE-INCIDENT KNOWLEDGE**

1. On January 19, 2021, Officer Prado contacted Officer Wright and the Riverside Police Department Multi-Enforcement Tactical Response Operations Team ("METRO") and requested to have resources assigned to apprehend Mr. Lopez.  Officer Wright obtained current relevant information from Officer Prado about Mr. Lopez's recent criminal behavior and began the METRO investigation.  Officer Wright reviewed Officer Prado's police report as well as Officer Prado's vehicle's COBAN video from the January 19, 2021, pursuit.  Officer Wright conducted a records check on Mr. Lopez, including his criminal history and current status.  Officer Wright obtained Mr. Lopez's photograph and confirmed that Mr. Lopez had an outstanding, felony, parolee-at-large warrant. Officer Wright also contacted Mr. Lopez's parole officer, Mr. William Iriart, to obtain additional information about Mr. Lopez.  After completing his preliminary investigation, Officer Wright updated and briefed the METRO Officers assigned and provided the officers with the details he learned concerning Mr. Lopez.[9]

2. The METRO unit including Officer Wright then conducted surveillance at several apartments and homes in Moreno Valley California where Mr. Lopez was thought to have resided.  None of these initial surveillance efforts were successful in locating Mr. Lopez.  After the initial surveillance effort failed, Officer Wright contacted Ms. Avila to obtain additional information to locate Mr. Lopez.  Ms. Avila was cooperative and provided additional addresses, information on family relatives, Mr. Lopez's cell phone number, and information concerning recent contact she had with Mr. Lopez concerning their daughter.  Ms. Avila reported that Mr. Lopez had recently been to her home, armed with a gun, and was "tweaked out."  She asked Mr. Lopez to leave.

3. Officer Wright, with his considerable experience in interacting with people who are under the influence of narcotics, assessed Mr. Lopez's narcotic use as likely to cause him to have erratic behavior and a potential lack of mental and logical process fluidity compared to people who are not under the influence of narcotics.  Officer Wright's general experience with people under the influence of narcotics is they do not act like people who are not under the influence of narcotics.  They cannot be counted on to react rationally or predictably to challenging circumstances.  In addition, the fact that Mr. Lopez's prior actions of driving dangerously in oncoming traffic in response to a stop request by law enforcement indicated that Mr. Lopez was willing to put his life (and the lives of others), at great risk to avoid being apprehended by the police.  It is for these reasons the specially trained City of Riverside METRO team was assigned the

---

[9] Officer Wright conducted a risk assessment on Mr. Lopez to include his criminal history; obtained photographs of Mr. Lopez and Ms. Avila to include her residence and drafted a warrant service apprehension plan to include contingencies, which Wright briefed with command and disseminated the information to the METRO team on January 26, 2021.

apprehension of Mr. Lopez.

4. Officer Wright asked Ms. Avila to inform him when Mr. Lopez contacted her with a reliable location where the police could apprehend him.  Ms. Avila and Officer Wright stayed in contact between January 22-26, 2021, concerning her communications with Mr. Lopez.  Ms. Avila told Officer Wright that Mr. Lopez would be coming to her home, located at 4610 Tomlinson Avenue, Riverside, California, 92503, on Tuesday, January 26, 2021, at 4:00 p.m.  As the lead investigating officer, Officer Wright updated the operational plan and issued tactical assignments to the METRO unit on January 26, 2021.

It is undisputed that these were the pre-shooting investigation facts known to Officer Wright.

**SHOOTING**

1. On January 26, 2021, at approximately 3:29 p.m., the METRO team arrived at 4610 Tomlinson Avenue, Riverside, California in unmarked vehicles.  Riverside Police Officer Robert Monreal was assigned point surveillance on Ms. Avila's residence.  Riverside Police Officers Henry Park and Kyle Wilder were with Officer Wright at this location, paired up with Officer Wright in his undercover Dodge minivan.[10] [11] [12]  They were tasked to arrest Mr. Lopez on his outstanding warrant to include the additional pending criminal charges.

2. After approximately twenty (20) minutes of surveillance, Mr. Lopez arrived in a Chrysler Sebring at 4610 Tomlinson Avenue by turning eastbound on Cook Avenue and then onto Tomlinson where it parked in the dirt lot across from the residence.  Officer Monreal notified the METRO units that Mr. Lopez's car was approaching, and it appeared that Mr. Lopez was the driver of the vehicle.  Officer Monreal further notified the METRO unit that the driver's door was opening, and a male was exiting the driver's seat wearing a trench coat with his hands in his pockets.  Mr. Lopez was wearing a black smock partially covering his face and began walking toward Ms. Avila's residence.

Officer Wright immediately drove his minivan toward the residence in an effort to intercept Mr. Lopez before he could reach the front door of Ms. Avila's residence.  Officer Wright stopped short of Mr. Lopez and exited the van with his duty firearm drawn.  Officer Wright called Mr. Lopez by his name saying, **"Hey, Xavier, it's the cops,**

---

[10] DKT 19-4 Dec of Robert Monreal.  Officer Monreal was assigned point surveillance in a black Toyota Camry near the front of the residence and provided updates to include when Mr. Lopez arrived.
[11] DKT 19-5 Dec of Henry Park.  Officer Park was in the Dodge mini-van with Officer Wright.
[12] Lopez 1 (CITY) 0656  Case Reports / Bates 0448, Officer Wilder was in the Dodge mini-van with Wright.

**take your hands out of your pockets, bro, hands up, hands up, don't move, don't move."**[13]

3. Officer Wright's objective was to get close enough to grab Mr. Lopez to facilitate the arrest without violence.  However, Mr. Lopez did not comply with Officer Wright's clear commands and instead, Mr. Lopez reached across his chest with his right hand and put it in his trench coat's left breast pocket.  Officer Wright stopped his forward approach when he saw the butt of a firearm in Mr. Lopez's hand as Mr. Lopez began to remove his partially concealed hand from his trench coat.  Officer Wright retreated and immediately decided to fire his duty weapon at Mr. Lopez to protect himself from a perceived impending deadly assault, including responding with deadly force to protect his fellow officers who were in close proximity to Mr. Lopez and any potential civilians that would have been in harm's way on the public street.  Officer Wright fired two shots in immediate succession while notifying everyone that Mr. Lopez had a gun.  Officer Wright believed at the time he decided to fire his duty weapon at Mr. Lopez that Mr. Lopez was going to kill him, or one of his partners.[14]  Once Officer Wright saw Mr. Lopez fall to the ground Officer Wright stopped firing his duty firearm.  Officer Wright felt the risk was reduced as Officers Park, Monreal, and Wilder were now within reach and could help him take Mr. Lopez into physical custody.  Officers on the scene provided Mr. Lopez with immediate first aid attention.

**OPINIONS**

1. Moments before the shooting [-4.338][15] [16]  Mr. Lopez's hands were placed in what is commonly referred to as a "ready-staged" position at or near his overcoat lapels.  This configuration affords a person ease of access to retrieve a weapon inside their clothing.[17]  A more pronounced view of Mr. Lopez stagging his hands in this position is seen in frame 1549 [-4.238] to frame 1559 [-3.904].

2. Beginning at or near frame 1560 [-3.871] Mr. Lopez begins to access his handgun.  Frame 1650 [-3.871] through approximate frame 1607 [-2.302] (approximately 1.569 seconds duration), Mr. Lopez accesses his handgun.  During this period of time, Officer

---

[13] BWC footage / Officer Wright.  Interview with Officer Wright by Riverside County DA Investigator James Compos.

[14] Interview with Officer Wright by Riverside County DA Investigator James Compos.

[15] Defense expert Mr. Parris Ward synchronized BWC videos, time coded to 1000's of a second.  The (-4.338) time code represents -4.338 seconds away from the shooting with 0.000 representing when Officer Wright fired his first round.

[16] Frame sequencing as captured by Officer Wright BWC.

[17] I attended the Heckler and Koch, Dignitary Protection Instructor School, Portland, OR, in May 1999 and a subsequent US Secret Service Dignitary Protection Instructor school, Hillsboro, OR, in June 2023.  This is a commonly applied technique allowing the user to navigate their clothing effectively and efficiently to access their weapon.

Wright, along with other officers on scene are verbalizing commands to Mr. Lopez, **"Take your hands out of your pockets, hands up, hands up."** At or near frame 1608 [-2.269] through approximate frame 1627 [-1.635] (0.634 seconds), Mr. Lopez retrieves his handgun from his interior coat pocket and this is clearly observed by Officer Wright.[18]  Around this time period, BWC footage shows Officer Wright reaching for the location of Mr. Lopez's hands, i.e., where Mr. Lopez's handgun is.  It is my opinion Officer Wright is doing this in a plausible effort to control Mr. Lopez's hand and/or trap the handgun and/or otherwise try and control the ultimate production of the handgun.[19]

3.   At approximately frame 1632 [-1.468] BWC footage indicates that Mr. Lopez makes a second notable attempt to either retrieve the weapon or gain a better grasp on the handgun.  Mr. Lopez acknowledged in his interview that the weapon was caught up or otherwise would not fully come out from his jacket.[20]  From approximately frame 1632 [-1.468] to frame 1637 [-1.301] BWC footage appears to show Mr. Lopez making a second attempt to access or stabilize the weapon either in or partially concealed in his coat pocket.  During this same period, BWC footage shows Officer Wright continuing to reach forward and contact Mr. Lopez's coat and/or sleeve area with his support hand (left hand), frame 1637 [-1.301] to approximately frame 1643 [-1.101].  Frame 1638 [-1.268] BWC footage does not capture Mr. Lopez's right hand raising as it moves out of frame.  From the perspective of Officer Wright's BWC, the camera does not capture what is occurring with Mr. Lopez's right hand from approximately frame 1638 [-1.268] to frame 1659 [-0.567], until at which point you see Mr. Lopez's right hand come back into frame, away from his jacket, approximately shoulder level of Mr. Lopez, palm facing Officer Wright.[21]

4.   Officer Park's BWC shows Mr. Lopez coming back into view of the camera at approximately [-1.235].[22]  Neither of Mr. Lopez's hands are raised.  It is not until approximately [-1.101] that you see Mr. Lopez start to raise his right hand.  From the beginning of the frame sequence [-1.235] through approximately [-0.968] it appears to show that Officer Wright's left arm is still extended in contact with Mr. Lopez in close proximity to where the gun was last observed.  It is my opinion this indicates that Officer Wright was using his left unincumbered hand to trap, defect, or otherwise attempt to control Mr. Lopez's producing the handgun a second time.  Frame [-1.2350] through

---

[18] Officer Wright Interview, LOPEZ 1 (CITY) 0442 DA Report / BATES 0203.

[19] Officer Wright does not mention this particular maneuver in his interview.

[20] Officer Wright Interview, LOPEZ 1 (CITY) 0442 DA Report / BATES 0257.

[21] Neither Officer Wright's BWC, nor any other BWC worn by the officers on scene, accurately depict the perspective of Officer Wright as the camera is mounted mid-chest level, approximately 12-18 below eye level.  Similarly, in terms of perspective, BWC do not undertake a perception, decision making process.

[22] LOPEZ 1 (CITY) 4153 Park BWC Frame Sequence / Defense Expert Parris Ward.

[-0.968] shows Mr. Lopez's left hand is at or near Officer Wright's left forearm.  It is my opinion this left-handed maneuver by Mr. Lopez is to exert possible control or deflection of Officer Wright's left hand and/or arm in an attempt to exert physical control over Officer Wright.  At [-0.934] it is clear Mr. Lopez is not indicating by the positioning of his hands, a position of surrender.  Not until approximately one-half second prior to Officer Wright firing his handgun does the BWC footage show that Mr. Lopez's hands were raised, [-0.534].  In addition, it is also my opinion the configuration of Mr. Lopez's hands and physical stance are in such a configuration to allow quick access to the handgun and/or engage in a physical confrontation with Officer Wright.  This conclusion is supported by the fact that Mr. Lopez was just previously in contact, at or near, Officer Wright's left arm, representative of a blocking/diversion maneuver of Officer Wright's left arm.

5. Viewing the camera footage from Officer Wilder's BWC (compared to the footage of Officer Wright's BWC), both Officer Wright and Officer Wilder's camera frames show Officer Wright's hand either near or in contact with Mr. Lopez's button area on his jacket [-1.001] frame 1492.  Mr. Lopez's hands are not raised at this juncture.  Officer Wright's BWC footage depicts at approximately [-0.934] frame 1648, Officer Wright's left hand is moving away from Mr. Lopez's jacket starting the process of returning his left hand to his weapon.  In this same sequence, Officer Wilder BWC, frame 1494, does not indicate Mr. Lopez has raised his hands and the BWC footage does not capture what Mr. Lopez is doing with his right hand.   From the perspective of Officer Wilder's BWC [-0.901] frame 1495, through approximately [-0.701] frame 1501 the BWC footage does not definitively show that Mr. Lopez has raised his hands.  It possibly indicates in frame 1501 that Mr. Lopez begins to raise his right hand, about the time Officer Wright's left-hand returns to his handgun facilitating his master grip.  Not until frame 1659 (Officer Wright BWC) do we see Mr. Lopez's hands raised, palms open [-0.567], essentially one-half (1/2) second before Officer Wright fires his handgun.[23]

6. At the time of Officer Wright's first shot [-0.00], Mr. Lopez is front facing (chest area-front torso towards Officer Wright).  Just prior to this, at or around [-0.267] Mr. Lopez rotates his head counterclockwise and starts to look towards Officer's Park and Wilder as they are converging on him.[24]  After Officer Wright's first shot, Mr. Lopez starts to turn towards Officer Park; Mr. Lopez's torso rotates counterclockwise facing Officer Park exposing Mr. Lopez's left flank (left arm, left torso area) to Officer Wright.  Officer Wright delivers his second shot at [0.534], essentially one-half second after his initial shot.  It is my opinion that Officer Wright's shot cadence time is consistent with Officer

---

[23] It is my opinion the timing sequencing in the videos I reviewed lies in stark contrast to what Plaintiff alleges to have occurred during this time period occurring during the preceding two seconds before the shooting.

[24] LOPEZ 1 (CITY) 4156 Synchronized BWC's / Defense expert Mr. Parris Ward.

Wright having to exercise some elements of sighting alignment (perception gaze coupling), having to accurately deliver a shot to Mr. Lopez's left side which is a significantly less exposed target area, to include a target area that is in motion (Mr. Lopez's torso rotation) and the fact that Officer Wright is in motion, stepping rearward at the time of his second shot.[25] [26]

7.  In under two seconds, Mr. Lopez manipulates and retrieves a handgun from his pocket. This is observed and accurately recalled by Officer Wright exclaiming definitively within a second of the shooting, "He (Mr. Lopez) has a gun". This is well after Mr. Lopez acknowledges and recognizes that he is being confronted by police. Up until this point, Mr. Lopez has willfully disregarded the clear, lawful, and multiple commands by the officers. At approximately 1.3 seconds before Officer Wright discharges his firearm, it is my opinion you can clearly see Mr. Lopez continually accessing his left coat pocket where the weapon has already been seen by Officer Wright. Mr. Lopez is doing nothing at this juncture, either by spoken words or mannerisms, to indicate he is surrendering. Just the opposite. Mr. Lopez is manipulating his semi-automatic 9mm handgun which he acknowledges got hung up in his coat pocket. Unenviably, Officer Wright is now thrust into having to literally make a split-second decision to respond with deadly force to save his life and possibly the lives of the officers around him or wait a mere fraction of a second and likely get shot. It is my opinion, Officer Wright acted reasonably to respond with deadly force under the circumstances confronting him, and his decision to do so comports with Riverside police agency policy and California law.[27]

8.  City of Riverside Police Use of Force policy 300.4(a) states: *"An officer may use deadly force to protect him/herself or others from what he/she reasonably believes is an imminent threat of death or serious bodily injury to the officer or another person."*

    Riverside Police Use of Force Policy 300.4 further states: "*An "imminent" threat of death or serious bodily injury exists when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the officer or another person. An officer's subjective fear of future harm alone is insufficient as an imminent threat. An imminent threat is one that from appearances is reasonably believed to require instant attention (Penal Code § 835a)."*

    It is my opinion, under these fact patterns, Mr. Lopez accessed and partially removed his handgun in direct opposition to the warnings provided by officers on scene. Clearly, this

---

[25] Vickers, J. (2007) Perception, Cognition, and Decision Training: The Quiet Eye in Action. Human Kinetics.

[26] Vickers, J. (2009) Advances in Coupling Perception and Action: The quiet eye as a bidirectional link between gaze, attention, and action. Progress in Brain Research, Vol 174.

[27] City of Riverside Use of Force policy 300 / Bates 0831. California Penal Code 835a.

fact alone supports Mr. Lopez's ability and opportunity to use the weapon.  This intentional act must also be considered against the backdrop of Mr. Lopez's past criminal history, illegal drug use, and desire to place others in harm's way to evade capture.  The apparent intent of Mr. Lopez, as interpreted by Officer Wright having previously arrested hundreds of violent felons and in 99.9 percent of those cases, those persons do not grab or otherwise access a handgun (if they are carrying one), when confronted by police.  It is my opinion it is certainly reasonable to deduce that Mr. Lopez's apparent intent was to use the firearm against the police.  Certainly achievable within a timeframe of less than a second, Mr. Lopez could have very easily finished removing his handgun from his coat pocket and shot Officer Wright and/or other officers on the scene thereby requiring instant attention and action on behalf of Officer Wright to mitigate against the impending deadly assault.[28]

9. With respect to warning requirements prior to using deadly force, Riverside Police Use of Force Policy 300.4(b) states:  "*An officer may use deadly force to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.  Where feasible, the officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts*".

It is my opinion Officer Wright along with Officer Monreal gave numerous, clear, non-cryptic warnings regarding their unambiguous stated intent for Mr. Lopez to do what they asked of him upon their initial contact with him.  So much so that Officer Wright was not even out of his car before he was provided clear directions to Mr. Lopez.  It is my opinion the record clearly shows that Officer Wright warned Mr. Lopez in three key areas:  (1) don't move; (2) take your hands out of your pockets, and (3) put your hands up.  Mr. Lopez complied with the admonishment to not move (i.e., flee), but Mr. Lopez willfully and knowingly disregarded the other two commands and reached into his coat pocket and partially removed a handgun.  Mr. Lopez's decision to access and partially retrieve a handgun was a clear and now ominous disregard for what Officer Wright and Officer Monreal asked of him.

In reviewing Officer Wright's deposition[29], it appears Plaintiff is asserting that Officer Wright should now add a separate and distinct admonishment that deadly force may be used if he (Mr. Lopez), fails to comply.  It is my opinion that Plaintiff's assertion is ill-advised, impractical, and unachievable for two reasons.

---

[28] Kinematic Analysis of Naive Shooters in Common Law Enforcement Encounters.  Journal of Forensics Biomechanics (2022) Kantor, Garg, Lewinski, Tenbrink, Lau, Pettitt.
[29] Officer Wright deposition Pg. 19

a)  The commands issued by Officer Wright and Officer Wilder, upon exiting their vehicles and initially approaching Mr. Lopez, were clear, succinct, unambiguous, and contextually correct based on the behaviors they were observing in Mr. Lopez.  At this beginning phase of the encounter, Mr. Lopez had not reached for the handgun and an admonishment or warning that deadly force could be used would be inappropriate as this would essentially be a bluff with no justifiable reason to follow through on this warning if Mr. Lopez were to flee or conduct himself in some other non-threatening manner.

b)  Once Mr. Lopez's behavior turned more ominous and life-threatening, i.e., reaching for and partially producing his firearm, these actions through the culmination of Officer Wright responding with deadly force was within two seconds.  Clearly, with the significant time compression of mere seconds, there would simply not be enough time to enunciate different commands that deadly force may be used if Mr. Lopez did not comply with the original commands provided.  Even the most hypothetical basic warning of "stop or I'll shoot" would likely take more than two seconds to verbalize.  It is my opinion, the Plaintiff's apparent assertion that officers could have achieved this more expanded warning would be unachievable given the rapidly evolving nature of this perceived impending deadly assault.[30] [31] [32]

10. Timing aspects with respect to human perception, contextualization, and decision-making processes are important factors to consider in evaluating the reasonableness of an officer's use of force.  There have been over 150 years of experimentation, and recognition of the implications associated with mental chronometry, including empirical-based studies and scientific mathematical laws to illuminate these important

---

[30] Smith v. Agdeppa, 9th Cir, 20-56254 (2022). "Our very framing of the "warning" principle itself presupposes that it is not a one-size-fits-all proposition that applies in every case or context.  We have stated only that the rule applies "[i]n general," "'whenever practicable.'" Gonzalez, 747 F.3d at 794 (quoting Harris, 126 F.3d at 1201).  We have also specifically emphasized that "[t]he absence of a warning does not necessarily mean that [an officer's] use of deadly force was unreasonable." Id. at 797 (emphasis added).  The flexibility built into our "warning" rule makes it more difficult for that rule, standing alone, to clearly establish a constitutional violation in any given case."

[31] Smith v. Agdeppa, 9th Cir, 20-56254 (2022). "The general warning principle we have articulated thus does not, on its own, invariably indicate when a warning is required.  Existing precedent does not clearly establish in every context when such a warning is "practicable," what form the warning must take, or how specific it must be.  Nor does existing law clearly establish how the absence of a warning is to be balanced against the other Graham factors in the context of a case such as this.  That officers may be constitutionally required to provide a warning before using deadly force in some cases does not mean it is clearly established that such a warning was required in this case."

[32] Smith v. Agdeppa, 9th Cir, 20-56254 (2022) (Dissent opinion by Justice Bress pursuant to initial holding prior to reversal). "[T]he dangers of today's decision are especially ominous.  At what micro-second interval in the final heated moments of this escalating confrontation was Agdeppa somehow legally required to hit the "pause button" and recite some yet-undisclosed, court-created warning script?  The uncertainty the majority opinion invites stands as a further condemnation of its holding."

areas.[33]  It takes time for humans to perceive the world around them, make decisions, and respond in kind.   What is well established, is humans do not make decisions instantaneously.  If this were the case, there would be no need to have yellow warning lights in traffic signals priming a motorist a forthcoming stop is expected.  It is my opinion Officer Wright correctly interpreted the events and circumstances he was challenged to quickly decern, including extrapolating possible consequences for his fellow officers and citizens in the area.

Officer Wright observed and correctly perceived Mr. Lopez's threatening actions and put those into meaningful context based on his experience, training, and past historical knowledge of Mr. Lopez's behaviors and conduct, and reasonably responded with deadly force given the extreme time constraints Officer Wright was confronted with.  To suggest otherwise, in this context, would discount the long-held prescribed recognition of the challenges associated with, and allowances afforded, the discernment and practical application of split-second decision-making in tense, uncertain, and rapidly evolving situations.[34]

11.  The BWC evidence obtained and reviewed in this case is also relevant to understanding the timing and sequencing of the events as they unfolded.  However, BWC video footage does not take into consideration the human eye's ability to utilize foveal vision/focal-point-focus (visual accommodation),[35] perception[36], attention,[37] visual search patterns,[38] and the decision-making process of the user.[39]  Put simply, a BWC or camera

---

[33] Donders, F.C. *On the speed of mental processes*. In W. G. Koster (Ed.), Attention and Performance II, Acta Psychological (1968) (Original work published in 1868).   T Hick, W. E. *On the rate of gain of information*. Quarterly Journal of Experimental Psychology, (1952). Tobin, E.J. and Fackler, M.L. *Officer reaction-response times in firing a handgun*. Wound Ballistics Review: Journal of the International Wound Ballistics Association (1997).  Schmidt RA, Lee TD. *Motor learning and performance - 5th edition*. Human Kinetics, (2014).  Bumgarner JB, Lewinski WJ, Hudson W. *An examination of police officer mental chronometry*.  The Scene, Journal of the Association for Crime Scene Reconstruction, (2007).

[34] Graham v. Conner USSC (1989) Also reiterated in 9th Circuit Appeals Court case Smith v. Agdeppa 20-56254 (2022) to include the Riverside Police Department Use of Force policy.  (Smith v. Agdeppa) "In conducting this analysis, we do not "second-guess officers' real-time decisions from the standpoint of perfect hindsight," O'Doan, 991 F.3d at 1036, and recognize that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 397.

[35] https://myvision.org/education/eye-accommodation-reflex/.

[36] The Invisible Gorilla: How Our Intuitions Deceive Us (2011), C. Chabris, D. Simonds.

[37] Nideffer, R. M., & Sharpe, R. C. (1978*)*. Attention control training: How to get control of your mind through total concentration. New York: Simon & Schuster

[38] Pre-publication (accepted by Police Practice and Research: An International Journal, 2023) "The Eyes Have It! Functional field of view differences between visual search behavior and body-worn camera during a use of force response in active-duty police officers".  R. Horn, N. Murray, J. Lawton, B. Lewinski, G. Heidner, C. Allen.

[39] Officer Wright deposition, Pg. 20 (Q) Do you think the body camera…accurately depicts what you were able to see?  (A) (Abv) It can't replicate a person being there; it doesn't take the place of me physically being there; it's

does not replicate human vision and perception.  BWC footage/evidence is one factor in the evaluation of the totality of the circumstances confronting the officer.  Historical knowledge often influences the officer's decision-making process.  Here, in this context, Officer Wright was apprised of the following information:

a)  Mr. Lopez had a criminal past involving reckless evading arrest, receiving stolen property, multiple felony parolee-at-large violations, and assault with a firearm.
b)  Mr. Lopez had a propensity to carry firearms as stated by his former girlfriend Ms. Avila (and mother of his child).
c)  Mr. Lopez had recently engaged in (felony) eluding police in a vehicle endangering the lives of police and others by intentionally driving the wrong way on a freeway in the daytime to evade capture.
d)  Mr. Lopez's use of drugs (methamphetamines) and alcohol.

(Although not known at the time of the shooting, Mr. Lopez was under the influence of methamphetamines and alcohol the morning of his contact with law enforcement in this case).[40]

Officer Wright was aware of these instances and factored these elements into the overall risk assessment of Mr. Lopez.[41]  It is my opinion the BWC evidence is important and should not be viewed in isolation from the broader context of the totality of the circumstances confronting Officer Wright, specifically the extensive violent history, volatility, and drug use of Mr. Lopez.[42]  Secondly, what the camera is recording, irrespective of the difference in visual plane, i.e., camera lens to the human eye, Officer Wright would only be able to able to focus on one item in the environment at a time and Officer Wright's visual attention point-of-view may certainly be different than the cameras point-of-view.

12.  Mr. Lopez was aware Officer Wright was a police officer prior to the shooting and heard the warnings issued by Officer Wright and fellow officers on the scene, also prior

---

kind of like a one-sided view of what happened; it doesn't take in the totality of the circumstances; it's pointed in one direction; there's a lot of things to look at during any incident not just mine.

[40] Mr. Lopez admitted to drinking Mad Dog 20/20 and using Methamphetamine the morning prior to his engagement with Officer Wright. LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report BATES 0252.

[41] The fact the METRO team was used to coordinate and facilitate the arrest of Mr. Lopez is evidence that Mr. Lopez's threat potential was determined to be higher.

[42] Officer Wilder was in the minivan prior to deployment and overheard on the phone Ms. Avila state to Officer Wright, "She last saw Lopez on the weekend on January 16-17 at her residence" "Lopez was upset with her" "Lopez was waving a gun around and acting incoherently" "Using methamphetamine and acting incoherently" "(Avila) scared to let her daughter leaver with Lopez".  LOPEZ 1 (CITY) 0443 - LOPEZ 1 (CITY) 0656 / BATES 0448 / Officer Park Report.

to the shooting.  The excerpts below were from Mr. Lopez's interview on February 2, 2021, conducted by Senior Investigator James Campos:[43]

a) [Bates 0266] (Campos) "OK. And how did you know the cops were there?" (Lopez) "Cuz they all approached me, like, and-and all at once."

b) [Bates 0267] (Lopez) "And then all I hear was, um, all they, all they said, let me see your hands, let me see your hands and I turn around."

c) [Bates 0267] (Lopez) "…he got closer and I had a, I had, I had, uh, said police." "And they had a vest on." "And that's when I was like, oh shit, it's the police."

d) [Bates 0258] (Lopez) "He just said don't move, don't move, don't move.  And I was like hold on, hold on, don't move and as soon I was trying to grab it out, I was already shot."

Mr. Lopez said he was trying to remove his handgun and put it on the ground. According to Mr. Lopez, his handgun got hung up in his jacket.  Regardless, Mr. Lopez's actions in removing his loaded handgun from his coat pocket were contradictory to what Officer Wright and the other officers on the scene had ordered him to do and what Mr. Lopez acknowledges he heard the officers ordering him to do.[44] [45]

It is my opinion, which I believe BWC evidence clearly shows, Mr. Lopez had ample time to comply with the multiple clear orders given to him by police and not access and retrieve his loaded handgun.[46]

13. It is my opinion Officer Wright was comprehensive in his pre-planning intelligence and organization of the warrant service to include the actual service of the felony warrant on Mr. Lopez.  The Riverside Police Department (METRO) team (and the associated officers involved), followed all agency policies pertaining to pre-planned warrant services and completed and disseminated the operational assessment to all associated officers involved with the warrant service.[47] [48]

---

[43] LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report.

[44] Lopez Interview / LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report / Bates 0257.

[45] Commands given by the officers prior to the shooting / Wright BWC / "Hey, Xavier, it's the cops, take your hands out of your pockets, bro, hands up, hands up, don't move, don't move."

[46] Mr. Lopez asserts that he thought it may be Ms. Avila setting him up, and it could have been other gang members or the Cartel's coming after him.  However, he acknowledged he heard the commands and recognized they were police prior to the shot.
0267), "I didn't know they were cops until they said don't move.."  These

[47] Riverside Police Department Policy 318 / Search Warrants, Probation, and Parole Searches; Policy 406 / SWAT.

[48] LOPEZ 1 (CITY) 0664 - LOPEZ 1 (CITY) 0665 RPD Operations Plan.

Officer Wright, who was the primary case agent, assembled seven (7) Riverside police officers to conduct the warrant service, some plain clothed with proper police markings, and some in uniform and marked police vehicles.[49]

Officer Wright obtained pertinent case information; reviewed and disseminated Mr. Lopez's previous arrests and pending criminal actions; interviewed Mr. Avila with respect to her involvement and knowledge of Mr. Lopez's behavior and tendencies; interviewed officers and reviewed police reports of officers who had previous contact with Mr. Lopez (Officer Prado); disseminated pictures of Mr. Lopez, Ms. Avila, and vehicles associated to the units assigned to the warrant service operation; coordinated the primary arrest team and the uniformed containment units; coordinated the intelligence (eyes-on) officer who was tasked with surveilling the residence to provide real-time intelligence to the units assigned; coordinated Riverside police department Air Support unit; discussed contingencies with the METRO team, i.e., Mr. Lopez reaching the house and/or fleeing; planned for and assembled medical first aid contingencies; considered evacuation options; had less lethal equipment readily available, i.e., Taser and 40MM Extended Range Impact Munitions, and briefed command personnel regarding the operation.  Officer Wright stated in his deposition, that not only did the METRO team have Tasers and extended-range impact weapons readily available and accessible in the van, within feet of their contact location, all METRO team officers were trained on the use of these less-lethal tools.[50]  If the circumstances hypothetically changed, and Mr. Lopez had not produced a handgun and engaged in a more prolonged defiant stand-off, these less-lethal alternatives may have been an option.  However, the circumstances as they presented themselves to Officer Wright and fellow METRO team officers on the scene, under this fact pattern, would not require them to use less-lethal options (per Riverside police policy), when confronting an armed suspect who was accessing a handgun and placing the officers in a clear, split-second, deadly force situation.[51] [52]

It is my opinion Officer Wright did an exemplary job investigating, researching, planning, and coordinating the arrest plan for Mr. Lopez.  Officer Wright acted within the City of Riverside Police Department's policies and procedures including Officer Wright's execution of the warrant service was also consistent with pre-planned tactical operations protocols and best practices nationally.[53]

---

[49] DKT 33 - Defs' Response to Pltf. Sep. Stmt. of Additional Material Facts / There were seven Riverside Police Department officers involved in the incident: Defendant Wright, and Officers Macias, Ortiz, Park, Lopez, Wilder, and Monreal.

[50] Officer Wright deposition, Pg. 4

[51] Riverside Police policy 305 / Control Devices and Techniques

[52] Riverside Police policy 306 / Taser

[53] National Tactical Officers Association, Tactical Response and Operations Standards for Law Enforcement Agencies (2018).

14. The tactics utilized by Officers Wright, Wilder, Park, and Monreal in contacting Mr.
    Lopez in the driveway in the manner they did (with respect to their speed, tempo,
    coordination, and alignment with each other and Mr. Lopez), was reasonable and an
    appropriate team tactic to utilize under these circumstances.  The officers maintained
    their appropriate spatial fields of contact and converged in fashion to maintain a
    degree of containment over Mr. Lopez while controlling the approach and contact.
    Officer Wright stated in his deposition, that his overall goal was to safely take Mr.
    Lopez into custody with a minimal amount of force:[54]

    a)   Q.   Was your goal to safely take Mr. Lopez into custody?
         A.   Yes it was just like everyone else and every other operations plan I've
              authored or every other operation I've been on that's always the goal
              safely apprehend the suspect.
         Q.   And is part of that goal to use the minimal amount of force?
         A.   Yes like I said each situation is different it's case by case basis.

15. Officer Wright immediately summoned medical personnel to aid in the care of Mr.
    Lopez.  Officer Wright began to provide appropriate post-shooting care for Mr. Lopez
    consistent with Riverside police policy and procedures including national best practices
    pertaining to providing on-scene first aid for persons injured.[55] [56]  Within approximately
    30 seconds of the shooting, Officer Wright summoned Fire/EMS to respond even
    before Mr. Lopez was in physical custody.  Within a minute of the shooting, Officer
    Wright again confirmed with the officers on the scene that Fire/EMS was responding.
    Within minutes of the shooting, once Mr. Lopez was in handcuffs and his handgun was
    secured, Officer Wilder accessed his personal first aid equipment and began to
    administer medical care prior to the arrival of Fire/EMS.[57]  Officer Wilder, including
    fellow officers on the scene, verbally reassured Mr. Lopez to remain calm and that City
    of Riverside medical personnel were responding.  Officer Wilder on numerous
    occasions attempted to keep Mr. Lopez in a recovery position, while Mr. Lopez was on
    the ground, awaiting the arrival of Fire/EMS.

16. It is my opinion the post-shooting investigation was thorough and comported with the
    City of Riverside Policy and Procedures pertaining to Officer Involved Shooting

---

[54] Officer Wright deposition, Pg. 8
[55] City of Riverside Policy 300.6 / Use of Force, Medical Considerations; Policy 302 / Emergency Medical Service
    Response; Policy 307.3.2 (Responsibilities) Investigations of Officer-Involved Shootings and Incidents Where
    Death or Serious Likelihood of Death Results.  Policy 404.4 / Crime and Disaster Scene Integrity.
[56] International Association of Chiefs of Police, National Consensus Policy and Discussion Paper on Police Use of
    Force (2017 Rev. 2022).  National Tactical Officers Association, Tactical Response and Operations Standards for
    Law Enforcement Agencies (2018).
[57] Officer Wilder used his QuikClot compression bandage and wrap.

investigation and protocols.[58]  City of Riverside Sergeant Marco Ortiz was the supervisor in charge of the METRO team and was on-scene, parked out of sight when the shooting occurred.  Post-shooting, Sergeant Ortiz responded and contacted Officer Wright at the shooting location.  Sergeant Ortiz was the initial on-scene commanding officer and assisted with crime scene management, evidence preservation, and area canvassing.[59]   Sergeant Ortiz contacted City of Riverside Police Supervising Detective Sergeant Trinidad Lomeli with the agencies Robbery-Homicide Unit and briefed Sergeant Lomeli.  Sergeant Lomeli then assumed supervising command of the crime scene and investigation.[60]

Within 15 minutes of the shooting, Riverside police Sergeant Lomeli contacted City of Riverside Supervising Forensic Specialist Ms. Selena McKay-Davis to begin coordination of evidence and crime scene technicians to process the shooting scene.[61] Ms. McKay-Davis coordinated Senior Forensics Specialists Liane Velin and Crystal Sanchez to process the scene and Senior Forensics Specialists Rebecca Meyer to process Mr. Lopez at the hospital.  Ms. McKay-Davis initially responded to the scene and received an incident brief from Riverside police Sergeant Marco Ortiz.  Ms. McKay-Davis was then assigned to chart and process the officers involved in the shooting (primary involved Officer Wright to include witnessing Officers Wilder, Park, and Monreal).  Photographs were taken of all involved officers.[62]

City of Riverside Police Officers David Pliego and Stanley Hua assisted with crime scene security and managed the crime scene log.[63]

Officer Wright's primary duty weapon was secured and processed by Ms. McKay-Davis. Officer Wright's primary involved firearm was a Springfield Armory .45 caliber semi-automatic handgun, 1911 Operator model, serial number 490097 with an attached TRL-1 Steamlight weapon mounted light.  (1) one Winchester 45 Auto cartridge was removed from the chamber.[64]

Mr. Lopez's handgun was seized and noted as a black Taurus G3C semi-automatic 9mm pistol, serial number ABL 150858.  The weapon magazine accompanying the firearm contained (6) six Blazer 9mm Luger and (4) four Maxx Tech 9X19 cartridges.[65]

---

[58] Riverside Police Policy 307 / Investigations of Officer Involved Shootings and Incidents Where Death or Serious Likelihood of Death Results.
[59] LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report / Bates 0052.
[60] LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report / Bates 0082.
[61] LOPEZ 1 (CITY) 0443 - LOPEZ 1 (CITY) 0656 Case Reports / Bates 0470.
[62] LOPEZ 1 (CITY) 0443 - LOPEZ 1 (CITY) 0656 Case Reports / Bates 0470.
[63] LOPEZ 1 (CITY) 0443 - LOPEZ 1 (CITY) 0656 Case Reports / Bates 0635.
[64] LOPEZ 1 (CITY) 0443 - LOPEZ 1 (CITY) 0656 Case Reports / Bates 0470, 0635.
[65] LOPEZ 1 (CITY) 0443 - LOPEZ 1 (CITY) 0656 Case Reports / Bates 0629.

City of Riverside Senior Investigators Mike Riley and Dave Purcell conducted a weapons
examination and test fire on Officer Wright's duty firearm and concluded the weapon
was in good working condition and performed to manufacture specifications with an
average trigger pull weight of 4lbs 3.1oz.[66]

17. Officer Wright, including the additional officers present at the time of the shooting,
were properly clothed and identifiable as police officers.  Officer Wright was wearing
green BDU style pants, black tactical boots, a black hooded sweatshirt, a nylon duty
belt, a right-handed Safariland holster, three magazines with eight .45 caliber rounds in
each, a black nylon load-bearing vest (LBV) w/ "POLICE" in high-visibility yellow, a cloth
Riverside Police Department badge that displays "Police Officer" and "Riverside Police",
a cloth Riverside Police Department SWAT TEAM patch, a body-worn camera (BWC), a
police radio, two sets of handcuffs, a black flashlight, and a high-visibility yellow
"POLICE" patch on the rear of Officer Wright load bearing vest.[67]  It is my opinion,
Officer Wright, and the additional involved METRO officers at the shooting scene were
properly dressed and had more than sufficient police markings and equipment readily
visible to adequately identify them as police officers.   During the time Officer Wright
has been assigned to the METRO team, he has participated in hundreds of arrests of
suspects and wears the same uniform.[68]

18. The City of Riverside police department provides its police officers, including Officer
Wright, with extensive ongoing law enforcement in-service training to aid in their
competency and proficiency in administering their assigned duties.[69] [70]  The City of
Riverside provided an exhaustive 1094-page compendium covering the various topics
and education materials provided to their police officers.  Officer Wright, at the time of
the shooting, was a 14-year police officer who had received extensive training in police
use of force and tactics, including the State of California and U.S. Federal requirements
pertaining to the legal requirements and justification for police to use force, to include
deadly force, more than what is required by the California Commission on Police
Officer Standards and Training.  Since 2006 through December of 2022, Officer Wright
has received 2065.22 hours of formal law enforcement training.  Several of these
courses pertain to firearms usage, firearms qualifications, and the legal requirements
to respond with lethal force.  In all such cases, Officer Wright received a passing grade.

---

[66] LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report / Bates 0441.
[67] LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report / Bates 0390.
[68] LOPEZ 1 (CITY) 0001 - LOPEZ 1 (CITY) 0442 DA Report (Interview with Detective Ontko) / Bates 0215.

[69] Riverside Police Department Policy 205 / Training.
[70] LOPEZ 1 (CITY) 2082 - LOPEZ 1 (CITY) 3175 Use of Force Training compendium.

In the year preceding the shooting (2020), Officer Wright passed his firearms
qualification (10/7/2020), to include all preceding firearms qualifications.[71]

19. It is my opinion, Officer Wright, including the aforementioned Riverside Police Officers
mentioned in my report, were in compliance with the pertinent City of Riverside
policies and procedures associated with this incident.[72]  The City of Riverside has an up-
to-date and comprehensive policy manual governing the rules and expectations of the
police department and its employees.  Officer Wright has received ongoing training
pursuant to agency policy and procedures to include pertinent State of California and
United States federal laws, and case law, governing police use of force including the
use of deadly force.

20. Since 2018, the Riverside Police Department has used Motorola Premiere One RMS,
which is a computer-based program that integrates and tracks calls for service and
internal reports ensuring proper documentation and review of use-of-force incidents
are adhered to.  Since 2015, the Riverside Police Department uses a Supervisory
Administrative After-Action Review process, which includes a supervisory review up to
and including the Division Commander, Deputy Chief of Police, and Chief of Police of
involved employees' use of force and cross-tracks the dispositions of these cases within
the agency's Internal Affairs division.[73]  The Riverside Police Department reviews all
allegations involving personnel complaints, violations of department policy (to include
allegations of excessive force), and other incidents described within this policy.

21. The Riverside Police Department uses an early warning system as outlined in agency
policy 309, which in part establishes and defines the procedures and responsibilities for
the tracking and review of reportable incidents, including use of force, and to identify
patterns of behavior that warrant intervention.  In addition, the Early Warning System
policy outlines and provides an array of timely non-disciplinary, corrective steps to
remedy any incipient problems or deficiencies in performance, policy, strategy, or
tactics.  The goal of these layers of oversight are to ensure police department
personnel adhere to the policies and procedures set forth therein.  The Riverside Police
Department Internal Affairs Division compiles and disseminates quarterly statistical
information, in part pertaining to reportable use of force to the Chief of Police, the
Deputy Chief of Police, and the Division Commanders of involved employees.[74]  It is
noteworthy, the Riverside Police Department reviews and looks for trends in police
practices and procedures (including use of force applications and training), and
modifies training and policy accordingly.  This active engagement by command level

---

[71] LOPEZ 1 (CITY) 4134 - LOPEZ 1 (CITY) 4152 Wright TMS training activity report
[72] LOPEZ 1 (CITY) 0775 - LOPEZ 1 (CITY) 1545 RPD Policy Manual
[73] The Supervisory Administrative After-Action Review process was in effect during the Officer Wright shooting.
[74] LOPEZ 1 (CITY) 0775 - LOPEZ 1 (CITY) 1545 RPD Policy Manual, Policy 309 Early Warning System (EWS).

personnel, to include the Chief of Police, is illustrative of the high level of accountability and oversight the agency endeavors to achieve with their personnel.

22. The Riverside Police Department has additional oversight mechanisms in place, namely the Community Police Review Commission (CPRC), which reviews and provides recommendations to the Chief of Police in part pertaining to allegations of excessive use of force, discrimination, and allegations of misconduct.  The CPRC has been in existence for over 15 years and as such provided oversight before, during, and after Officer Wright's Officer Involved Shooting.[75]

23. Since 2006, through the date of Officer Wright's shooting, including to date of my report, the Riverside Police Department has not been under any federal oversight mandates pursuant to police pattern and practice violations including excessive use of force.[76]

24. Since 2010, through the date of Officer Wright's shooting, Officer Wright has been involved in 12 incidents involving use of force. In each of these incidents, Officer Wright's use of force was reviewed and determined to be within agency policy.  Officer Wright has no sustained violations of excessive or out-of-policy use of force.[77]

25. On March 15, 2021, The Riverside Police Department concluded its internal affairs investigation into Officer Wright's Officer Involved Shooting and concluded the shooting comported with agency policy and law.[78]  On October 13, 2021, The Riverside County District Attorney's Office completed its review of Officer Wright's shooting and found the use of deadly force was reasonable and no evidence of criminal liability existed on Officer Write's part.[79]

26. Under Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), the Supreme Court rejected the proposition that a governmental entity may be held liable under a respondent superior theory for an injury caused solely by its employees

---

[75] https://www.riversideca.gov/cityclerk/boards-commissions/community-police-review-commission/about

[76] https://clearinghouse.net/case/15238/   On March 5, 2001, the Office of the Attorney General filed a complaint and stipulated judgment in People of the State of California v. City of Riverside. The judgment, which remained in effect for a period of five years, required the Riverside Police Department to implement reforms in the areas of training, supervision, and accountability. The City of Riverside was required to pay the cost of a consultant to assist the Attorney General in monitoring compliance with the terms of the judgment.  On March 2, 2006, the Attorney General, after concluding that the Riverside Police Department had fulfilled the conditions of the judgment, requested and received formal approval from the court for the judgment's dissolution.  It does not appear that the Department of Justice took any further actions after the initial joint investigation.

[77] LOPEZ 1 (CITY) 3179 - LOPEZ 1 (CITY) 3188

[78]  LOPEZ 1 (CITY) 3257 - LOPEZ 1 (CITY) 3258 Employee Acknowledgement--Ofcr. Wright

[79] LOPEZ 1 (CITY) 3235 - LOPEZ 1 (CITY) 3235 DA clearance letter_Wright

or agents.  Instead, the Court held that to maintain a cause of action against a governmental entity for a civil rights violation under 42 U.S.C. § 1983, a plaintiff must establish that the governmental entity had a "custom, practice, and policy" that led to a violation of civil rights. Id. at 694.  Specifically, the Court stated, "The language of § 1983, read against the background of its legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to an official municipal policy of some sort caused a constitution tort." Id. at 691.  To succeed on a Monell claim, the plaintiff must produce evidence to establish three elements: (1) Evan Wright acted under color of law; (2) the actions of Evan Wright deprived Xavier Lopez of his particular rights under the United States Constitution; and (3) Evan Wright acted pursuant to an expressly adopted official policy or a longstanding practice or custom of the City of Riverside Police Department.[80]

It is my opinion, in reviewing the materials provided, the Riverside Police Department did not endorse or have any custom, policy, or practice that led to a violation of Mr. Lopez's constitutional rights.  This is evident by the comprehensive and current policies adopted by the Riverside Police Department from a nationally well-respected law enforcement policy provider, Lexipol[81], to include the customizations of policies to fit specifically the needs of the Riverside Police Department and the community for which they serve (i.e., policy 309 Early Warning System).  In addition, the Riverside Police Department has a robust internal after-action review process for police use of force codified in agency policy.  The Riverside Police Department, for well over a decade, has embraced the necessity (although not required by law), to have outside agency oversight of its use of force and agencies practices.  It is to the credit of the Riverside Police Department that they have adopted and continue their relationship with the Community Police Review Commission.

The Riverside Police Department was not deliberately indifferent to the training needs of its officers.  In fact, the Riverside Police Department has a robust training program in compliance with California Police Officer and Standards and Training evidenced by the

---

[80] To prevail on a Monell claim, the plaintiff must show that the municipality' policy was the "moving force" behind the constitutional violation.  Commis v. Brown, 520 U.S. 397, 404 (1997).  "Inadequate training that manifests a deliberate indifference on the part of the municipality must be shown to have actually caused the constitutional deprivation at issue." Merritt v. Cnty. Of Los And, 875 F.2d 765, 770 (9th Cir. 1989) (emphasis added) (internal quotation marks omitted).  Liability under Monell may attach when a public employee acts pursuant to an **expressly adopted official policy**.  Lytle v. Carl, 382 F.3d 978, 981 (9th Cir. 2004); see also Gibson v. Cnty. of Washoe, Nev., 290 F.3d 1175, 1185 (9th Cir.2002), cent. denied, 537 U.S. 1106 (2003).  Alternatively, liability may attach when an employee commits a constitutional violation pursuant to a **"longstanding practice or custom."**  Webb v. Sloan, 330 F.3d 1158, 1164 (9th Cir. 2003), cent. denied, 540 U.S. 1141 (2004).  Such a "custom or practice" must be so "persistent and widespread" that it constitutes a "permanent and well-settled city policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996), citing Monell, 436 U.S. at 691; Gillette v. Delmore, 979 F.2d 1342, 1349 (9th Cir. 1992) (plaintiff must present evidence proving "the existence of a widespread practice that ... is so permanent and well-settled as to constitute a `custom or usage' with the force of law.").

[81] https://www.lexipol.com/

extensive and ongoing training Officer Wright has received, which is well in excess of
the minimum California Peace Officer Standards.[82]

No final authority had knowledge of Officer Wright's actions on January 26, 2021,
sufficient to ratify the conduct in real time.  There is no evidence of ratification by the
City of Riverside or Chief Gonzalez.  The subsequent investigations of both the Riverside
Police Department and the Riverside County District Attorney's Office validate the use
of force unrelated to any action by command staff.

It is my opinion, that at the time of Officer Wright's shooting on January 26, 2021, and
prior thereto, the Riverside Police Department had a policy regarding the use of force
that was constitutionally sound.  The Riverside Police Department's training records for
Officer Wright prove there was no deliberate indifference to his training.  Officer
Wright was regularly trained and required to meet the requirements set by California
Police Officer Standards and Training.  No ratifying authority, such as the Chief of Police
or any commanding officer was present at the time of Officer Wright's use of
force.   Following the shooting, a complete investigation was conducted by both the
Riverside County District Attorney's Office and the police department and found Officer
Wright's use of force to be within policy and law.

27.  The Complaint identifies only four (4) isolated sporadic events involving the use of
force in the 10 years preceding Officer Wright's shooting.  One of these cases (Calhoun)
was recently tried and a Riverside County Superior Court jury found in favor of the City
of Riverside on all issues of excessive force, battery, negligence, and Bane Act
violation.  Further, none of the identified incidents are similar to this matter.  The
plaintiff provided no evidence in discovery to support that any conduct by Officer
Wright was unconstitutional in the first place.  The plaintiff's complaint seems to
attempt to establish facts that a custom of excessive force and other constitutional
violations existed by referencing prior cases.  Any such unsubstantiated allegations are
not enough to establish the "persistent and widespread" improper practices
constituting "permanent and well-settled policy."[83]

28.  It is my opinion, in reviewing the materials provided, the plaintiff cannot establish
ratification on the part of the City to the extent that the plaintiff asserts that the City of

---

[82] https://post.ca.gov/Learning-Portal-Training-that-Meets-Mandates
[83] Meehan v. Cty. of Los Ames, 856 F.2d 102, 107 (9th Cir. 1988); see also Jones v. Cnty. of San Bernardino, 2016
U.S. Dist. LEXIS 109508, at *33-36 (C.D. Cal. Aug. 17, 2016) (evidence of mere investigations and filing of
Lawsuits were insufficient to demonstrate a custom of excessive force); Meas v. City & Cnty. of San Francisco,
681 F. Supp. 2d 1128, 1 142 (N.D. Cal. 2010) ("To survive summary judgment based on a claim of prior
complaints, plaintiff is required to show that the complaints were meritorious and that the Police Department
failed entirely to investigate the complaints.");  Hayes v. City & Cnty. of San Francisco, 2010 U.S. Dist. LEXIS
76829, at *4 (N.D. Cal. July 28, 2010) ("evidence of past complaints against officers is generally insufficient to
establish a policy or custom of indifference."

Riverside Chief of Police "ratified" the actions of the Officer; there is no such evidence in this case, and even so, such allegations cannot establish ratification liability under Monell.[84] [85]

**CONCLUSION**

On January 26, 2021, Riverside Police Officer Evan Wright was acting in the professional capacity of a police officer and was in the process of serving a valid felony arrest warrant on Mr. Xavier Lopez when the threatening actions of Mr. Lopez caused Officer Wright to respond reasonably with deadly force based upon his reasonable perception of an actual and imminent threat to his life and the lives of fellow Riverside METRO police officers in the immediate area. This was a direct result of Mr. Lopez willfully defying commands to surrender while intentionally reaching into his coat and partially retrieving a concealed 9mm handgun within a second and within feet of Officer Wright.

Mr. Lopez not only made one clearly obvious, and observable attempt to fully retrieve his handgun within seconds of the shooting, Mr. Lopez again attempted a second time to access the area where his firearm was at approximately 1.2 seconds prior to the shooting.  Throughout these harrowing, literally micro-second intervals, Officer Wright correctly perceived and interpreted Mr. Lopez's ominous and imminently threatening actions and was forced to rely upon his training and his reasonable perceptions of an impending deadly attack and responded correctly with deadly force.

Officer Wright fired two shots in immediate succession while verbalizing to everyone on the scene that Mr. Lopez had a gun.  Officer Wright believed at the time he decided to fire his weapon at Mr. Lopez, Mr. Lopez was going to kill him, or one of his partners.  Not until approximately one-half second prior to the initial shot being fired by Officer Wright, did Mr. Lopez raise both his hands.  This final act of Mr. Lopez raising his hands cannot be stripped away and viewed in split-second isolation from Mr. Lopez's moments earlier successful partial retrieval of his handgun, in direct opposition to the clear commands provided to him by officers to surrender, let alone Mr. Lopez's second attempt to access his weapon within a second of the

---

[84] To show ratification, a plaintiff must prove that the authorized policymakers approve a subordinate's decision and the basis for it; Christie v. Lopa, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)); (ratification requires showing that officials "adopted and expressly approved of the acts of others who caused the constitutional violation").

[85] Clouthier v. Cnty. of Contra Costa, 591 F.3d 1232, 1253-54 (9th Cir. 2010) (mere failure to discipline employees, without more, is insufficient to establish ratification); Dunklin, 2013 U.S. Dist. LEXIS 51871, at 92-95 (N.D. Cal. Apr. 10, 2013) (in granting summary judgment on Monell claims: "merely affirming a finding that a particular use of force was `within policy' does not constitute ratification under [U.S. Supreme Court authority]").  The Riverside County District Attorney's Office and the Riverside Police Internal Affairs Division conducted an investigation into the incident.  Officer Wright was provided a clearance letter from the District Attorney's Office and Officer Wright's actions were found to be within law and policy.  Officer Wright's history of complaints does not include any concerning the use of force.

shooting coupled with Mr. Lopez, blocking, maneuvering or otherwise physically attempting to thwart Officer Wright reaching to control the area where his handgun was at.  Clearly, the precipitous actions by Mr. Lopez would lead a reasonable police officer to conclude they were under deadly assault.

It is my opinion after reviewing the materials provided to me including all other information that I reviewed described herein, Officer Wright reasonably perceived Mr. Xavier Lopez to be an imminent threat and correctly and justifiably responded with objectively reasonable deadly force in compliance with the City of Riverside policies, including the State of California and Federal use of force case law governing police use of deadly force.  Officer Wright's response to this very dangerous situation demonstrates the standard officers are trained to meet – the reasonable officer standard.  This standard is defined in police training as, "Would another officer with similar training and experience, given the same or similar circumstances, respond with force in the same or similar manner?"  The fact pattern of this shooting makes plainly apparent that Officer Wright met this standard.

Finally, it has long been held since Graham v. Connor, 490 U.S. 386, 396 (1989), that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer and that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation.

It is my opinion, clearly the circumstances Officer Wright confronted in this case were tense, uncertain, and most assuredly rapidly evolving.  Officer Wright was facing an imminent attack with a deadly weapon within seconds of the shooting.  From the time officers first confronted Mr. Lopez, providing commands, and exiting their vehicles, was at best five seconds until the shooting occurred.  For the preceding and final three seconds, Mr. Lopez was reaching for, obtaining, controlling, and removing his handgun, now within mere feet of the officers.  In the final and harrowing two seconds, Mr. Lopez attempted to reach for his handgun a second time, still choosing to disobey commands from the police officers who he acknowledged he recognized were police officers.

Instead of Mr. Lopez simply raising his hands throughout the preceding five seconds, Mr. Lopez chose the opposite.  Mr. Lopez accessed and partially withdrew his handgun the first time, attempted to access his handgun a second time, and instead of raising his hands as clearly directed by the officers, Mr. Lopez instead moved one of his hands to Officer Wright's arm to assert some degree of impediment or opposition to Officer Wright who was trying to control Mr. Lopez's movements.  Mr. Lopez shares relative culpability in the outcome here.  Regardless, Officer Wright was unenviably forced into literally making split-second decisions to respond

with deadly force justifiably and reasonably as he did, and most certainly in a rapidly evolving life-threatening encounter.

I reserve the option to modify, amend, and change the opinions expressed in this document at any time, including at trial, should further information, testimony, analysis, or data be provided affecting my understanding of the fact patterns in this case.

Respectfully submitted,

Craig Allen

Dated this __16__ day of November 2023, in Sherwood, Oregon.

_____

Declarant Craig Allen

///
///

# Fees for Expert Witness Services
# Craig Allen

**File Review & Case Preparation, Preparation for Court or Deposition Testimony**

► $225 per hour, billed per quarter hour.

**Deposition and Court Testimony**

► $825 for deposition testimony (3-hour minimum), thereafter billed at $275 per hour (billed per quarter hour).  Initial 3-hour minimum pre-paid by the requesting party to include applicable travel expenses.

► $1,100 for trial testimony (4-hour minimum), thereafter billed at $275 per hour (billed per quarter hour), to include stand-by time in court.  Paid by the requesting party to include applicable travel expenses.

**Other charges related to expert witness services/travel and per diem**

▶ Travel fees .................................................... $50.00/hour*  Time spent in actual
                                                                                            transit/portal to portal

▶ Airfare ......................................................... Paid for/reimbursed by client

▶ Mileage ....................................................... $0.65/mile

▶ Hotel ........................................................... Paid for/reimbursed by client

▶ Rental Car .................................................. Paid for/reimbursed by client

▶ Parking ....................................................... Paid for/reimbursed by client

▶ Meals / Incidentals ...................................... GSA per-diem rate


Receipts will be provided for associated costs for case-related research