# "EXHIBIT R"

# Xavier Lopez v. City of Riverside et al.

## United States District Court (Central District of California)
## Case No. 5:21-cv-02140-ODW (JEMx)

### Expert Witness Report of Jeffrey A. Martin, J.D., C.F.V.T.

#### IDENTIFICATION AND QUALIFICATIONS

My full name is Jeffrey Alan Martin. I am a retired police sergeant from the San Jose, California, Police Department. I currently divide my time between consulting, expert witness services, and teaching. I am a former labor relations attorney whose practice focused on representing public safety personnel in administrative matters. I also worked as an author of "Daily Training Bulletins" regarding various police practices, including the use of force, for Lexipol, L.L.C. In that capacity, I regularly applied policy, legal, and other police practices concepts to fact patterns to determine whether the presented conduct would likely be deemed within policy.

I started my full-time law enforcement career as an officer with the San Francisco Bay Area Rapid Transit District (B.A.R.T.) Police Department from October 1981 through December 1984. While there, I worked in uniformed and plainclothes patrol assignments and was a collateral-duty baton instructor. After starting my tenure at the San Jose Police Department, I was promoted to sergeant in 1995. I worked in the Patrol Division, the Administrative Unit of the Bureau of Field Operations as the training coordinator, the Airport Division, and as a supervisor in the Training Division.

Before that, I was a police officer, and my assignments included Patrol, the Parks Enforcement Unit, Field Training Officer Program, and as an investigator in the Narcotics/Covert Investigations (NCI) Unit.

My training and experience regarding the investigation and documentation of police force responses include the following:

▶ I am currently an instructor in the California Commission on Peace Officer Standards and Training (POST) Institute for Criminal Investigations (ICI) course on Officer-involved Shooting and Death Investigations (OISI);

▶ I taught use-of-force investigation and documentation in the POST Supervisor School for the South Bay Regional Public Safety Training Consortium and the San Jose Police Department Night Detective Academy; and

▶ I personally responded to several force-response incidents and investigated them as a patrol supervisor.

1

1       My training and experience in the <u>evaluation of force responses by law enforcement</u>
2   <u>officers, including the relevant human factors,</u> include the following:

3

4   ▸   I used various tools and techniques to control subjects in field situations, including
5       the use of batons, chemical agents (both C.S. and O.C. sprays), the TASER,
6       extended-range impact munitions, maximal restraints, various weaponless
7       measures including control holds, takedowns, neck restraints, and de-escalation
8       approaches;

9

10  ▸   I applied this training and experience to multiple situations involving violent
11      subjects who were under the influence of P.C.P., methamphetamine, and other
12      controlled substances;

13

14  ▸   For the POST-ICI OISI course, I was recruited to develop and instruct a block of
15      instruction on "Lawful Force." During this block of instruction, I teach the legal
16      framework required for the use of force by police to meet both state statutory and
17      federal constitutional standards;

18

19  ▸   I am a POST-certified Force-Options Simulator (FOS) Instructor and served as an
20      instructor for the South Bay Regional Public Safety Training Consortium. The
21      F.O.S. program concentrates on teaching the state and constitutional laws regarding
22      the use of force by peace officers, as well as the decision-making involved in using
23      various force options;

24

25  ▸   As a supervisor in the Training Division at the San Jose Police Department (2005-
26      2009), I supervised the POST-FOS program, which was implemented in 1999 to
27      fulfill POST "perishable skills" requirements. In this program, my staff and I
28      delivered this training to the sworn members of the San Jose Police Department, as
29      well as other peace officers within Santa Clara County. Additionally, our facility
30      was designated as a "regional skills training center," and we provided instructor
31      training to others throughout California;

32

33  ▸   I hold multiple instructor-level certifications in defensive-tactics/arrest-and-control
34      programs, including batons, and I served as a defensive tactics instructor in the
35      basic academy at the South Bay Regional Public Safety Training Consortium;

36

37  ▸   I am a certified firearms instructor and served as the firearms instructor for the NCI
38      Unit;

39

40  ▸   While in the NCI Unit, I served as a raid planning instructor and I planned and

assisted with several planned arrests;

▸ While in the S.J.P.D. Training Unit, I supervised and taught classes in defensive tactics and officer safety;

▸ I also served as the lead instructor and instructor-trainer for the TASER program at the San Jose Police Department and Basic Academy; and

▸ I hold a current instructor certification from Axon/TASER® International.

My training and experience in <u>human factors</u> include the following:

▸ I completed the 40-hour Force Analyst certification course at the Force Science Institute;

▸ I hold a graduate certificate in Human Factors Psychology from Grand Canyon University;

▸ I am two weeks from completing all required coursework for earning a Master of Science in Psychology with Human Factors Psychology Emphasis;

▸ I completed an additional graduate-level course on Human Factors and Ergonomics at San Jose State University;

▸ I was invited back to San Jose State University as a guest lecturer regarding the application of fundamental human vision to a forensic setting;

▸ For the POST-ICI OISI course, I was recruited to develop and deliver a block of instruction on "Human Factors." The curriculum includes the basics of sensory and cognitive factors and how they form the reasonable officer's perspective, including basic vision, attention, perception, memory, reaction time, officer-subject interactions, pattern (gestalt) v. detailed (feature-intensive) processing, time-to-stop-shooting responses, human memory compared to video evidence, fatigue, and stress reactions;

▸ I am a member of the Human Factors and Ergonomics Society (H.F.E.S.), and I have presented at the annual meetings in 2016, 2018, 2020, and 2023, each accompanied by the publication of peer-reviewed proceedings papers. I am currently serving as the ad hoc co-program chair for the Forensic Professionals Technical Group for the 2023 Annual Meeting;

3

- ▸ I have testified in state criminal court trials or hearings on the subject of the use of force in 13 state criminal court trials or hearings and five federal court trials; and

- ▸ I have testified on human factors in nine state criminal court trials or hearings and once in federal court.

My training and experience in the technical preparation, examination, and interpretation of video evidence total 163 hours and includes the following:

- ▸ A 40-hour course titled "Level 1: Forensic Video Analysis & the Law," provided by LEVA;

- ▸ A 40-hour course titled "Level 2: Digital Multimedia Evidence Processing," provided by LEVA, completion of which provided certification as a "Certified Forensic Video Technician";

- ▸ Provided testimony regarding the importance of properly analyzing video evidence in administrative hearings in Wisconsin and California;

- ▸ Provided training on the basics of examining video evidence in other investigations courses, as well as training and technical assistance to the Inspectors of the San Mateo County District Attorney's Office;

- ▸ Presented on the topic of forensic evaluation of video evidence at the 2021, 2022 and 2023 annual training symposiums of the International Homicide Investigators Association, as well as in the 2021 and 2022 Public Safety Discipline and Internal Investigations Seminar for Americans for Effective Law Enforcement on the limitations of video evidence as well as proper interpretation; and

- ▸ I have testified to digital video analysis and demonstrative video exhibits I prepared in seven California Superior Court trials, 1 federal court trial, and 13 administrative hearings.

I hold a Juris Doctor Degree from Northwestern California University and am a member of the State Bar of California. I also have a Bachelor's Degree in Psychology from California State University at Hayward (now "East Bay").

My expertise and qualifications to provide expert testimony on the investigation, documentation, and evaluation of peace-officer conduct; police force responses based upon the standard of what a trained and reasonable officer – who is aware of the clearly established law regarding the lawful use of force – including the related human factors; the interactions of officers and suspects during use-of-force encounters; and the preparation, examination, and interpretation

of video evidence, flows from the following:

1. My education, personal experiences, and training;

2. The scope of my expertise is how these areas relate to how reasonable law enforcement officers are trained to respond with force lawfully and how their actions will be evaluated according to clearly established law; evaluating police force responses; the relevant human factors; and the proper preparation, examination, and interpretation of video evidence.

3. My analysis is similar to that of other experts in the field and has a factual foundation based on widely accepted methods of analyzing the objective reasonableness of police conduct;

4. My understanding of the facts of this case;

5. My recognition that there will be factors or evidence that may either support, not support, or have a neutral effect on my opinion; and

6. I have drawn conclusions based on certain assumptions.

My curriculum vitae is attached and incorporated into the body of this report by this reference. My professional experiences and activities are more fully outlined in my vitae, along with my publications prior to and including the previous ten years. It also contains a list of the cases in which I have testified as an expert in deposition or trial during the past four years.

Much of my professional life involves studying and analyzing the conduct of peace officers and law enforcement agencies and their practices, including liability issues and human performance factors. I have also rendered opinions on police practices, which are more fully outlined in my vitae. My fee agreement for the work in this matter is also attached and incorporated by reference.

## METHODOLOGY, DATA AND OTHER INFORMATION CONSIDERED WHEN FORMING OPINIONS

The methodological approach in forming my opinions and conclusions, in this case, includes (1) processing through any initial emotional responses and biases; (2) using all of the available and relevant data to reconstruct the incident to the extent possible; (3) conducting reviews of the relevant peer-reviewed and non-peer-reviewed literature; (4) applying my training, education, and experience, and (5) applying the legal or professional standards of care as commonly taught to California peace officers to the reconstructed facts.

1    The literature reviewed may include those specific to the law enforcement profession and
2    materials in general circulation. I have also drawn on the totality of the materials I have read,
3    studied, and examined, as well as the experiences and instruction I have had and provided to law
4    enforcement personnel throughout my career. The materials listed herein are the type, quality, and
5    quantity upon which I and others in my profession rely in examining the events surrounding a
6    police practice and forming opinions and conclusions regarding the matters addressed herein.

7    All statements and opinions herein are to a reasonable – or higher – degree of professional
8    certainty or probability on a more-probable-than-not basis. All times, time intervals,
9    measurements, frame numbers, and line references are approximations.

10   This report and all work in this matter (1) uses my scientific, technical, and other
11   specialized knowledge to assist the trier of fact in understanding the evidence or to determine a
12   fact in issue, particularly pertaining to the forensic use of forensic digital media and it's limitations,
13   human factors, i.e., the capabilities and limitations humans have in interacting with their
14   environments, their tools and their environments, and with others and their environments, and how
15   trained and reasonable law enforcement officers interact with their environments due to their
16   training, experience, or improvise when facing unusual situations for which their procedural
17   training falls short; (2) based on sufficient objective facts and data, as well as the
18   phenomenological reports of others; (3) based upon reliable principles and methods; and (4) my
19   opinions reflect a reliable application of the principles and methods to the facts of the case, which
20   is done by reconstructing the facts to the extent possible and applying the evaluative standards to
21   which peace officers are trained their conduct will be compared.

22   I reserve the option to modify, amend, and change any opinion expressed in this document
23   should additional information be provided affecting my understanding of the fact pattern in this
24   case. I also reserve the right to illustrate the points made in this report with demonstrations,
25   demonstrative exhibits, and audio-visual aids.

26
27   The specific case materials I have reviewed to date as of the writing of this report are listed
28   in Appendix A.
29
30   **FOUNDATIONAL INFORMATION REGARDING THE USE OF DIGITAL VIDEO**
31   **EVIDENCE IN OFFICER-INVOLVED INCIDENTS**
32
33   It should be remembered that California peace officers, including members of the Riverside
34   Police Department (R.P.D.), are trained to state statutory and federal constitutional legal standards
35   regarding the limitations on their uses of force. Those standards dictate that uses of force will be
36   judged from the officers' perspectives. As such, the use of digital video evidence must be put into
37   proper context because digital video evidence does not necessarily reflect the reasonable officers'
38   perspectives, especially as how officers processed the actual event–in real-time–and how that
39   compares to what is or is not depicted in a video file. As I have written before, ***"cameras record;***
40   ***people process."***

When compared to how humans detect and perceive visual information, it is essential to remember the following limitations of video evidence:

1. Even when a camera is mounted on an officer's head, it does not perfectly represent the officer's visual perspective;

2. The video perspective is limited to the field of view recorded in each frame;

3. The viewer of video usually knows the outcome of the event, while an officer experiencing the same event in real time does not, thereby failing to accurately represent the fears, emotions, and stressors that might be affecting an officer's reasonable perceptions and decision-making;

4. Video records a series of still images at constant or variable frame rates. Most people are accustomed to watching video that is recorded and played back at either 23.97 frames per second (F.P.S.), which is considered by some to be the minimum frame rate for the perception of smooth motion, or 29.97 FPS.[1] Therefore, video recorded at significantly slower frame rates tends to miss much action or contribute to the perception that movements or actions depicted were more forceful than they were, thereby making the video less accurate and reliable in depicting the events;

5. Even though metadata readers might indicate that a video file is played back at a particular frame rate, that rate frequently represents an average, and it cannot be assumed that each frame accurately represents even time intervals between frames. This is because frames might be encoded or displayed at various time intervals and for different durations;

6. Humans usually perceive their visual worlds in three dimensions; video is two-dimensional and can have a "flattening" effect that influences the perception of depth, space, and distance;

7. Most body-worn cameras (BWCs) used by law enforcement agencies have a relatively wide field of view, i.e., they use wide-angle lenses with inherent distortion, which makes their representations of depth and distance even more difficult to accurately gauge;

8. During fast-paced events, actions that are shown to have been clearly perceived and

---

[1] Scientific Working Group on Digital Evidence, *S.W.G.D.E. Technical Overview of Digital Video Files,* Version 1.0, July 18, 2017, retrieved on May 17, 2018 at: https://www.swgde.org/documents/Current%20Documents/SWGDE%20Technical%20Overview%20of%20Digital%20Video%20Files

reacted to by officers in video evidence may not be stored in an officer's long-term memory if the time and effort to reflect on it is interfered with;[2]

9.  Most humans usually see in clear detail, while recordings that are recorded and/or stored at low resolution have the potential to obscure that detail;

10. The quality and accuracy of video evidence can be significantly affected by what is known as "spatial" and "temporal" compression.[3]  Temporal compression occurs when "predictive framing" algorithms encode the data for most of the frames and can fail to record movement that occurred, produce movement that did not actually occur, or cause the same object to appear in two different locations within the same frame. Spatial compression occurs within individual frames whereby redundant or less essential color aspects are removed and can result in the loss of detail, making the images visually distorted or degraded;

11. Video data can be further degraded or altered through compression if it is processed, even if that processing includes emailing a video directly from a cell phone, uploading to a social media platform, or on-screen recording, any of which can also include the loss of entire frames;

12. While inferences may be drawn about what viewers believe video images depict, there might be qualitative factors such as resolution, frame rate, compression, distance, motion, perspective, and/or lighting that constitute the "bandwidth."[4] of the video, or whether or not the video can be said to be authenticated, i.e., is it adequate to accurately represent what it is being offered to prove, given how it was originally generated? In other words, what is the question the evidence is believed to answer? Therefore, when video evidence has low-bandwidth attributes, it must always be considered that it might be insufficient to conclusively answer certain questions, such as, "Did the kick land on the arm or the head?" Another consideration is if one or more cameras had recorded the same event while closer to the action, at a higher frame rate, or from a better perspective, would different conclusions result?;

13. It is inappropriate and unempirical to make determinations as to what people are perceiving or intending based upon the video evidence alone; and

---

[2] Schwartz, Bennett L. *Memory: Foundations and Applications*. Thousand Oaks, CA: SAGE, 2018.
[3] *Supra*, at Note 1.
[4] Chen, Jessie Y., and Jennifer E. Thropp. "Review of Low Frame Rate Effects on Human Performance." *IEEE Transactions on Systems, Man, and Cybernetics - Part A: Systems and Humans* 37, no. 6 (2007): 1063–76. https://doi.org/10.1109/tsmca.2007.904779.

14. The video must be viewed in a player that has the ability to single-frame advance and reverse so that the content and context will most likely be accurately interpreted. The demonstrative video exhibits generated in this case are playable using SMPlayer, MPC-HC, or Switch on Windows operating systems and V.L.C., Apple QuickTime, or Switch on Apple Mac operating systems. I recommend Switch, as it will play most of the exhibits on either operating system, allowing for easy single-frame advance and reverse.

All of these technical realities make it critical that the processing history of video files is known and that anyone using video evidence in investigations or evaluations of peace officer conduct understands the recognized best practices in the technical preparation, examination, and interpretation of digital video evidence.[5]

It is also important to note that when using video evidence in investigating or evaluating police conduct, the same perceptual dynamics that influence how people perceive real-time experiences also apply; their previously held beliefs and biases can influence what they see and how they interpret video images.[6] This dynamic also applies to human performance limitations such as limited visual acuity, which can contribute to viewers looking at only one aspect of the video event, such as what the officer appears to be doing, not what a resistive suspect or another officer is doing contemporaneously.

Although Mr. Parris Ward has performed the primary forensic video work in this matter, I obtained demonstrative still images from Officer Wright's BWC video using Amped Five, cropped or magnified portions of the images, adjusted the contrast of some of them, applied text overlays with the original frame numbers (OFNs) and the frame types, and saved them as lossless bitmap images. I used these demonstrative images and Mr. Ward's demonstrative exhibits to assist in my reconstruction and analysis of the event, which are included in Appendix B. My technical notes are available upon request. It should be noted that the BWC videos were highly compressed at a ratio of 185:1, exhibited unusual effects, and did not serve as a substitute for a human on the scene with good eyesight. The interpretations of the video evidence contained in this report are subject to challenge by other analysts and subject matter experts, and reasonable challenges are welcomed. This author or other viewers may discover additional information in subsequent viewings. It should also be noted that most of the same information derived from any the demonstrative video exhibits can be determined using the original BWC videos.

[5] Scientific Working Group on Digital Evidence, *S.W.G.D.E. Guidelines for Forensic Image Analysis*, Version 1.0, Feb. 21, 2017, retrieved on April 10, 2019 at:
https://www.swgde.org/documents/Current%20Documents/SWGDE%20Guidelines%20for%20Forensic%20Image%20Analysis
[6] Blake, David. "Body Worn Cameras: Comparing Human and Device to Ensure Unbiased Investigations." *Law Enforcement Executive Forum,* 15, no. 4 (2015). doi:10.19151/leef.2015.1504c

1  **<u>FOUNDATIONAL INFORMATION REGARDING THE TRAINING OF CALIFORNIA</u>**
2  **<u>PEACE OFFICERS ON THE LAWFUL USE OF FORCE</u>**
3
4  California Peace Officers are trained that the "goal for the use of force...in any enforcement
5  situation is to gain **control** of the situation or individual(s) encountered, when reasonable."[7]
6  California peace officers are also trained they are authorized to use force in the performance of
7  their duties according to California Penal Code § 835a(b), which states:
8
9  Any officer who has reasonable cause to believe that the person to
10  be arrested has committed a public offense may use ***objectively***
11  ***reasonable*** force to effect an arrest, to prevent escape or to
12  overcome resistance [emphasis added].[8]
13
14  California Peace Officers are also trained that, in determining whether their actions are/were
15  objectively reasonable, the following must be considered:
16
17  1.  The determination of objective reasonableness must be fact specific and based
18  on the totality of the circumstances confronting the officer;
19
20  2.  It must allow for the fact that peace officers are often forced to make split-
21  second judgments in circumstances that are tense, uncertain, and rapidly
22  evolving;
23
24  3.  It must be judged from the perspective of a reasonable officer on the scene,
25  rather than with the 20/20 vision of hindsight;[9] and
26
27  4.  Based on the facts and circumstances confronting the officer without regard to
28  the officer's underlying intent or motivation.[10]
29
30  California peace officers are also trained that the following major factors, as determined
31  by *Graham v. Connor*, 490 U.S. 386 (1989), will be used to determine whether an officer's use of
32  force is objectively reasonable:

---

[7] California Commission on Peace Officer Standards and Training, *Learning Domain 20: Use of Force/De-escalation*, v5.4, p. 1-3.
[8] *Learning Domain 20*, p. 1-8
[9] A reasonable officer is generally defined as whether another officer, facing like or similar circumstances, act in the same way or use similar judgment? (See *Learning Domain 20*, p. 1-6)
[10] *Learning Domain 20*, p. 1-4.

1.  Whether the suspect posed an immediate threat to the safety of the officers or others – the most important factor;

2.  The severity of the crime at issue;

3.  Whether the suspect was actively resisting arrest;

4.  Whether the suspect was attempting to evade arrest by flight; and

5.  Split-second judgments during circumstances that are tense, uncertain, and rapidly evolving.[11]

In addition to the major factors listed above, California peace officers are trained that the following additional factors may determine the objective reasonableness of officers' force responses:

1.  Whether there was an opportunity to warn about the use of force prior to force being used and, if so, was such a warning given;

2.  whether there was any assessment by the officer of the subject's ability to cease resistance and/or comply with the officer's commands;

3.  availability of other objectively reasonable **force options**;

4.  number of officers/subjects;

5.  age, size, and relative strength of officers/subjects;

6.  specialized knowledge, skills, or abilities of subjects;

7.  prior contact;

8.  injury or exhaustion of officers;

---

[11] *Ibid.*

1         9.   subject's access to potential weapons;

2

3       10. environmental factors, including but not limited to lighting, footing, sound

4              conditions, crowds, traffic, and other hazards; and

5

6       11. whether the officer has reason to believe that the subject is mentally ill,

7              emotionally disturbed, or under the influence of alcohol or drugs.[12]

8       California peace officers are also trained to classify the types of subject behaviors that may

9  influence the officers' force responses, which are listed in Table 1. It is also important to note that

10 this chart ***doesn't imply*** that officers' force options are "limited based upon any single factor, but

11 rather they are based upon the totality of the circumstances.[13,14]

*Table 1. Subject's actions correlated to force options as taken from POST LD 20.*

| Subject's Actions | Description | Possible Force Options |
|---|---|---|
| Compliant | Subject officers no resistance | • Mere professional appearance<br>• Nonverbal actions<br>• Verbal requests and commands<br>• Handcuffing and control holds |
| Passive non-compliant | Does not respond to verbal commands but also offers no physical form of resistance | • Officer's strength to take physical control, including lifting/carrying<br>• Pain compliance control holds, takedowns and techniques to direct movement or immobilize a subject |
| Actively resistant | Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally or physically signaling an intention to avoid or prevent | • Control holds and techniques to control the subject and situation<br>• Use of personal body weapons to gain advantage or the subject |

---

[12] *Learning Domain 20*, p. 1-5.

[13] *Learning Domain 20*, pp. 3-6 to 3-7.

[14] It is important to note that California peace officers are specifically trained that "It is not the intent...to imply that an officer's force options are limited based on any single factor" (See *Learning Domain 20*, p. 3-7).

| | | |
|---|---|---|
| | being taken into or retained in custody | |
| Assaultive | Aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person | • Use of devices and/or techniques to secure compliance and ultimately gain control of the situation<br>• Use of personal body weapons in self-defense and to gain advantage over the subject |
| Life-threatening | Any action likely to result in serious bodily injury or death of the officer or others | • Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

1    California peace officers are also trained that their force options generally fall into the
2  following three categories and generally corresponding levels of resistance, as listed in Table 2.[15]

*Table 2. Force option categories with examples.*

| Force Option Category | Examples | Objectively Reasonable Under the Totality of  Circumstances |
|---|---|---|
| Non-Deadly Force: Force which creates a minimal risk of injury. | Verbal direction, soft-empty hand control (holds, grabs), TASER in drive-stun mode. | 835a P.C. |
| Non-Deadly Intermediate Force: Force which has a significant risk of injury. | O.C. spray, TASER in probe mode, batons, canine, takedowns. | 835a – Active Resistance with a threat to the safety of officers or others. |
| Deadly Force: Force which has a substantial risk of serious bodily injury or death. | Firearms. | 835a – Active resistance with a threat of serious bodily injury or death or dangerous fleeing felon. |

3    An additional legal principle on which California peace officers are generally trained is the
4  "quantum of force," i.e., the foreseeable effects and injuries caused by a particular force option
5  under the totality of the circumstances. This speaks to the fact that officers may use the same type
6  of force option that might fall under any of the three categories due to the overall circumstances
7  under which they are used.[16]

---

[15] *Learning Domain 20*, pages 3-9, with examples added by this author.
[16] *Learning Domain 20*, p. 3-10.

In addition to the constitutional standards regarding deadly force as listed above, California peace officers are trained that California Penal Code § 835a(c)(1)(A) states:

> A peace officer is justified in using deadly force upon another person only when the officer believes, based on the totality of the circumstances, that such force is necessary...to defend against an imminent threat of death or serious bodily injury to the officer or another person.[17]

California peace officers are trained that the definition of an "imminent threat" as provided by California Penal Code § 835a(e)(2) is:

> ...when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent threat is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of harm, but is one that, from appearances, must be instantly confronted and addressed.[18]

Additionally, California peace officers are trained that they may also use deadly force when the officer believes, based on the totality of the circumstances, that such force is necessary to:

> ...apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

> Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.[19]

---

[17] *Learning Domain 20*, p. 4-4.
[18] *Learning Domain 20*, p. 4-7.
[19] *Learning Domain 20*, p. 4-6.

## **RECONSTRUCTION**

On 1/19/2021 at approximately 0531 hours, Officer Moses Prado of the Riverside Police Department was on duty, working in full uniform and driving a fully marked patrol vehicle. At that time, he attempted to pull over a silver Chrysler Sebring, California License No. 8TIB315, which was traveling south on Adams Street at California Avenue. (Ortiz Report, Bates 0504; Ontko Report, Bates 0036) The driver of the Sebring fled from Officer Prado and drove south in the northbound lanes until he entered the westbound 91 freeway off-ramp at Adams Street. Because of the violator's disregard for the safety of others, Officer Prado aborted the pursuit. Officer Prado subsequently identified the driver of the Sebring as Xavier Lopez who had an outstanding felony warrant for being a parolee at large. (Ortiz Report, Bates 0504; Ontko Report, Bates 0036; Ex. 1 to Wright Declaration (Prado Report, p. 6))

Later that day, at about 0814 hours, Officer Prado contacted Officer Evan Wright of the RPD Multi-enforcement Tactical Response Operations (METRO) Team, which serves as a full-time SWAT team and focuses on apprehending wanted persons when they are not training or on SWAT callouts. (Wright Declaration, 1:27-28; Wright Interview, Bates 0192-193; Interview Audio, Bates 2062) Officer Wright then reviewed Officer Prado's report and the in-car-camera recording of the incident and checked Mr. Lopez' criminal history, which included a conviction on 9/19/2019 for assault with a firearm, California Penal Code § 245(a)(2). Officer Wright also obtained a photograph of Mr. Lopez and contacted his parole officer, William Iriart. Agent Iriart provided a telephone number for Mr. Lopez' ex-girlfriend, Carina Avila, with whom Mr. Lopez has a daughter. (Wright Declaration, 3:3-24)

Officer Wright and his fellow METRO teammates conducted surveillance of possible residences associated with Mr. Lopez in Moreno Valley, but were unsuccessful. Officer Wright telephoned Ms. Avila, who told him that Mr. Lopez had recently come to their residence at 4610 Tomlinson Avenue in Riverside with a gun and while apparently under the influence of a controlled substance. During that visit, Mr. Lopez threatened Ms. Avila with a handgun.[20] Ms. Avila was cooperative, and provided potential locations and a cell phone number for Mr. Lopez. Ms. Avila, at Officer Wright's request, later contacted Officer Wright and she told him that Mr. Lopez would be coming to her home at 4610 Tomlinson Avenue to visit their daughter. (Wright Declaration, 4:17-23; Wright Interview Audio)

Officer Wright updated the operations plan he had already completed for the arrest of Mr. Lopez for both the parole-violation warrant and for a probable cause arrest for the felony evading from Officer Prado. Officer Wright briefed the team, which consisted of himself, Officer Henry Park, and Officer Kyle Wilder, who would be in their unmarked Dodge van and assigned as the arrest team. Officer Robert Monreal was assigned as "point" in an unmarked Toyota Camry.[21]

---

[20] When Detective Mercadefe interviewed Ms. Avila on the date of the incident, she told him that Mr. Lopez became hostile with her and lifted up his shirt, displaying a handgun tucked in his waistband, making her fear that Mr. Lopez might shoot her (Mercadefe Report, Bates 0567).

[21] The officer designated as being "on point" during moving or stationary surveillance operations is responsible for establishing and maintaining a direct line of sight of the principal being followed or the location being surveilled.

1   Officer Silvio Macias was assigned to assist with the surveillance and was driving an unmarked
2   blue Ford F-150 pickup truck, And Sergeant Ortiz and Officer Lopez, drove a marked patrol
3   vehicle. (Wright Declaration, 4:24-5:4; Wright Interview Audio; Wright Deposition, 9:2; Macias
4   Report, Bates 0511; Ortiz Report, Bates 0505; Monreal Report, Bates 0499; Monreal Deposition;
5   RPD Operations Plan, Bates 0664-65)

6        The METRO team arrived and went to their respective positions at about 1529 hours, with
7   Officer Monreal parked about one house north of 4610 Tomlinson, on the west side of the street
8   facing south; Officers Wright, Park, and Wilder parked at the east side of Tomlinson facing north,
9   just south of Cook Avenue, which was roughly 220 feet south of the residence;[22] Officer Macias
10  parked on the north side of Cook Avenue, facing west, just east of Tomlinson Avenue; and
11  Sergeant Ortiz and Officer Lopez parked their marked unit on Burnham Court, about 4/10 of a
12  mile to the northeast. (Wright Declaration, 4:24-5:4; Wright Interview Audio; Wright Deposition,
13  9:2; Macias Report, Bates 0511; Ortiz Report, Bates 0505; Monreal Report, Bates 0499; Monreal
14  Deposition; RPD Operations Plan, Bates 0664-65)

15       The plan was to quickly approach Mr. Lopez to prevent him from fleeing into the house
16  occupied by Ms. Avila and others, and to prevent him from re-entering the Sebring and driving in
17  a manner that constituted an immediate threat to the public due, anticipated due to his driving
18  behavior when Officer Prado pursued him seven days earlier. They also planned to not take
19  immediate action other than to follow Mr. Lopez in the event his daughter came out of the house
20  and greeted him. Sergeant Ortiz approved this plan. (Wright Declaration, 5:5-14; Wright
21  Deposition, 10:10-15; Ortiz Report, Bates 0505; RPD Operations Plan, Bates 0664)

22       At about 1608 hours, Officers Wright, Park, and Wilder saw the Sebring drive past them,
23  north on Tomlinson Avenue and cross Cook Avenue. Just after that, Officer Monreal radioed that
24  the Sebring had parked across from 4610 Tomlinson Avenue, it had no front license plate, that the
25  windows were tinted, the door was opening, that the driver was wearing a mask and that, "he's our
26  boy," that the driver got out of the Sebring, and was walking toward the front of the house. Officer
27  Monreal added that Mr. Lopez was wearing a "giant black trench coat" and that his hands were in
28  his pockets. Officer Wright called for the RPD Helicopter in the event Mr. Lopez were to flee on
29  foot. (Monreal BWC Video, Bates 3176, OFNs 1000 through 1680; Wright Declaration, 5:15-23;
30  Wright Interview Audio; Lopez Deposition, 73:4-10)

31       As Officer Monreal started to radio this information, the event unfolded as follows:

32  •   Officer Wright drove north on Tomlinson Avenue and came to a stop about even
33      with the driveway to 4610; (Synchronization BWCs 1080P.mp4, FNs 1341 through
34      1793; Wright Declaration, 5:24-6:1; Wright Interview Audio)

35  •   As he came to a stop, Mr. Lopez was walking toward the residence with his hands
36      in his coat pockets with his head turned toward the officers' van; (Synchronization
37      BWCs 1080P.mp4, FNs 1753 through 1765; Appendix B, Figure 1; Park
38      Deposition; Lopez Deposition, 11-14)

---

[22] Approximate distance obtained using Google Earth Pro in conjunction with the BWC video.

1  • As Officer Wright brough their van to a stop and put it into park, Officer Wright
2    opened his door and said, "Hey Xavier, it's the cops. Take your hands out of your
3    pockets, Bro," and then, Officer Wright or another unidentified officer said, "Hands
4    up. Hands up";[23,24,25,26] (Synchronization BWCs 1080P.mp4, FNs 1732 through
5    1895; Wright Declaration, 5:24-6:1; Wright Deposition, 7:17-8:14)

6  • While Officer Wright was doing this, Mr. Lopez removed his hands from the
7    warmer pockets of his coat, oriented toward Officer Lopez, with his left hand
8    holding the left edge of his coat and his right hand started reaching inside the left-
9    front breast portion of the coat;[27] (Synchronization BWCs 1080P.mp4, FNs 1732
10   through 1819; Appendix B, Figures 1 through 5)

11 • Just before Officer Wright reached Mr. Lopez, Officer Wright saw Mr. Lopez
12   remove a handgun from the left-inside of his coat;[28] (Synchronization BWCs
13   1080P.mp4, FNs 1819 through 1871; Appendix B, Figures 6-8; Wright Deposition,
14   24:10-23; Wright Interview Audio; Lopez Interview, Bates 257-258)

15 • As Officer Wright closed the final distance between them, Mr. Lopez positioned
16   his left hand so that it was between his right hand and Officer Wright. Officer
17   Wright, who was holding his handgun in his right hand, extended his left hand
18   toward the area of Mr. Lopez' coat from where he had produced the handgun,
19   possibly touching the coat; (Synchronization BWCs 1080P.mp4, FNs 1883 through
20   1894; Appendix B, Figures 10-12)

21 • At about the time Officer Wright was touching the coat, Mr. Lopez stepped away
22   and leftward from Officer Wright, raising his bent left arm upward and between
23   himself and Officer Wright, and his right hand still just inside the coat;
24   (Synchronization BWCs 1080P.mp4, FNs 1880 through 1889; Appendix B, Figures
25   10-13)

26 • As Mr. Lopez continued to keep his bent left arm in the raised, i.e., relatively at his
27   chest level, without any appreciable upward movement, Officer Wright was

---

[23] During his deposition, Officer Wright did not recall saying, "Hands up, hands up." However, it is clearly heard on his BWC video, although the voice seems to be slightly different (25:24-27:6).

[24] When Officer Monreal got out of his car, he ran, from about 60 feet toward 4610 Tomlinson, and yelled, "Hands up. Hands up. Hands up. Don't move. Don't move. You're going to get fucking shot." However, he started yelling this as Officer Wright was finished saying, "Hey Xavier. It's the cops. Take your hands out of your pockets" and when Mr. Lopez was already reaching into the left-inside of his coat (See Synchronized BWCs 1080P.mp4, FN 1819 – approximate distance obtained using Google Earth Pro in conjunction with Officer Monreal's BWC video).

[25] During his deposition, Mr. Lopez stated that his daughter was standing at the gate to the residence when Officer Wright approached him (69:16-18).

[26] During his deposition, Mr. Lopez did not recall Officer Wright saying anything to him when the officer opened the door (77:17-78:6).

[27] During his deposition, Mr. Lopez confirmed that Monica Camacho was in the Sebring with him, and that his daughter had come to the front yard-gate portion of the house without shoes on (73:6-21).

[28] During his deposition, Mr. Lopez stated that he never "pulled" anything, as he "never had a – physically any weapon to fully grab anything. I never had anything in my hand" (78:9-12).

1    bringing his left hand up to his handgun; (Synchronization BWCs 1080P.mp4, FN
2    1905; Appendix B, Figure 14)

3    •   As Officer Wright continued brining his left hand to his handgun, meeting his right
4        hand which was holding the handgun in an extended posture, Mr. Lopez's left hands
5        started to move upward, but stopped rising at about the level of his shoulders and
6        his elbows bent, as he assumed a stance with his right foot and side back and away
7        from the officer; (Synchronization BWCs 1080P.mp4, FNs 1906 through 1911;
8        Appendix B, Figures 15 through 20)

9    •   As this was occurring, Officer Wright continued bringing his left hand to his
10       handgun, stepped backward away and leftward from Mr. Lopez, and, as Mr. Lopez'
11       hands were now in the same semi-raised position as Mr. Lopez turned leftward in
12       the general direction of Officer Monreal, and after about .7 to .8 seconds after Mr.
13       Lopez had started raising them, Officer Wright fired twice at Mr. Lopez, who fell
14       to the ground;   (Synchronization BWCs 1080P.mp4, FNs 1906 through 1911;
15       Appendix B, Figures 15 through 32)

16   •   Officer Wright immediately told the other officers, "He's got a gun";
17       (Synchronization BWCs 1080P.mp4, FNs 1945 through 1998;

18   •   As Mr. Lopez lay on the ground, Officer Wright told him, "Don't move," and
19       covered him with his handgun as Officers Monreal and Wilder approached Mr.
20       Lopez, and Officer Monreal told Mr. Lopez, "Do not grab that gun," as they each
21       took control of one of Mr. Lopez' arms. Just before they rolled Mr. Lopez into a
22       prone position for handcuffing, they asked if the gun was in Mr. Lopez' shirt, and
23       Officer Wright replied that it was in his jacket pocket. Once they rolled Mr. Lopez
24       over, Officer Monreal asked, "Will someone get medical aid?" One of the officers
25       using radio identifier Metro 2 then used his portable radio to notify the channel
26       operator that shots hand been fired and to start an EMS response at about 1609
27       hours, , or about 14 seconds after Mr. Lopez fell to the ground; (LOPEZ 1 (CITY)
28       3178 Numbered.mp4, OFNs 1980 minus 1565; Incident Detail Report, Bates 0705)

29   •   After Officers Monreal and Wilder handcuffed Mr. Lopez, they rolled him back to
30       his right side and opened up his coat. Officer Wright pointed to the left-inside
31       pocket which held the handgun. Officer Monreal then used trauma shears to cut the
32       coat to expose the pocket, and he removed a Taurus G3C 9mm pistol – loaded with
33       10 rounds of ammunition including one in the chamber – from it and the manual
34       safety engaged. (LOPEZ 1 (CITY 3176)...mp4, OFNs 3460 through 4491; Monreal
35       Deposition; Monreal Report, Bates 0500; Park Report, Bates 0449)

36   •   Officers Montreal (a trained emergency medical technician) and Wilder continued
37       to provide first aid to Mr. Lopez, as they saw a bullet wound on his abdomen,
38       another on his right shoulder, and an exit wound on his back. They applied pressure
39       bandages to the wounds and maintained Mr. Lopez in a recovery position, until
40       relieved by Riverside Fire Department Engine 3 personnel at Mr. Lopez' side at

18

1    1617 hours; and (LOPEZ 1 (CITY 3176)...mp4, OFNs 4492 through 17017;
2    Monreal Report, Bates 0500; Montreal Deposition)

3    • Mr. Lopez was subsequently transported to Riverside Community Hospital, where
4    he received treatment; (Ontko Report, Bates 0626)

5

6                  **ANALYSES AND OPINIONS**

7

8    The opinions in this report are based upon the question of whether the officers' conduct
9    would be consistent with that of trained and reasonable peace officers facing the same or similar
10    circumstances and who were aware of the clearly established law at the time of the incident
11    (hereinafter referred to as a "trained and reasonable officer").

12

13    **Opinion One: Mr. Lopez' actions of reaching for and partially withdrawing the handgun**
14    **from his left-inside coat pocket with his left hand – along with the other actions of holding**
15    **his left hand between his right hand and Officer Wright – would cause a trained and**
16    **reasonable officer to believe that he was in imminent danger of death or serious bodily.**

17    As stated above, California peace officers are trained that they may use deadly force
18    "...when the officer believes, based on the totality of the circumstances, that such force is
19    necessary...to defend against an imminent threat of death or serious bodily injury to the officer or
20    another person.[29]

21    When Officer Wright shot Mr. Lopez, he was facing the following circumstances:

22    • He was aware that there was a felony arrest warrant for Mr. Lopez for violating the
23    terms of his parole;

24    • He was aware that Mr. Lopez had taken extreme measures, i.e., had driven without
25    due regard for the safety of others when he fled from Officer Prado going the wrong
26    way on the 91 freeway on 1/19/2021;

27    • Mr. Lopez' criminal history included felony convictions, including assault with a
28    firearm;

29    • He had information that Mr. Lopez was a drug user;

30    • He had been informed by Carina Avila, the woman with whom he shares a
31    daughter, that Mr. Lopez had recently come to her residence at 4610 Tomlinson,
32    was under the influence of drugs, and caused her to feel threatened when he
33    brandished a handgun in his waistband;

34    • Officer Montreal, who was on point about one house north of 4610 Tomlinson
35    Avenue, notified the rest of the team that Mr. Lopez had arrived in the Sebring, that
36    he was wearing a mask and a trench coat, and that he had his hands in his pockets
37    as he walked towards 4610 Tomlinson;

---

[29] *Learning Domain 20*, p. 4-4.

- When Officer Wright came to a stop and opened the left-front door of the unmarked van, Officer Wright knew that his uniform was conspicuously marked in such a manner that a reasonable person should recognize him as a police officer;
- As Officer Wright got out of their van and called out to Mr. Lopez, Mr. Lopez started using his right hand to reach to the left-inside of the trench coat, while holding onto the left edge with his left hand, and turning leftward toward Officer Wright; (Appendix B, Figures 4-6)
- Officer Wright saw Mr. Lopez remove a handgun from the left-inside coat pocket;[30],[31],[32] and
- Officer Wright feared that Mr. Lopez would shoot him and or his partners.

It should also be pointed out that Mr. Lopez's right and left hands remained at the portion of the coat with the left-inside pocket – including keeping the left hand between his right hand and Officer Wright, for about three seconds before Officer Wright reached out and touched Mr. Lopez' coat. During most of this period, Mr. Lopez kept his left hand or arm between his upper torso and Officer Wright. (Appendix B, Figures 4 through 12) Also, keeping in mind that from the time Officer Wright started opening the door to the van until the approximate time the handgun became visible to his camera, only about 5 seconds had passed, with less than two second before Officer Wright fired the first shot, making the circumstances tense, uncertain, and rapidly evolving. (Synchronized BWCs 1080P.mp4, FNs 1719-1871)

**Opinion Two: Although the video evidence indicates that Mr. Lopez had raised his hands to shoulder level at the time Officer Wright fired, his perception-reaction time was within expected perception-reaction times under the circumstances, i.e., Mr. Lopez did not start raising his hands until about .7 to .8 seconds after Officer Wright had already initiated the movement to fire.**

The human factor of perception-reaction time has been recognized in the scientific literature as an important factor in the calculus of objective reasonableness.[33] Generally, humans must perceive a stimulus, process it, decide or react with a course of action, then physically initiate

---

[30] During his deposition, Mr. Lopez stated that he had a handgun in his left breast pocket during the incident, the handgun had a bullet in the chamber, but that he could not "reach it" during the incident (68:4-15). He also stated that he did not know of the handgun worked, that he had "never held it," and that he had it for protection (6:20-23).

[31] During his deposition, Mr. Lopez said that when he turned around and saw the Dodge van, that he saw a big guy with a hoodie jump out, run towards him, and then another guy with a gun approached from his left. He then realized they were officers, and that there were "already two" of them on him, and that he put his hands up (70:2-7). He also stated that he recognized one of the officers when the officers was four feet away from him, then stated that he realized it was an officer when he saw "him in the distance" (72:3-10).

[32] During his deposition, Mr. Lopez stated that Officer Wright was not wearing anything that said, "police" that he could see up close and that the other officers were wearing yellow tags that said, "police" on them.

[33] Blair, J. Pete, Joycelyn Pollock, Don Montague, Terry Nichols, John Curnutt, and David Burns. "Reasonableness and reaction time." *Police quarterly* 14, no. 4 (2011): 323-343 (citing Honig, Audrey, and William J Lewinski. "A Survey of the Research on Human Factors Related to Lethal Force Encounters: Implications for Law Enforcement Training, Tactics, and Testimony." *Law Enforcement Executive Forum* 8, no. 4 (December 2008): 129–52.

1   that action.[34] Not only is this understood in the context of officers starting to shoot in response to
2   threats, but also in the context of the time it takes to process that a threat no longer exists and to
3   stop shooting.[35]

4          Attention can also be either internally or externally generated.  With internally driven
5   attention, the observer *selects* or searches for particular people, objects or events.  With externally
6   driven attention, the people, objects or events *capture* the observer's attention.[36] It is also important
7   to understand the factors involved in predicting whether something in a person's visual field will
8   externally capture and hold their visual attention.  Those factors are:

9

10   • the salience of the object (i.e., its size, color, contrast, and whether it's in motion);
11   • its "newness" (i.e., if it recently appears in the visual field); and
12   • the observer's attentional set.[37]

13

14   As applied to the facts of this incident, Officer Wright saw Mr. Lopez holding the butt of the
15   handgun as Mr. Lopez withdrew the handgun from the inside left-pocket of the coat. He did so
16   while he was in motion, and reached forward and touched that area of Mr. Lopez' coat with his
17   left hand, during which time Mr. Lopez' right hand went further into the left side of the coat.  Mr.
18   Lopez' hands moved  from the area of the left breast pocket (Appendix B, Figure 12 OFN
19   1638/1:03.02; Synchronized BWCs 1080P.mp4, FN 1889) As Mr. Lopez turned rightward, he kept
20   his hands and left arm at about his chest level until he started raising his hands about .6 seconds
21   later. (Appendix B, Figure 15 OFN 1655/1:03.59) However, by this time Officer Wright had
22   already started raising his left hand and establish a two-handed firing grip, with only about .7
23   seconds before he actually fired. (Synchronized BWCs 1080p.mp4, FN 1906)

24          It should also be pointed out that both Officer Wright and Mr. Lopez were in motion, with
25   Officer Wright moving backward as he fired the two shots. Any additional tasks, i.e., watching a
26   moving subject while stepping backward, all while trying to track and fire at an assailant, tends to
27   slow overall perception-reaction time, including the additional movement time.[38] Additionally,
28   some have studied average times for shooters to raise drawn handguns and fire (starting with both
29   hands on the gun), ranging from .677 seconds (from ready position) to 1.260 seconds (already

---

[34] Johnson, Addie, and Robert W. Proctor. *Attention: Theory and practice*. Sage, 2004.

[35] Lewinski, William J, and Christa Redmann. "New Developments in Understanding the Behavioral Science Factors in the 'Stop Shooting' Response." *Law Enforcement Executive Forum* 9, no. 4 (December 2009): 35–54 (Cited by Biggs et al. (2023), Naval Medical Research Unit and Naval Special Warfare Command and Lorei (2022), Hessian University of Police and Administration – Police Department).

[36] Johnson, Addie, and Robert W. Proctor. *Attention: theory and practice*. Thousand Oaks, Calif.: Sage, 2009, p. 21

[37] Wickens, Christopher D., and Jason S. McCarley. *Applied attention theory*. CRC press, 2007, pp. 28-29.

[38] Busse, Kita. *Smart Move; Economy of Motion for the Shooting Sports*. Kita Busse, 2019.

21

pointed), and depending upon the complexity of the situation.[39,40,41] Performing the tasks of tracking and shooting Mr. Lopez under such conditions makes it even less likely that an officer would notice that Mr. Lopez' hands had raised until he finished firing, as this influences his attentional set. This is especially true when the video evidence shows that Officer Wright did not fire the weapon until about 1.2 to 1.3 seconds after Mr. Lopez' right hand is still under the left side of his jacket. (Synchronized BWCs 1080P.mp4, FN 1889; Appendix B, Figure 12)

Also, the time between the two shots was about ½ second.  (1 (CITY) 3177...mp4, OFNs 1676 through 1692; Synchronized BWCs 1080P.mp4, FNs 1927 through 1943) While officers average about .2 to .25 seconds,[42] these times are measured in sterile settings with no additional demands on the shooter other than to fire the weapons as fast as they can. Again, the additional task demands as faced by Officer Wright would be expected to increase the time between shots, also considering he was using a handgun that fires .45 ACP ammunition, which fires heavy bullets and increases the recoil, making it more challenging to fire as quickly as someone firing a 9mm handgun.

**Opinion Three: The tactical plan made and applied by Officer Wright and the other METRO Team members was sound.**

Officer Wright and the other METRO Team members, including Sergeant Ortiz were aware that (1) Mr. Lopez had visited the residence at 4610 Tomlinson Avenue in the recent past while apparently under the influence of drugs and armed with a handgun – which he angrily brandished in the presence of Ms. Avila; (2) Mr. Lopez had a prior felony conviction for committing an assault with a firearm; and (3) Mr. Lopez had a prior conviction for felony evading (fleeing in a motor vehicle) and that he had recently engaged in extremely reckless driving that posed a threat to the public on 1/19/2021. Therefore, the officers had a compelling interest to physically apprehend him before he could enter the residence and so that he could not retreat to his car and flee in it. In short, the likelihood of safely arresting Mr. Lopez also relied upon speed and surprise.

While someone might criticize the officers for "not taking cover" when they confronted Mr. Lopez, this would have most likely provided Mr. Lopez with the opportunity to run into the residence, which carried with it a good chance of a hostage-barricade situation ensuing. In conclusion, anyone who claims that a different tactical approach would have resulted in a different result is positing an unprovable hypothesis, due to the potential actions Mr. Lopez could have chosen from (i.e., variables), which adds randomness to the mix. Also, quickly getting close to Mr. Lopez reduced the likelihood of errant shots.

[39] Tobin, Ernest J., Fackler, Martin L. 1997. "Officer Reaction-Response Times in Firing a Handgun," *IWBA Wound Ballistics Review*, *(3)*1, pp. 6-9;

[40] Tobin, Ernest J., Fackler, Martin L. 2001. "Officer Decision Time in Firing a Handgun," *IWBA Wound Ballistics Review*, *(5)*2, pp. 8-10;

[41] Hontz, Thomas A. "Justifying the Deadly Force Response." *Police Quarterly,* 2, no. 4 (1999): 462-76. doi:10.1177/109861119900200404.

[42] Jason, Alexander. 2010. "Shooting Dynamics: Elements of Time & Movement in Shooting Incidents." *Investigative Sciences Journal (2)*1, pp. 1-19.

1    Additionally, Officer Wright, who was dressed in his METRO Unit uniform, which was
2    consistent with the way many peace officers currently dress, i.e., wearing load-bearing vests with
3    "Police" across the front in high-contrast characters, a cloth badge in the typical left-chest location,
4    and other typical police equipment, was dressed almost identically to the other METRO Team
5    members, and a trained and reasonable officer would believe that he and the others were readily
6    identifiable as police officers.[43]

7

8    **Opinion Four: Other options, including de-escalation or attempting to use intermediate force**
9    **options were not feasible and would have unreasonably increased the risks of death or**
10   **serious bodily injury to the officers.**

11   De-escalation methods can take time, which the officers did not have the luxury of given
12   the circumstances they faced in apprehending an armed, wanted felon. The de-escalation approach
13   they chose was to use command presence and advisements, which included speed and surprise, to
14   convey to Mr. Lopez that fleeing from the officers or fighting them – with or without a firearm –
15   was not in his best interest.[44] Additionally, typical de-escalation methods are intended to be applied
16   to people in crisis who are not wanted felons and not armed with firearms. (RPD Training Notice,
17   "Integrating Communications, Assessment and Tactics (ICAT)" Expanded Course Outlines, Bates
18   2113, 2160, 2166)

19   The METRO Team kept a TASER and a 40mm less-lethal projectile launcher in their
20   vehicles so they could be rapidly retrieved and deployed should the need arise. However, I'm
21   aware of no trainers or training programs that advocate using either of those when confronting
22   wanted felons who are believed to be armed with handguns. This is because extended range impact
23   weapons using the 40 mm platform have been found to be effective in only in 41 to 53% of the
24   times they were used by the Los Angeles Police Department from 2017 through 2021.[45] Because
25   extended-range impact weapons depend mostly on pain-compliance to work, even had Mr. Lopez
26   been struck by one or more projectiles, there would have been a fair chance he would have not
27   been prevented from escaping into the residence or drawing and firing his handgun at the officers.
28   Additionally, Mr. Lopez' resistance to the effects of a 40 mm extended-range-impact weapon
29   would likely have increased if he were under the influence of a controlled stimulant, such as
30   methamphetamine.

31   The TASER is an idiosyncratic weapon, as it depends upon both darts connecting with the
32   subject, including through clothing, it should be discharged from a distance that provides a
33   minimum dart spread of 12 inches, and if one of the darts misses or does not achieve a good

---

[43] During his deposition, Mr. Lopez stated that Officer Wright was not wearing anything that said, "police" on it, while the other officers wore "yellow tags on their things that said, "police" (77:9-16). However, all of the officers were virtually identically attired, including "police" in high-contrast letters across the fronts of their vests (Bates 1550, 1584, 1599, and 1613).

[44] San Diego County Regional De-escalation and Crisis Management Course, Escondido Police Department, Sept. 2020.

[45] Los Angeles Police Department, *Use of Force Year-end Review – 2021*, pp. 141 retrieved from https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/lapdonlinemedia/2022/04/2_2021-UOF-YER-compressed.pdf

1    connection with the subject, it will likely be ineffective. The Los Angeles Police Department found
2    the TASER to be effective in 51 to 56% of their applications from 2017 through 2021. Therefore,
3    attempting to use a TASER under the circumstances would have unreasonably increased the risks
4    to the officers. Additionally, even if the TASER affects part of the body, the rest of the body can
5    still move. In other words, Mr. Lopez could have still drawn and fired his handgun even while
6    being subjected to the TASER current.

7         OC Spray also depends upon spraying the agent directly into a subject's eyes, and even if
8    this were to happen and the suspect felt the pain and discomfort from it – which is also less likely
9    if the subject is under the influence of drugs like methamphetamine – he could still draw and fire
10   a handgun.

11        Batons require officers to get very close to subjects, and subjects often take defensive
12   actions when officers try to strike them. Moving within range and attempting to strike subjects
13   also takes time, time which could be exploited by an armed subject by drawing and firing a
14   handgun. The same goes for unarmed subject-control measures, which are frequently defeated by
15   resistive subjects, and do not generally prevent them from drawing and firing handguns.

16        Again, I know of no trainer or training program that advocates for the use of these less-
17   lethal and nonlethal force options when arresting wanted felons who are believed to be carrying
18   handguns. And finally, California peace officers are generally trained that they do not need to
19   experiment with lower levels of force before using deadly force.[46] They are also trained that they
20   do not need to wait until a suspect points a firearm at them before using deadly force.[47]

21

22   **Opinion Five: A trained and reasonable officer facing the same circumstances as Officer**
23   **Wright would not believe that giving Mr. Lopez a verbal warning that he would be shot prior**
24   **to shooting him would be feasible, as it would unreasonably increase the risk to the officers.**

25        As stated above, California peace officers are trained that they must only give a warning if
26   feasible, i.e., it can be done without unreasonably increasing the risks of harm to them or others.[48]
27   The fact that taking the extra time to say, for example, "Don't move or I'll shoot," consumes about
28   one second. Furthermore, there are an increasing number of anecdotal examples provided by open-
29   source videos of officers being shot under such circumstances, i.e., close to suspects with one or
30   more hands concealed in pockets and the suspects suddenly draw, point, and fire concealed

---

[46] *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994).
[47] *George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013), "That is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed–or reasonably suspected of being armed–a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."
[48] California Government Code § 7286(a)(2).

1    handguns, wounding or killing the officers.[49,50,51,52,53] This performance limitation has even been
2    acknowledged by federal courts.[54]

3         Given the likely stress and task demands Officer Wright had to deal with, he needed to take
4    immediate action to prevent Mr. Lopez from completing the act of drawing and firing the handgun
5    as soon as he could, and had he issued a warning and waited to see if Mr. Lopez were going to
6    comply, it likely would have allowed Mr. Lopez to complete the action of getting a firm grip on
7    the handgun, pointing it, and firing at him.

8

9    **Opinion Six: The manner in which Mr. Lopez carried the Taurus G3C 9mm handgun made**
10   **it less likely that he could efficiently draw and fire it from the inside coat pocket.**

11        It is well known by those who legally carry concealed handguns that carrying them inside
12   of garment pockets presents safety challenges. These include accidentally pulling the trigger while
13   drawing from the pocket and keeping the handgun stable within the pocket, i.e., oriented in such a
14   manner that facilitates obtaining a firing grip on the handgun and pulling it from the pocket without
15   snagging or accidentally pulling the trigger.[55] In order to mitigate these problems, there are holsters
16   manufactured specifically for the purpose of carrying handguns within garment pockets.[56]

17        During his deposition, Mr. Lopez stated that he was unable to "reach" the handgun that
18   was located in the left breast pocket of his coat. (68:4-15) Officer Wright recalled that he saw Mr.
19   Lopez holding the butt of the gun when he pulled it from the inside of the coat, and Mr. Lopez is
20   depicted holding the grip of the handgun using his fingertips in Officer Wright's BWC video.
21   (OFN 1620; Appendix B, Figure 8) After the handgun grip had become visible to Officer Wright

---

[49] "Fox 10 Phoenix on Facebook Watch." Facebook Watch. Accessed April 17, 2022.
https://www.facebook.com/FOX10Phoenix/videos/note-this-video-may-be-disturbing-for-some-it-does-not-show-the-actual-shooting-/789728537742362/.

[50] NEWS9OklahomaCity. "OCPD Chief Addresses Fatal Shooting That Injured an Officer." YouTube. YouTube, March 19, 2022. https://www.youtube.com/watch?v=UQOoq2fs9Oc.

[51] Person. "Copa Releases Bodycam Video of Lawndale Police Shooting That Injured 2 Officers, Suspect." ABC7 Chicago. WLS-TV, June 10, 2021. https://abc7chicago.com/chicago-police-shooting-lawndale-cpd-assault/10768951/.

[52] Cox, Katie. "IMPD Releases Body Cam Video, Surveillance from Feb. Shooting Where Officer Was Shot in the Neck." WRTV. WRTV, April 1, 2022. https://www.wrtv.com/news/local-news/crime/impd-releases-body-cam-video-surveillance-from-feb-shooting-where-officer-was-shot-in-the-neck.

[53] "'Tell My Family I Love Them': Video Captures near-Death Shooting of Cop." Police1, August 11, 2017. https://www.police1.com/police-products/body-cameras/articles/tell-my-family-i-love-them-video-captures-near-death-shooting-of-cop-vNmDWHj8BW0otoFq/.

[54] *Supra* at Note 45. See *George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013), "That is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed–or reasonably suspected of being armed–a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."

[55] Harris, George. "Pocket Rockets: Teaching and Practicing Pocket Carry." *Firearms Training* (2022, June 2). https://www.usconcealedcarry.com/blog/pocket-rockets-teaching-and-practicing-pocket-carry/#:~:text=A%20pocket%20holster%20is%20excellent,that%20tends%20to%20collect%20there.

[56] Kriss, Megan. "Best Pocket Holsters [2023 Buyer's Guide]." *Recoil* (2022, July 27). https://www.recoilweb.com/best-pocket-pistol-holsters-175512.html.

25

1   and his BWC, Mr. Lopez' right hand went deeper inside the coat after that where it could be seen
2   still there for about another ½ second, until it moves out of the frame. Overall, Mr. Lopez's hands
3   are depicted in that area of his person for about three seconds, during which Officer Wright was
4   approaching him.
5       The orientation of the handgun when Mr. Lopez is depicted holding it after drawing it from
6   the pocket, as well as the apparent orientation of the handgun within the pocket at the time Officer
7   Monreal cut the coat and removed it, suggests that the handgun was positioned with the top of the
8   slide on the bottom of the pocket with the grip pointing upward and the backstrap pointing outward,
9   or distal from his centerline. This, would explain why someone, under similar circumstances,
10  would have had difficulty in quickly reaching for, gripping, drawing, and firing the handgun,
11  which would take more time.[57]
12
13  **Opinion Seven: The fact that none of the other RPD officers present, including Officers**
14  **Monreal, Park, and Wilder, is irrelevant because they were in different locations, at different**
15  **distances, and were not in a position to see that Mr. Lopez had drawn the handgun from his**
16  **left-inside coat pocket; i.e., they could not have perceived the totality of the circumstances as**
17  **did Officer Wright.**
18      At about the time that Mr. Lopez drew the handgun from the inside coat pocket where it
19  was visible to Officer Wright and his BWC, Officer Park, who saw Mr. Lopez reach inside his
20  coat, was still on the passenger side of their Dodge van, Officer Monreal had not yet reached the
21  front of the house, and Mr. Lopez' left back was toward him, and Officer Wilder also saw Mr.
22  Lopez reach into his coat, but he did not get to the location of the shooting until about 14 seconds
23  after the first shot was fired. (Park Report, Bates 0448-449; Park Deposition, Monreal Report,
24  Bates 0500; Monreal Deposition, Wilder Report, Bates 0495; Synchronized BWCs 1080P.mp4,
25  FN 1971)
26
27  **Opinion Eight: Officer Wright's actions complied with the policies of the Riverside Police**
28  **Department.**
29      The RPD use-of-force policy in effect at the time is the standard policy crafted and issued
30  by Lexipol. The policy substantially quotes the same statutory standards regarding Penal Code §
31  835a as listed above. This applies to the deadly force used by Officer XXX and it also restates
32  aspects of *Graham v. Connor* as listed above, including:
33
34          Officers shall use only that amount of force that appears reasonably
35          necessary given the facts and totality of the circumstances known to
36          or perceived by the office at the time of the event to accomplish a
37          legitimate law enforcement purpose (Penal Code § 835a).

---

[57] The manual safety of the Taurus G3C was engaged when Officer Monreal removed it from Mr. Lopez' coat pocket (Lopez 1 (CITY) 3176...mp4, OFN 4491).

1   Any evaluation of reasonableness must allow for the fact that
2   officers are often forced to make split-second decisions about the
3   amount of force that reasonably appears necessary in a particular
4   situation, with limited information and in circumstances that are
5   tense, uncertain, and rapidly evolving. (300.3)

6

7   Additionally, RPD Policy provides that "[a]n officer may use deadly force to protect him/herself
8   or others from what he/she reasonably believes is an imminent threat of death or serious bodily
9   injury to the officer or another person." (300.4) Given the totality of the circumstances facing
10  Officer Wright at the time, and because the policy mirrors the statutory and constitutional standards
11  listed above, i.e., they present the same rules and evaluative criteria, Officer Wright's conduct
12  complied with the use of force policy.

Respectfully Submitted,

JEFFERY A. MARTIN, J.D., C.F.V.T.

Date: November 16, 2023
Boise, Idaho